Tom Buchele, OSB No. 081560
Earthrise Law Center
10010 S. Terwilliger Blvd.
Portland OR  97219-7799
Telephone: 503-768-6736
Fax: 503-768-6642
E-mail: tbuchele@lclark.edu

Jesse A. Buss, OSB No. 122919
Willamette Law Group
411 Fifth Street
Oregon City OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

Attorneys for Plaintiff Blue Mountains Biodiversity Project

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| **BLUE MOUNTAINS BIODIVERSITY PROJECT**, an Oregon non-profit corporation; | Case No. 2:20-cv-2158 |
| Plaintiff, | COMPLAINT FOR VACATUR OF ILLEGAL AGENCY DECISION, DECLARATORY AND INJUNCTIVE RELIEF |
| v. | |
| **SHANE JEFFRIES**, in his official capacity as Ochoco National Forest Supervisor; and **UNITED STATES FOREST SERVICE**, an agency of the United States Department of Agriculture. | (Pursuant to the Administrative Procedure Act, the National Environmental Policy Act, and the National Forest Management Act) |
| Defendants. | |

Page 1:       COMPLAINT FOR VACATUR, DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      This is a civil action brought by Plaintiff Blue Mountains Biodiversity Project ("BMBP") for vacatur of an illegal agency decision, as well as declaratory and injunctive relief under the Administrative Procedure Act ("APA") (5 U.S.C. §§ 551 *et seq*.).  BMBP challenges the Decision Notice (DN), including the Finding of No Significant Impact ("FONSI"), and underlying Environmental Assessment (EA) issued by Defendant United States Forest Service  approving the Walton Lake Restoration Project ("the project"), a logging proposal in the Ochoco National Forest. Together, the DN and EA  represent a dramatic shift in how the Forest Service intends to manage the Walton Lake area. Defendant Ochoco National Forest Supervisor Shane Jeffries signed that DN on December 7, 2020. Defendants are collectively referred to herein as "defendants" or "Forest Service." The DN violates the National Forest Management Act (NFMA) and its implementing regulations and violates the National Environmental Policy Act (NEPA) and its implementing regulations.

2.      The challenged decision approves the logging of hundreds of large trees and numerous very large old growth trees in the project area, including a predominately fir, old growth forest in the Walton Lake visual influence area.  Walton Lake is one of the most popular recreation sites in the Ochoco National Forest. Implementation of the Walton Lake Restoration Project ( the "Project") will result in the loss of more than 500 old growth firs, destruction of visual quality provided by the old growth forest, degradation of excellent wildlife habitat, significant impairment to outdoor recreation in the Project Area, and negatively impact the aesthetics, social context, and biophysical

COMPLAINT FOR VACATUR, DECLARATORY AND INJUNCTIVE RELIEF

aspects of Walton Lake's current and beloved sense of place. Recreational activities in the Project Area like hiking and bird watching will also be significantly impaired.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA) and 28 U.S.C. §§ 1331 (federal question), and 2412 (costs and fees). Plaintiff has challenged a final agency action as defined by the Administrative Procedure Act ("APA"), 5 U.S.C. § 704. Plaintiff has exhausted all required administrative remedies provided by the USFS. Plaintiff thus seeks judicial review of final administrative actions of the USFS. *See* 5 U.S.C. § 704 (actions reviewable).

4.      Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because Defendant Ochoco National Forest Supervisor Shane Jeffries resides in this district, and the events or omissions giving rise to the claims occurred in Oregon.

5.      This case is properly filed in Pendleton, Oregon and properly before the Pendleton Division of this District pursuant to Local Rules 3-2 and 3-3 because Shane Jeffries, the Ochoco National Forest Supervisor who signed the challenged Decision Notice, is headquartered in Prineville, Crook Country, Oregon.

## PARTIES

6.      Plaintiff BLUE MOUNTAINS BIODIVERSITY PROJECT is a non-profit environmental advocacy organization dedicated to the conservation of the natural ecosystems of the Pacific Northwest and the native flora and fauna they harbor. BMBP and its supporters actively participate in governmental decision-making processes on public lands, including national forests, throughout Oregon.

7.      The mission of BMBP is to protect and restore the biodiversity of the Blue Mountains region of Oregon and Washington and to educate the public about threats to forest ecosystems in Eastern Oregon. In order to further its mission and protect the interests of BMBP's supporters in preserving the biodiversity of the Pacific Northwest forests, BMBP monitors timber sales and other Forest Service activities in the Malheur, Umatilla, Wallowa-Whitman, and Ochoco National Forests.

8.      BMBP's supporters, officers, and staff hike, camp, bird watch, view wildlife, photograph scenery and wildlife, and engage in other vocational, educational, scientific observation, and recreational activities within the Ochocos, including the Walton Lake Project area and adjacent lands.

9.      BMBP's officers, staff, and supporters reside near and/or regularly visit the Walton Lake Project area. BMBP's officers, staff, and supporters derive recreational, inspirational, religious, scientific, and aesthetic benefit from their activities within the Ochocos, including the area in and around the Project Area, and intend to continue to use and enjoy these areas frequently and on an ongoing basis in the near and distant future.

10.      BMBP has an organizational interest in the proper and lawful management of the Ochocos. BMBP's aesthetic, recreational, scientific, and religious interests have been and will be adversely affected and irreparably injured if Defendants continue to act as alleged herein, and affirmatively implement the decision that Plaintiff challenges. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under the National Environmental Policy Act and other federal laws. The injuries would be redressed by the relief sought.

11.      BMBP has participated extensively in administrative actions to protect

plaintiffs' interests within the Ochocos. BMBP actively participated in the administrative

process for the Walton Lake Project and has exhausted any and all available

administrative remedies. Reviewable final agency action exists that is subject to this

Court's review under 5 U.S.C. §§ 702 & 704.

12.     BMBP's physical address is 27803 Williams Lane, Fossil OR 97830.

13.     Defendant UNITED STATES FOREST SERVICE is an agency of the

United States and is a division of the Department of Agriculture, and is charged with

managing the public lands and resources of the Ochoco National Forest in accordance

and compliance with federal laws and regulations. USFS is an agency within the meaning

of the APA, 5 U.S.C. § 551.

14.     Defendant SHANE JEFFRIES, Ochoco National Forest Supervisor, is the

official responsible for deciding the type and extent of management activities in the

Walton Lake Project. He signed the final Decision Notice challenged in this case.

Defendant Jeffries is sued only in his official capacity.


**STATUTORY AND REGULATORY FRAMEWORK**


**National Environmental Policy Act (42 U.S.C. §§ 4321-4370(h))**

15.     Congress enacted the National Environmental Policy Act ("NEPA") in

1969, directing all federal agencies to assess the environmental impacts of proposed

actions that significantly affect the quality of the human environment. NEPA seeks to

"promote efforts which will prevent or eliminate damage to the environment and

biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. As such,

NEPA obligates agencies to make available to the public high-quality information, including accurate scientific analyses, expert agency comments, and public comments, "before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b)(2019). NEPA's public disclosure goals are twofold: (1) to ensure that the agency has carefully and fully contemplated the environmental effects of its action; and (2) to ensure that the public has sufficient information to review, comment on, and challenge (if necessary) the agency's action. *See* 42 U.S.C. §§ 4321, 4332.

16.     The Council on Environmental Quality ("CEQ") promulgated uniform regulations to implement NEPA that are binding on all federal agencies. Those regulations are found at 40 C.F.R. Parts 1500–1508 (2019). The Project was developed and analyzed under the 2019 CEQ regulations, and thus BMBP has relied upon the 2019 regulations when commenting and objecting to  the relevant project documents The FONSI specifically cites to the 2019 CEQ regulation.

17.     The Court may review agency actions taken pursuant to NEPA under the APA.  5 U.S.C. §§ 702, 704, 706.

18.     NEPA requires all federal agencies to prepare a "detailed statement" assessing the environmental impacts of all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  This statement is known as an Environmental Impact Statement (EIS).

19.     An environmental assessment (EA) can be created to aid the agencies in determining whether or not a proposed activity will significantly affect the quality of the human environment. 40 C.F.R. §§1501.4(b) (2019), 1508.9 (2019). The role of the EA is

to determine whether an EIS is needed or if a finding of no significant impact (FONSI) is supported. *Id.*

20.    To determine the significance of a federal action, CEQ regulations require agencies to look to both the context and the intensity of the action. 40 C.F.R. § 1508.27 (2019). Context refers to the significance of the action in regard to society as a whole, the affected region, the affected interests, and the locality. For site-specific actions, significance usually depends upon the effects in the locale. Both short- and long-term effects are relevant to the action's context. *Id.* § 1508.27(a) (2019). The intensity of the action is evaluated based on several factors, including, but not limited to, the degree to which the action affects public health or safety, the degree to which the effects on the quality of the human environment are likely to be highly controversial, and the degree to which the possible effects on the human environment are highly uncertain or involve unknown characteristics. *Id.* § 1508.27(b) (2019).

21.    An EA must include an adequate analysis of environmental impacts of a project and alternatives and must also include a consideration of the direct, indirect and cumulative impacts of the project and its alternatives, resulting from all past, present and reasonably foreseeable future actions.  *Id.* §§ 1508.7 (2019), 1508.8 (2019), 1508.9 (2019), 1508.25(c) (2019). Cumulative impacts are impacts to the environment resulting from the incremental effects of the present action, combined with other past, present and reasonably foreseeable future actions, regardless of what agency or person undertook, undertakes or will undertake those actions.  *Id.* § 1508.7(2019).  "Cumulative impacts can result from individually minor but collectively significant actions." *Id.*

22.     In order for a federal agency to make a finding of no significant impact, it must present reasons why the action "will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13 (2019). The FONSI must include the EA "or a summary of it and shall note any other environmental documents related to it." *Id*.

23.     NEPA requires that "environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b) (2019). NEPA also requires agencies to "make diligent efforts to involve the public in preparing and implementing their NEPA procedures." *See* 40 C.F.R. § 1506.6(a) (2019).

### *EA Requirements*

24.     All EAs must include (1) a description of the need for the project, (2) a description of the proposed action and alternative(s), (3) a discussion of the environmental impacts of the proposed actions and alternative(s), and (4) a note of the agencies and persons who were consulted throughout the process. 36 C.F.R. § 220.7(b). Importantly, an EA needs to "provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]". 40 C.F.R. § 1508.9(a)(1) (2019).

25.     Public scrutiny is essential to implementing NEPA. *Id*.§ 1500.1(b) (2019). NEPA requires agencies to make diligent efforts to involve the public in preparing and implementing their NEPA procedures. *Id*. § 1506.6(a) (2019). NEPA procedures ensure that environmental information be made available to public officials and citizens before decisions are made and actions are taken. *Id*. § 1500.1(b) (2019).

26.     NEPA requires that all agencies "study, develop, and describe appropriate alternatives to recommend courses of action." 42 U.S.C. § 4332(2)(E). This requirement "extends to all such proposals, not just . . . [environmental] impact statements." 40 C.F.R. § 1507.2(d) (2019). The EA shall also provide sufficient evidence and analysis of the environmental impacts of the proposed action, as well as the alternative(s). 36 C.F.R. § 220.7(b)(3)(i).

27.     NEPA requires agencies to take a hard look at the environmental consequences before taking a major action. This includes considering all foreseeable direct and indirect impacts, as well as cumulative impacts.

28.     Accurate scientific analysis is essential to NEPA implementation. *Id*. § 1500.1(b) (2019).

29.     NEPA documents need to be written in plain language so that decisionmakers and the public can readily understand them. Documents are unacceptable if they are indecipherable to the public.

30.     After completing an adequate EA, the agency shall prepare either an EIS or a FONSI. An agency must prepare an EIS when it makes a determination that the action has the potential to significantly affect the environment. 36 C.F.R. § 220.6(c). A FONSI will be prepared if the action causes no significant effect to the human environment; but the agency must provide a convincing statement of reasons to explain how the impacts are insignificant. 40 C.F.R. § 1508.13 (2019).

## National Forest Management Act (16 U.S.C. §§ 1600-1614)

31.    The National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 *et seq*., is the primary statute governing the administration of national forests. Agency actions taken pursuant to NFMA are reviewable under the APA. 5 U.S.C. §§ 702, 704, 706.

32.    NFMA requires the Forest Service to develop and implement a land and resource management plan (LRMP or Forest Plan) for each unit of the National Forest System. 16 U.S.C. §1604. Forest Plans guide natural resource management activities forest-wide, setting standards, management area goals and objectives, and monitoring and evaluation requirements. A Forest Plan must provide for multiple uses for the forest, including: recreation, range, timber, watershed, and wildlife and fish purposes. *Id*. § 528.

33.    Under NFMA all permits, contracts, and other instruments for the use of National Forest System lands "shall be consistent with the land management plans." *Id*. § 1604(i). Therefore, after a Forest Plan is developed, all subsequent agency actions, including site-specific actions, must comply with NFMA and the governing Forest Plan.

34.    Among its Forest Management Goals, Objectives, and Desired Future Condition goals for its Recreation areas such as the Walton Lake area, the Ochoco National Forest Plan lists the goal to "[p]rotect unique natural and recreational features[.]" Ochoco LRMP 4-22. More specifically, for Management Area 13, which includes Walton Lake, logging is only authorized for safety and visual enhancement. Ochoco LRMP 4-71.

35.    The Forest Plan governing all of the ONF was adopted in 1989. During the 1990s, the Forest Service amended this and every other forest plan in Oregon and Washington east of the Cascade Mountains by adopting the so-called "Eastside Screens."

The Eastside Screens were designed to address the Forests' deficiency of large trees resulting from decades of over-logging. The Screens prohibit logging in old forests that are below their historical range of variability, and both inside and outside old forests, prohibit logging trees over 21 inches in diameter at breast height (dbh).

### United States Forest Service Project-Level Pre-decisional Administrative Review Process Regulations (36 C.F.R. Pt. 218)

36.     The Forest Service provides regulations establishing a pre-decisional administrative review (also known as objection) process for proposed actions of Forest Service projects documented with a Decision Notice. 36 C.F.R. § 218.1.

37.     Objections are written documents seeking pre-decisional administrative review of a proposed project implementing a land management plan that are documented with an EA and can be filed by those who have submitted written comments to the specific project during the commenting opportunity. *Id*. § 218.2.

38.     These regulations note that certain projects are subject to legal notice and the opportunity to comment, among these are projects for which a revised EA is prepared based on consideration of new information or changed circumstances. *Id*. § 218.22(d). This not only provides the public with an opportunity to comment but ensures that the right to file an objection is maintained for those who comment. *Id*. § 218.5.

**Administrative Procedure Act (5 U.S.C. § 701-706)**

39.     Section 702 of the APA, 5 U.S.C. § 702, provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."

40.     Under section 704 of the APA, 5 U.S.C. § 704, "final agency action" is reviewable. A final agency action is one that marks the consummation of the agency's decision-making process and one by which rights or obligations have been determined or from which legal consequences flow. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

41.     Under section 706 of the APA, 5 U.S.C. § 706, "The reviewing court shall – … (2) hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; … [or] (D) without observance of procedure required by law …"

42.     NEPA and NFMA do not contain specific judicial review provisions, and the Forest Service's actions governed by those statutes, such as the Walton Lake Project Decision Notice, are therefore subject to judicial review under the APA.

**ADDITIONAL FACTS GIVING RISE TO THE PLAINTIFF'S CAUSE OF ACTION**

43.     BMBP has challenged the Forest Service's unlawful decisions regarding Walton Lake in the past. A federal court issued a preliminary injunction against implementation of a previous iteration of the Project in 2016, and the Forest Service then withdrew the Decision Memo for the Project in order to do additional NEPA analysis. However, before the project was enjoined and the Decision Memo withdrawn, the Forest Service entered into a contract giving a private timber company the right to conduct the

commercial logging authorized by the Project (the "logging contract"). This logging contract was not withdrawn or canceled in 2016 and remained in place during all of the Forest Service's subsequent NEPA analysis and was still in place when the Forest Service made the decision at issue here, which authorizes essentially the same type and amount of logging as the withdrawn 2016 Decision. The 2016 Decision authorized 176 acres of logging and the current Decision authorizes 178 acres of logging. Draft DN at 2.

44.     The Forest Service made a second attempt to comply with NEPA in 2017 when it prepared an EA and issued a draft Decision Notice. The Forest Service however failed to re-scope before conducting this NEPA analysis and thereby failed to correct, and merely compounded, the initial flawed scoping process. This 2017 EA and draft Decision Notice were also flawed in many other respects, including the fact that it was prepared after the logging contract was in place. The Forest Service withdrew the proposed 2017 decision after BMBP submitted an Objection to it.  The Forest Service's current decision fails to cure the legal deficiencies in its prior, related decisions regarding what is essentially the same Project.

45.     Located near the geographic center of Oregon, the Ochoco National Forest covers approximately 850,000 acres of land. The forests, grasslands, and rivers of the ONF provide important habitat for fish and wildlife.

46.     The Walton Lake Project is 218 acres in size. *DN* at 2. It is located within the Camp/Cady Creek watershed and the Project Area includes Walton Lake and the Walton Lake Campground and a visual influence area that encircles the lake and campground. Most of the commercial logging authorized by the DN would occur in the visual influence area.

Page 13:        COMPLAINT FOR VACATUR, DECLARATORY AND INJUNCTIVE RELIEF

47.    Where old growth exists in the Project Area, it includes ponderosa pine up to 61" dbh, Douglas firs up to 60" dbh, and Grand firs up to 57" dbh. That is, old growth trees are not limited to ponderosa pine.

48.    The Walton Lake Campground is an extremely popular and much cherished site in the Ochoco National Forest and is responsible for bringing many visitors to the Ochoco, to recreate and to enjoy the natural beauty of the area.

49.    The Final EA for the Project was published in July of 2020.

50.    The Draft Decision Notice and FONSI for the Project was published in July of 2020. Defendant Jeffries signed the Final Decision Notice and FONSI on December 7, 2020.

51.    BMBP has previously submitted timely, written comments regarding the Project throughout the periods where public comments were requested.

52.    BMBP submitted a timely objection for the Project on September 4, 2020, which was within 45 days of the public notice which was published on July 21, 2020. Although the Forest Service made a few relatively minor changes to the project  in response to BMBP's objection, the Forest Service overruled almost all of BMBP's substantive and legal objections on November 18, 2020.

53.    The overarching problem with this "restoration project" is the Forest Service's failure to adequately explain and justify a dramatic shift in how it intends to manage the Walton Lake area. The significance of this shift is underscored by the fact that the Forest Service now proposes four different Forest Plan amendments in order to allow its proposed management.

54.    The Project Area includes both a developed site and a visual influence area.

Page 14:        COMPLAINT FOR VACATUR, DECLARATORY AND INJUNCTIVE RELIEF

55.    For decades the Forest Service has managed the risks created by dead or dying trees by surveying for such hazard trees and removing them on a regular basis. This management has understandably focused on removing hazard trees in the developed site, as is evident from the numerous downed ponderosa pines and firs in and around campsites, and along the area's roads and trails.

56.    Five years ago, the Forest Service shifted its prior management approach dramatically, and proposed to essentially clearcut a predominately fir, old growth forest in the visual influence area because, as they have for decades, some of the firs have laminated root rot (LRR),  and all of the firs are susceptible to that naturally occurring disease..

57.    Removing all of these firs – essentially a clearcut – would completely destroy the visual quality provided by an old growth forest which the visual influence area is intended to maintain.

58.    The Forest Service has had five years and three consecutive NEPA processes to explain this dramatic shift in management priorities, but it has still not provided a convincing reason for why it now needs to cut down more than 500 old growth firs that provide much of the area's visual quality, provide excellent wildlife habitat, provide a much different recreational experience than the developed site, and significantly enhance the recreation experience in the developed site.

59.    The Forest Service is unjustifiably treating the developed site and the visual influence area as if they should be managed in exactly the same way in terms of identifying and eliminating potential safety hazards. This is inconsistent with decades of prior management and the Forest Service Manual. That Manual explains that all outdoor

recreational activities on national forest lands, including activities at recreation sites, have

inherent risks due to the natural setting in which they occur and individuals engaging in

outdoor recreational activities on national forest  lands assume these inherent risks.


### CLAIMS FOR RELIEF

### Plaintiff's First Claim for Relief

### (Violations of NEPA and the APA by the Forest Service)

60.    Plaintiff realleges and incorporates by reference all preceding paragraphs

into each of the counts set forth below.


### <u>Count 1</u>

### (*Flawed and Illegal Public Involvement Process*)

61.    The Forest Service violated NEPA by conducting a flawed public

involvement process. For example, the Forest Service arbitrarily refused a reasonable

request to extend the March 2020 Draft EA comment period or to notice a second

comment period to accommodate delays caused by national and state emergencies that

had been declared during that scoping period. In violation of 40 C.F.R. §

1506.6(b)(2)(2019), the Forest Service failed to notify BMBP of its plan to restart the

NEPA process for this project in an apparent attempt to avoid BMBP's input or reduce

the time available to BMBP to respond to the Forest Service's proposals. Further, the

Forest Service arbitrarily denied BMBP's request for additional time for public comment

due to the electronic comment link not working.

62.     All of these errors and irregularities, and especially the exclusion of BMBP from the June 2019 public process, significantly prejudiced BMBP's to fully participate in the NEPA process, in violation of NEPA. See, e.g., 40 C.F.R. Secs. 1500.2(d) (2019), 1501.4(b) (2019), and 1506.6 (2019). The Forest Service's denial of the various requests set forth above were arbitrary and capricious in violation of the APA and NEPA.

## Count 2

### (*Purpose and Need Statement is Unreasonably Narrow*)

63.     The Forest Service unreasonably and impermissibly defined the purpose and need of the Project such that it ignores numerous Forest Plan management objectives for the Walton Lake area

64.     The Forest Service defines the need itself as the very project it is proposing. The first purpose and need statement states: "[t]here is a need to curb the laminated root rot infestation where it occurs within the Developed Recreation Management Area around Walton Lake, to develop a healthy stand of vegetation, and provide for public safety." EA at 4. The second states: "[t]here is need to reduce stand density within overstocked dry mixed conifer stands, to improve resilience of large ponderosa pine and western larch, and reduce risk of stand-replacing wildfire." *Id.* The third states: "[t]here is a need to enhance hardwood species that provide food and habitat for wildlife, visual interest through color and pattern, and shade." *Id.* at 5. Finally, the fourth states: "[t]here is a need to amend the Ochoco Land and Resources Management Plan." *Id.* This violates NEPA because the purpose and need statement dictates the

Page 17:     COMPLAINT FOR VACATUR, DECLARATORY AND INJUNCTIVE RELIEF

specific actions that must be taken to achieve the purpose. 40 C.F.R. §§ 1502.13 (2019) and 1502.14 (2019).

65.    The unreasonably narrow purpose and need definition resulted in an unreasonably narrow alternatives analysis in violation of 40 C.F.R. §§ 1502.13 (2019) and 1502.14 (2019).

66.    The Forest Service's decision to unreasonably and impermissibly define the purpose and need of the Project and then propose to remedy that issue by amending the Plan itself was arbitrary and capricious in violation of the APA and NEPA.


## Count 3

### (*Failing to Analyze an Adequate Range of Alternatives*)

67.    The Forest Service violated NEPA because it failed to evaluate all reasonable alternatives in the face of unresolved conflicts regarding the Project and justified a decision already made. The Forest Service provided an inadequate range of alternatives because it omitted other viable solutions such as reducing the developed recreation boundary to within 150 feet of the loop road. The Forest Service justifies its decision on its policy to provide public safety, however, the EA does not cite to a single instance where a recreationalist has been struck, or even almost struck, by a falling tree or explain why the visual influence area must be managed in the same way in terms of risk as the much more developed and utilized camping and picnic areas closer to the lake.

68.    The Forest Service violated 40 C.F.R. § 1502.14 (2019) by failing to evaluate all reasonable alternatives. The Forest Service's decision to omit other viable solutions was arbitrary and capricious and violates the APA and NEPA.

## Count 4

### (*Forest Service's Continuing Contract with T2 Violates NEPA*)

69.     The Forest Service violated NEPA because it irreversibly and irretrievably committed resources by entering into a logging contract before beginning the EA process. The Forest Service has acknowledged that its "stewardship contract" with a company to log the areas in question is still in place. As the contract has not been rescinded and is only on hold, the Forest Service has continued to commit itself to essentially the same commercial logging covered by the logging contract, and the alternative the Forest Service actually adopted in the DN, before the completion of the EA in violation of NEPA.

70.     Entering into a logging contract and thereby committing resources prejudicing the selection of alternatives before the NEPA process was complete, as well as the failure to rescind such a contract, is arbitrary and capricious and violates NEPA, including 40 C.F.R. §§1502.2(f) (2019) and 1502.2(g) (2019), and the APA.

## Count 5

### (*Project is "Significant" under NEPA and Requires an EIS*)

71.     The Forest Service failed to meet its burden to articulate a "convincing statement of reasons to explain why a project's impacts are insignificant." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001) (quotation and citation omitted). Given the analysis appearing in the Final EA and its supporting documents, the

Forest Service cannot sustain a finding of no significant impact under CEQ regulations at 40 C.F.R. § 1508.27 (2019), which illustrates that significance must be determined through analysis of both context and intensity.

72.     Clearcutting 35 acres and removing some of the last large trees from such a relatively small area and thereby destroying a large part of the current viewshed for the recreation area will have a significant impact on the Walton Lake area, which is the most relevant context, and requires an EIS.

73.     The fact that the Forest Service must propose four plan amendments in order to accomplish the Project underscores how inconsistent the Project is with the existing plan and its intent for the area, and the significance of the changes to the Walton Lake area that the Forest Service is proposing.

74.     Intensity factors, such as unique characteristics of the geographic area, the degree to which the effects on the quality of the human environment are likely to be highly controversial, and ability of the project to create a precedent for the future use of similar Forest Plan amendments, tip the Project in favor of significance.

75.     BMBP raised substantial questions about whether the Project will have a significant effect on the environment, indicating that the Forest Service should prepare an EIS instead of an EA. The agency's decision not to do so is arbitrary and capricious and violates the APA and NEPA.

## Count 6

### (*Improperly Limited Geographic Scope of the Cumulative Impacts Analysis*)

76.     The Forest Service failed to provide an individualized, species-specific explanation for the geographic scope of the cumulative impact analysis. The Forest Service developed a rationale for the geographic scope after the cumulative impact analysis was already completed. Also, even though the Forest Service claims the geographic scope of its cumulative impacts analysis is limited to one or two subwatersheds (depending on the species), the agency also claimed to justify its finding of no adverse effect for several species by referencing the impact at the scale of the national forest.

77.     The Forest Service's cumulative effects analysis and resulting findings based on that flawed analysis are thus arbitrary and capricious and violate the APA and NEPA.


## Count 7

### (*Improper Soils Analysis*)

78.     The Final EA does not incorporate the Soils Specialist Report so that Report cannot be used to comply with NEPA. The EA's overall soils analysis is poorly written, incomplete, and confusing, with the most important conclusions buried in long, dense paragraphs of text. This violates NEPA, including 40 C.F.R. § 1502.8 (2019), and the APA.

## SECOND CLAIM FOR RELIEF

### *Defendants' Violations of NFMA and the APA*

79.     Plaintiff realleges and incorporates by reference all preceding paragraphs into each of the counts set forth below.

## Count 1

### (*Proposed Site-Specific Forest Plan Amendments Violate NFMA*)

80.     The Forest Service violated NFMA because it did not identify and prove unique characteristics of the Walton Lake Project area, nor adequately articulate a rational connection between those unique characteristics and the choice to adopt site-specific, rather than forest-wide, plan amendments.

81.     Instead of working within the existing Forest Plan, the Forest Service proposed amendments to eliminate Forest Plan provisions that are barriers to its preferred action alternative. These include eliminating the Eastside Screens provision requiring retention of late and old structural (LOS) stages in areas that are below the historical range of variability (HRV), eliminating the Eastside Screens requirement to "maintain all remnant late and old seral and/or structural live trees >= 21 inches DBH that currently exist within stands proposed for harvest activities, eliminating the strict visual quality standard that applies to the Walton Lake recreation area, and removing the 5-acre limit on clearcutting ("regeneration harvest").

82.     The Forest Service's use of site-specific Forest Plan amendments to address conditions found throughout the Ochoco National Forest is impermissible.. Site-specific Forest Plan amendments may be used only to address unique site-specific

conditions. The Forest Service has not justified the Walton Lake Project Forest Plan amendments based on unique site-specific conditions. The Forest Service's decision to adopt site-specific amendments without adequate justification is arbitrary and capricious and violates the APA and NFMA.

## Count 2

### (*Forest Plan Amendments are Significant Under NFMA and Require Additional Procedures, Including an EIS*)

83.    The Forest Service failed to comply with a number of additional NFMA requirements, including providing a much longer comment period and public meetings, when it proposed amendments for the Walton Lake Project that result in significant changes in the Forest Plan. The Forest Service also failed to analyze the significant amendments in an EIS. The four proposed amendments for the Walton Lake Project are significant changes, individually and cumulatively, because they would fundamentally change the management prescription for the Walton Lake area and result in long-term negative impacts. The Forest Service's decision to not provide a longer comment period and public meetings violates 16 U.S.C. § 1604(d) and (f)(4) and is arbitrary and capricious under the APA and NFMA.

## Count 3

### (*The EA and DN Fail to Give Proper Consideration to Applicable 2012 Planning Rule Factors for Plan Amendments*)

84.    When deciding to adopt Plan amendments the Forest Service failed to give proper consideration to the applicable 2012 Planning Rule factors in its EA and DN. 36

C.F.R. 219.10(a) requires the Forest Service to consider certain factors "to the extent relevant to the plan area." Because the majority of the proposed logging around Walton Lake would occur in the designated Visual Influence Area, the factors related to visual resources should be given particular attention. The Forest Service did not give proper consideration to the most pertinent factors, namely: "aesthetic values," "recreation settings," "scenery," and "viewsheds." The Final EA only gives cursory consideration to these factors and draws arbitrary conclusions from the analysis it does undertake. The Forest Service is undertaking a forest type-conversion and reducing species diversity in the project area, not maintaining ecosystem integrity, ecosystem diversity, or diversity of native tree species like the agency claims.

85.    The first amendment eliminates the Eastside Screens provision requiring retention of late and old structural (LOS) stages in areas that are below the historical range of variability (HRV). The EA admits that, in direct contradiction of the Eastside Screen's core purpose and objectives, the amendments would result in a net loss of LOS acreage. EA at 29.

86.    The second amendment eliminates the Eastside Screens requirement to "maintain all remnant late and old seral and/or structural live trees >=21 inches DBH that currently exist within stands proposed for harvest activities." EA at 29.

87.    The third amendment eliminates the strict visual quality standard that applies to the Walton Lake recreation area. EA at 30. This would allow the Forest Service to ruin the visual integrity of the Walton Lake area for many years to come. The Forest Service objectively violates its own standards in proposing a "sanitation harvest," also known as clearcutting, for units 2-4. Whether using the language of the Ochoco Forest

Plan's Visual Quality Objectives (VMS), or the EA's Scenic Integrity Levels (SMS), the proposed action goes far beyond any action the Forest Plan currently allows. Under the current "retention" Visual Quality Objective the Forest Service is tasked with ensuring that "human activities are not evident to the casual forest visitor." Clearcutting 35 acres of large and old trees within the Visual Influence Area of the most popular developed campground in the Ochoco National Forest would be exceedingly evident to all but the blind forest visitor.

88.    The fourth amendment removes the 5-acre limit on clearcutting ("regeneration harvest"). The proposed amendment plans to increase the allowable harvest patch size seven-fold from 5 acres to at least 35 acres. EA at 30.

The Forest Service's failure to consider the most pertinent factors related to visual resources violates 36 C.F.R. §§ 219.10(a) and 219.9(a) and is arbitrary and capricious in violation of the APA and NFMA.

## Count 4

### (*Improper Soils Analysis*)

89.    The Forest Service failed to demonstrate compliance with the mandatory compaction and detrimental soil standard set forth in the Ochoco Forest Plan. The failure to demonstrate compliance with a mandatory Forest Plan standard is in clear violation of the NFMA, 16 U.S.C. § 1604(i) consistency requirement and thus violates NFMA and the APA.

## Count 5

### (*Final EA Violates INFISH*)

90.    The Forest Service's Final EA analysis violates the INFISH Plan Amendments. The Final EA acknowledges that the Project Area includes two Class 3 and two Class 4 streams under INFISH. The Final EA admits that logging will occur within the Riparian Habitat Conservation Area ("RHCA") boundaries for these streams. Logging in RHCAs must be by the terms of the exception permitted by INFISH. The Final EA and special report, however, fail to analyze or explain current deficiencies in the subject RHCAs and how this project is needed to attain current Riparian Management Objectives. Without such an explanation, proposed logging in these areas is, on its face, a violation of Plan INFISH standards, in clear violation of the NFMA 1604(i) consistency requirement and the APA.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for an order and judgment:

a.    Declare that the Forest Service's DN/FONSI for the Walton Lake Project violates NEPA and/or NFMA, and is arbitrary, capricious, an abuse of discretion, and/or not in accordance with law under the APA, 5 U.S.C. § 706(2)(A);

b.    Vacate and set aside the Forest Service's illegal DN/FONSI as an illegal agency action under the APA;

c.    Preliminarily and permanently enjoining the Forest Service from implementing the Walton Lake Project unless and until the agency complies with NEPA and NFMA;

d.    Enter appropriate injunctive relief to ensure that the Forest Service complies with NEPA and NFMA, and specifically to ensure that the Forest Service and

its agents take no further actions toward proceeding with the challenged Walton Lake

Project unless and until they have complies with NEPA and NFMA;

     e.    Award Plaintiff its reasonable costs, litigation expenses, and attorney fees

associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. §

2412; and

     f.    Grant such further relief as the Court deems just and equitable.


Respectfully submitted this 11th day of  December, 2020.

<div style="margin-left: 40%;">

    s/Tom Buchele

Tom Buchele, OSB No. 081560
Earthrise Law Center
Lewis & Clark Law School
10010 S. Terwilliger Blvd.
Portland OR 97219-7799
Telephone: 503-768-6736
Fax: 503-768-6642
E-mail: tbuchele@lclark.edu

Jesse A. Buss, OSB # 122919
Willamette Law Group
411 Fifth Street
Oregon City OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

Attorneys for Plaintiff Blue Mountains Biodiversity Project

</div>