Tom Buchele, OSB # 081560
Earthrise Law Center
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

Jesse A. Buss, OSB # 122919
Willamette Law Group
411 Fifth Street
Oregon City, OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

*Attorneys for Plaintiff Blue Mountains Biodiversity Project*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| **BLUE MOUNTAINS BIODIVERSITY PROJECT**, an Oregon nonprofit corporation,<br><br>Plaintiff,<br><br>v.<br><br>**SHANE JEFFRIES**, in his official capacity as Ochoco National Forest Supervisor; and **UNITED STATES FOREST SERVICE,** an agency of the United States Department of Agriculture,<br><br>Defendants. | Case No. 2:20-cv-2158-SU<br><br>MOTION FOR PRELIMINARY INJUNCTION OR IN THE ALTERNATIVE FOR A TEMPORARY RESTRAINING ORDER AND SUPPORTING MEMORANDUM<br><br>EXPEDITED HEARING REQUESTED<br><br>ORAL ARGUMENT REQUESTED |

## MOTION

Plaintiff Blue Mountains Biodiversity Project ("BMBP") hereby moves this Court for an order pursuant to Federal Rule of Civil Procedure ("FRCP") 65 preliminarily enjoining or temporarily restraining, defendants United States Forest Service and Ochoco National Forest Supervisor Shane Jeffries (collectively "Forest Service" or "Service") from allowing or implementing any of the sanitation logging or commercial thinning authorized in units 1–5 by the December 7, 2020 final Decision Notice for the Walton Lake Project ("DN"). AR 8713–8793.[1] That DN authorizes a total of 178 acres of logging within the 218-acre Walton Lake Recreation Area in the Ochoco National Forest. AR 8716–17. Those 178 acres of logging include 35 acres of sanitation logging in units 2–4, 43 acres of commercial thinning in units 1 and 5, and 100 acres of non-commercial thinning in units 6–8. *Id.* BMBP only seeks preliminary relief regarding the 78 acres of sanitation logging and commercial thinning in units 1–5 (the "commercial logging"). BMBP does not seek preliminary relief regarding the 100 acres of non-commercial thinning because, although that logging was also authorized illegally and is covered by the claims in BMBP's Amended Complaint, ECF No. 12, its implementation likely would not cause BMBP or its supporters irreparable harm. Also, BMBP does not object to the removal of actual hazard trees in the developed site and immediately adjacent to roads and designated trails.

As required by LR 7-1, counsel for BMBP has conferred with counsel for the Forest Service regarding this motion, was unable to resolve the issues raised by this motion, and the Forest Service opposes the motion. However, the Forest Service does not oppose the request for

---

[1] The Forest Service has filed its Administrative Record with the Court. *See* ECF Nos. 13 and 18. Although BMBP disputes the completeness of that record, *see* note 1 below, BMBP does not seek to strike any documents from that record. BMBP will cite to that incomplete record as "AR_____", referencing the Bates numbering inserted by the Forest Service on the right hand corner of each page in its record.

an expedited hearing. During that conferral, counsel for the Forest Service stated that the commercial logging and/or commercial thinning could begin any time after October 15, 2021. This motion will be fully briefed on or before September 30, 2021. *See* ECF No. 38. If the Court is unable to set this motion for argument before October 15, 2021, or is for any other reason unable to fully consider the parties' briefs and arguments before that date, BMBP requests that its motion be treated as a motion for a temporary restraining order (TRO) pursuant to FRCP 65. BMBP also submits the following Memorandum and declarations from Marilyn Miller, Paula Hood, and Jesse Buss in support of this motion.

Wherefore, BMBP respectfully requests that the Court enter an order preliminarily enjoining, or temporarily restraining, the Forest Service from allowing or implementing any of the sanitation logging and/or commercial thinning authorized by its challenged DN in units 1–5.

# TABLE OF CONTENTS

Page Nos.

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

TABLE OF ACRONYMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ix

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROJECT HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

PRELIMINARY INJUNCTION STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    I.    The Project Will Result in Immediate and Irreparable Harm to BMBP. . . . . . . 9

    II.    BMBP is Likely to Succeed on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        a.    The Forest Service Violated NEPA by Having an Unreasonably Narrow
            Purpose and Need Statement (Claim 1, Count 2) . . . . . . . . . . . . . . . . . . . . 11

        b.    The Forest Service Violated NEPA by Failing to Evaluate All Reasonable
            Alternatives (Claim 1, Count 3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        c.    The Service's Ongoing Contract with T2 Violates NEPA
            (Claim 1, Count 4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

        d.    The Forest Service's Soils Analysis Violates NEPA (Claim 1, Count 7)
            and NFMA. (Claim 2, Count 4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        e.    Project is Significant Under NEPA and Requires an EIS
            (Claim 1, Count 5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

            i.      Context . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            ii.      Intensity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    III.    The Balancing of the Equities and the Public Interest Strongly Favor a
        Preliminary Injunction Against the Logging of Large and Old Growth
        Fir Trees. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

    IV.    The Bond Requirements Should be Waived . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

APPENDIX

# TABLE OF AUTHORITIES

**<u>Case</u>**                                                                                               **<u>Page Nos.</u>**

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............................ *passim*

*Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845 (9th Cir. 1997) ...................................................11

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004)..........................................................................28

*BARK v. U.S. Forest Service*, 958 F.3d 865 (9th Cir. 2020) .........................................................29

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ..................26

*Blue Mountains Biodiversity Project/League of Wilderness Defenders v. Turner*,
No. 2:16-cv-01648-MO (D. Or. Oct. 18, 2016)..........................................................................4, 5

*Cascadia Wildlands v. Bureau of Land Management,* 410 F. Supp. 3d 1146 (D. Or. 2019) .......28

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) ...............................................11

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir.
2008)......... ...................................................................................................................................14

*Ctr. for Food Safety v. Vilsack*, 753 F.Supp.2d 1051 (N.D. Cal. 2010) *vacated on other
grounds,* 636 F.3d 1166 (9th Cir. 2011) .....................................................................................34

*Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006) ........................................23

*Found. For N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172 (9th Cir. 1982) ..............30

*Friends of Southeast's Future v. Morrison,* 153 F.3d 159 (9th Cir. 1996).....................................13

*Gifford Pinchot Task Force v. Perez*, No. 3:13-cv-00810-HZ, 2014 WL 3019165
(D. Or. July 3, 2014)..... ..............................................................................................................25

*Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836 (9th Cir. 2013) ...............................24

*Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) ....................................11

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc*)* ..............................................11

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ..........................................................................................10, 24, 33

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000)..............................................................18, 19, 21

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto Ins. Co.,*
463 U.S. 29 (1983)…..................................................................................................11

*Native Ecosystems Council v. U.S. Forest Serv.,* 418 F.3d 953 (9th Cir. 2005) ..........................24

*Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001) ............................25, 30

*Nat'l Parks Conservation Ass'n v. BLM*, 606 F.3d 1058 (9th Cir. 2010).....................................12

*Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998) ..........................34

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005) ..........................29

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028
(9th Cir. 2001)…..........................................................................................................28

*Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281 (9th Cir. 2013) .......................................8

*Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664 (7th Cir. 1997).........................................12

*Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097
(9th Cir. 2006)…..........................................................................................................34

*Valdez v. U.S.,* 56 F.3d 1177 (9th Cir. 1995) .............................................................................16

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) ...........................................14, 17

*W. Watersheds Project v. Bernhardt,* 391 F. Supp. 3d 1002 (D. Or. 2019) ............................8, 34

*W. Watersheds Project v. Bernhardt,* 392 F. Supp. 3d 1225 (D. Or. 2019) ...................32, 33, 34

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................8, 9

## Codes and Regulations

5 U.S.C. §§ 701–706...................................................................................................11

5 U.S.C. § 706 ...............................................................................................................14, 17

5 U.S.C. § 706(2)(A)......................................................................................................11

16 U.S.C. §§ 1600–1614 ...............................................................................................10

16 U.S.C. § 1604 ..........................................................................................................24

16 U.S.C. § 1604(i) ..................................................................................................23, 25

42 U.S.C. § 4321, *et seq* ................................................................................................10

42 U.S.C. § 4332(C) ........................................................................................................25

40 C.F.R. §§ 1500–1508 (2019) ....................................................................................12

40 C.F.R. § 1500.2 (2019) ..............................................................................................23

40 C.F.R § 1500.2(e) (2019) ..........................................................................................14

40 C.F.R § 1502.1 (2019) .........................................................................................23, 24

40 C.F.R. § 1502.2(f) (2019) ...............................................................................18, 20, 21

40 C.F.R. § 1502.2(g) (2019) ...............................................................................18, 21

40 C.F.R. § 1502.8 (2019) ........................................................................................23, 24

40 C.F.R. § 1502.13 (2019) .......................................................................................11, 14

40 C.F.R. § 1502.14 (2019) .......................................................................................14, 17

40 C.F.R. § 1506.13 (2020) ............................................................................................12

40 C.F.R. § 1508.27 (2019) ............................................................................................25

40 C.F.R. § 1508.27(a) (2019) ..................................................................................26, 27

40 C.F.R. § 1508.27(b) (2019) .......................................................................................29

40 C.F.R. § 1508.27(b)(3) (2019) ..................................................................................29

40 C.F.R. § 1508.27(b)(4) (2019) ..................................................................................30

40 C.F.R. § 1508.27(b)(6) (2019) ..................................................................................31

40 C.F.R. § 1508.27(b)(7) (2019) ..................................................................................31

40 C.F.R. § 1508.27(b)(10) (2019) ................................................................................32

**<u>Other</u>**

*Forest Service Manual, Section 2300, Chapter 2330, Sub-Chapter 2330.6 (Safety)* ......................2

*Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026 (Mar. 23, 1981)* ..................................................14

*Fed. R. Civ. P. 65* ....................................................................................................i, ii, 8

*Fed. R. Civ. P. 65(c)* .................................................................................................34

*Fed. R. Civ. P. 72(a)* .................................................................................................2

*Local Rule 7-1* ...........................................................................................................i

## TABLE OF ACRONYMS

| | |
|---|---|
| BMBP | Blue Mountains Biodiversity Project |
| CE | Categorical Exclusion |
| DBH | Diameter at Breast Height (also: "dbh") |
| DM | Decision Memo |
| DN | Decision Notice |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FOIA | Freedom of Information Act |
| FONSI | Finding of No Significant Impact |
| FRCP | Federal Rules of Civil Procedure |
| LR | Local Rule |
| LRR | Laminated Root Rot |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| ONF | Ochoco National Forest |

## MEMORANDUM IN SUPPORT OF MOTION

## INTRODUCTION

The commercial logging BMBP seeks to enjoin would occur on about 78 acres of the 218-acre Walton Lake Recreation Area (the "project area"), AR 8716–17, the most visited recreation site in the Ochoco National Forest (ONF). AR 7625; ECF No. 20 ¶ 2 (admitting popularity of the location). That logging would occur in units 1–5, AR 8716–17 (treatments map), mostly within Walton Lake's "visual influence area" and mostly outside of the developed recreation site where visitors actually camp, picnic, and park vehicles. The commercial logging, which could begin at any time after October 15, 2021, would immediately irreparably harm BMBP by cutting down more than 500 large fir trees, including numerous old growth firs, in areas where BMBP's supporters recreate. The balancing of harms from a short-term injunction (against the logging of large trees that would not regrow within the lifetime of any of BMBP's supporters) tips sharply in favor of BMBP. The public interest is served by maintaining the status quo and preserving these trees while the Court fully resolves BMBP's legal claims.

On the merits, the Forest Service's decision represents a dramatic shift in how it intends to manage the Walton Lake area. The significance of this shift is underscored by the fact that the Forest Service now proposes four different ONF Plan amendments in order to allow its proposed "management." As the Final Environmental Assessment (EA) admits, the area includes both a developed site and a separate visual influence area, each with its own management prescriptions. AR 7575; *see also* AR 1486, AR 1629. For decades, the Forest Service has managed the risks created by dead or dying trees by surveying for such hazard trees and removing them on a regular basis. Six years ago, the Forest Service shifted its thinking dramatically and proposed to mostly eradicate a predominantly fir, old growth forest in the visual influence area because some

of the firs had laminated root rot ("LRR"), a naturally occurring disease that has been present in and around the Walton Lake area for decades. Suddenly, according to the Forest Service, these old growth firs in the undeveloped visual influence area present an unacceptable risk. Removing all of these firs – essentially a clearcut – would completely alter the forested character of this area and destroy the visual quality provided by an old growth forest and which the visual influence area is intended to maintain.

The Forest Service is unjustifiably treating the developed site and the visual influence area as if they should be managed in exactly the same way in terms of identifying and eliminating potential safety hazards. This is not only inconsistent with decades of prior management but is also inconsistent with the Forest Service Manual. *See* Declaration of Jesse Buss ("Buss Decl.") ¶9, Ex. 4 at 10 (FSM 2330.6 (Safety) ("Recreation sites present inherent risks to users in vary degrees depending on the level of site modifications and the activity involved… individuals engaging in outdoor recreational activities on [NFS] lands assume these inherent risks.")). [1] The Forest Service's proposed uniform management approach improperly ignores the obvious differences in purpose and use between the developed site and the visual influence area, and the different levels of acceptable, inherent risk that attach to those contrasting purposes and uses. Even if such a shift in management direction were necessary, it must be preceded by a thorough and unbiased NEPA process that allows for a fully-informed decision,

---

[1] The completeness of the administrative record for this case is still a disputed matter. BMBP filed a motion to complete the record before Magistrate Judge Sullivan, *see* ECF Nos. 10, 11, 19, 21, 22, 36, which was denied on the same day this motion was filed. ECF No. 40. BMBP will file objections to that record ruling pursuant to FRCP 72(a) within fourteen days. The Buss Declaration includes as exhibits an excerpt from the Forest Service Manual, Ex. 4, and three Forest Service documents that were addressed in BMBP's motion as missing from the record that the Forest Service filed with the Court. *See* Buss Decl. at ¶¶ 6–8, Ex. 1–3. Because BMBP will object to the exclusion of Buss Declaration Exhibits 1–3 and other documents from the record, BMBP believes it is appropriate to offer these documents currently missing from the record in support of its motion for preliminary relief.

that facilities complete public participation, and demonstrates that the decision fully complies with all applicable laws.

BMBP's legal claims addressed below establish that did not happen for the Walton Lake Project. The Forest Service starts its EA by offering an unduly narrow purpose and need statement tailored to result in only its preferred approach – addressing safety by logging hundreds of large fir trees – being able to satisfy that improper purpose and need. That in turn prevents the Forest Service from, as NEPA requires, presenting and properly evaluating all reasonable alternatives to the Forest Service's preferred intensive logging. The Forest Service's biased approach to its NEPA obligations is explained in part by the fact that the Service improperly left in place a stewardship contract, executed in 2016 before the Forest Service had complied with NEPA, and which calls for the same intensive logging that was its preferred alternative in the EA and ultimately the approach approved by the DN. This approved logging, however, would also violate the ONF Land and Resource Management Plan's (the "Plan") mandatory 20% limit on soil disturbance in units 2–4, where thousands of fir trees would be logged. The EA seems to acknowledge this violation but its "analysis" is so convoluted that, in violation of NEPA, it is impossible for the public to tell by exactly how much the Plan's standard would be violated. Finally, the Forest Service's finding of no significant impact (FONSI) illegally fails to evaluate the significance of the Project's impacts in the most important context– the localized impacts on the 218-acre Walton Lake Recreation Area itself. The intensity of those localized impacts – direct impacts from non-commercial thinning and commercial logging on 178 acres, with the most intense "sanitation"  logging of thousands of fir trees, including more than 500 large and old growth firs on 35 acres (about 25%) of the visual influence area – is clearly significant. That is especially true when you consider that the 35-acre clearcut will

essentially destroy the moist mixed-conifer forest the Forest Service identifies as a part of what makes the Walton Lake Recreation Area "unique." Such intense proposed "management" within the 218-acre, most-visited recreation site in the ONF, requires the more thorough and comprehensive analysis provided by an Environmental Impact Statement (EIS).[2]

## PROJECT HISTORY

Walton Lake is the ONF's most visited recreation site, AR 7570, 7625, and is also the only recreation area in the ONF with a lake and a combination of moist and dry mixed conifer forests surrounding it. AR 7729. There is a forested campground and day use area which are "well-loved," and  visitors value the lake for its fishing opportunities, and the surrounding area for its beauty. AR 4848. In particular, visitors cherish the massive trees at Walton Lake.[3] The Forest Service is essentially proposing to eliminate Walton Lake's moist mixed conifer forest in Walton Lake's visual influence area by removing more than 500 large fir trees over 21 inches DBH and more than 2,500 other commercially valuable firs from a 35 acre area, leaving only about 100 large ponderosa pine and western larch. AR 7608; AR 7583–4.

The Forest Service's "Walton Lake Restoration Project" logging proposal has existed in some form since 2015. Initially, the Forest Service proposed to conduct the logging under several NEPA categorical exclusions ("CE") and issued a Decision Memorandum ("DM") to that effect. AR 7570. BMBP challenged that decision in court in 2016 and obtained a preliminary injunction. *Blue Mountains Biodiversity Project/League of Wilderness Defenders v. Turner,* No. 2:16-cv-

---

[2] For purposes of obtaining preliminary relief, BMBP does not address the merits of all the legal claims in its amended complaint. ECF No. 12. Instead this motion focuses on the claims BMBP believes it can best present and the Court can best evaluate in the abbreviated time frame that applies when a party must seek such emergency relief. BMBP reserves the right to address all of its legal claims when it seeks summary judgment.

[3] *See, e.g.,* AR 6102 (comment suggesting that if the Forest Service logs the area its recreational value would drop); AR 6124 (comment stating that if the Forest Service cuts down these trees, "the natural beauty of the area will be totally destroyed.").

01648-MO (D. Or. Oct. 18, 2016) ECF No. 25. One of BMBP's claims focused on the Forest

Service's failure to properly describe the extent of its proposed logging in its 2015 scoping

notice. *Id.* ECF No. 9 at 4–7, 21–27. Shortly after the preliminary injunction was issued, the

Forest Service withdrew its DM. AR 5174. However, before the Project was enjoined and the

DM withdrawn, the Forest Service entered into a contract giving a private timber company the

right to conduct the commercial logging. AR 5170–73 (contract, dated May 3, 2016). This

contract was not withdrawn in 2016 and remained in place during all of the Forest Service's

subsequent NEPA analyses, including its NEPA analysis for the current iteration of the proposed

project. *See* AR 7886–900. To BMBP's knowledge, and as suggested by the quickly approaching

project implementation date, the 2016 contract still remains in place as of the date of this filing.

 In 2017, the Forest Service changed its approach in terms of NEPA compliance and

issued an EA and FONSI regarding the proposed logging. AR 5409–5593. However, the Forest

Service did not rescope the project before doing so. Instead, before beginning the new additional

NEPA analysis, the project manager informed his team that the logging contract remained in

place and the proposed action in the EA (which they had not yet drafted) would be the same

action he had authorized in the 2015 DM. AR 7883. BMBP filed an objection to that 2017

decision, and as a result the Service again withdrew its decision documents. AR 5708, 5709.[4]

 The Forest Service is now attempting to authorize the Project for the third time. The

Forest Service published a scoping notice for the Project in August 2019. AR 6058. The Final

EA for the Project was published in July of 2020 along with the Draft DN and FONSI. AR 7487;

AR 7566. Defendant Jeffries signed the Final DN and FONSI on December 7, 2020. AR 8734.

---

[4] BMBP subsequently learned the decision was withdrawn so the Forest Service could include
additional plan amendments. AR 7893.

The Forest Service's current Decision authorizes essentially the same type and amount of commercial logging as the withdrawn 2016 DM. The 2016 Decision authorized 176 acres of logging and the current Decision authorizes 178 acres of logging. AR 5057 and AR 8716–17, respectively. The Forest Service's current decision fails to cure the legal deficiencies in its prior decisions regarding essentially the same project, and in fact compounds them.

The Forest Service began its latest NEPA process in June of 2019 with a "public information meeting," AR 7579, but failed to notify BMBP of its plan to restart the NEPA process and did not invite BMBP to this meeting. When asked about this the Forest Service did not deny BMBP and its attorneys were left off the email distribution lists for the notice of this meeting but instead asserted that it was already aware of BMBP's positions regarding the Project. AR 6037. The Service published an actual scoping notice for the Project on August 7, 2019. AR 6058. BMBP submitted comments on September 5 and 6, 2019, AR 6161–89; AR 6193–202, but was unable to address what was disclosed at the June 2019 public meeting. BMBP was surprised to see that the Forest Service now proposed four plan amendments (the 2017 proposal had only two). AR 5201–02. Prior to receiving its scoping comments the Forest Service was not aware of BMBP's positions regarding these two new amendments.

On February 18, 2020 the Forest Service made its draft EA available for a 30-day public comment period. AR 6601. On March 18, 2020, BMBP requested an extension of the comment period, or a second comment period, primarily because the comment period occurred just as the COVID pandemic was escalating and many public facilities such as libraries and universities began closing their facilities to the public. AR 6720. BMBP was not the only member of the pubic to request such an extension for this same reason. AR 7262. The Forest Service

inexplicably denied BMBP's request. AR 6762. BMBP was able to submit comments on March

19, 2020, which objected to the Service's refusal to allow more time for comments. AR 6767.

The Service gave notice of an Objection Period for the Project on July 21, 2020, and

BMBP submitted a timely objection on September 4, 2020. AR 7823, 7829. The Forest Service

hosted an objection resolution meeting on October 30, 2020 which BMBP attended. AR 8637.

While no resolution was reached, AR 8641, the Forest Service proposed dropping its logging of

large firs over 21 inches DBH in most of units 1 and 5, despite its claim for five years that

logging these large firs was essential to forest health and fire prevention. AR 8637; AR 8671.[5]

The Forest Service issued its final DN on December 7, 2020. AR 8713. It approved the

Project with sanitation logging in units 2, 3, and 4 (removing all grand fir and Douglas-fir,

including all large and old growth fir); non-commercial thinning in units 6, 7, and 8 (removing

only small trees with no commercial value); and commercial and non-commercial thinning in

units 1 and 5 (removing some large fir). AR 8716–17. In order to allow for the commercial

logging the DN also approved four different ONF Plan amendments, as follows: (1) a Plan

amendment to "allow harvest within LOS stages that are below HRV" (i.e., to allow logging in

old growth areas); (2) a Plan amendment to allow removal of large trees (i.e., trees 21" DBH or

greater); (3) a Plan amendment to modify  the visual quality standard away from "retention,"

("retention" means that human activities are not evident to casual forest visitor); and (4) a Plan

amendment waiving the 5-acre harvest patch size limit. Final EA (AR 7582). The Forest Service

includes these four Plan amendments because, without the first two amendments, the Project

would violate the 1995 Eastside Screens Plan Amendments (*see* AR 7598, describing the

standards that would be violated), and without the second two amendments, the Project would

---

[5] Unlike its logging of all firs in units 2–4, which it primarily justifies as a public safety measure, the Service had never emphasized public safety as a reason for logging large firs in units 1 and 5.

violate the original 1989 ONF Plan. *See* AR 7599 (describing the standards that would be violated). The fact that the Forest Service had to approve four plan amendments in order to accomplish this Project underscores how inconsistent the Project is with the existing Plan and the significance of the changes to the area that the Service is proposing.

The Forest Service could begin commercial logging at any time after October 15, 2021, although a specific date has not yet been provided. ECF No. 31, at 4.

## PRELIMINARY INJUNCTION STANDARDS

Under FRCP 65, the Court may issue a preliminary injunction pending final resolution of BMBP's claims. Typically, a plaintiff must demonstrate "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).[6] However, a plaintiff need "only show that there are 'serious questions going to the merits'... if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore*, 709 F.3d at 1291 (quoting *Alliance for the Wild Rockies ("AWR") v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). As the concurring opinion in *AWR* explained, 632 F.3d at 1139 (Mosman, J., concurring): a "district court at the preliminary injunction stage is in a much better position to predict the likelihood of harm than the likelihood of success ... in many, perhaps most, cases the *better* question to ask is whether there are serious questions going to the merits." *Id.* at 1140. Although injunctive relief is an extraordinary remedy and requires a clear showing that plaintiffs are entitled to such relief, *Winter,* 555 U.S. at 22, BMBP can make such a showing here.

---

[6] The test for issuing a TRO is essentially the same. *W. Watersheds Project v. Bernhardt,* 391 F. Supp. 3d 1002, 1007 (D. Or. 2019).

## ARGUMENT

### I.    The Project Will Result in Immediate and Irreparable Harm to BMBP.

In order to obtain a preliminary injunction, plaintiffs must show that they are likely to suffer irreparable harm absent an injunction. *Winter*, 555 U.S. at 20. The Ninth Circuit has concluded that plaintiffs satisfy this requirement when a project will harm a plaintiff's members' ability to "view, experience, and utilize the areas in their undisturbed state," and will "prevent [their] use and enjoyment … of the forest." *AWR*, 632 F.3d at 1135 (concluding that logging, even in only a portion of a burned area, establishes a likelihood of irreparable harm). For the purposes of establishing irreparable harm, "undisturbed" refers to the state of the forest before the challenged future activity occurs. *See Id.* at 1129. The Project's commercial logging at issue here would remove hundreds of large fir trees including all the firs from a dense, mixed-conifer forest, which includes large old growth Douglas firs up to 60" dbh and grand firs up to 57" dbh. AR 4964; AR 7583 ("Remove all grand fir and Douglas-fir of all ages and all sizes").

BMBP's supporters, officers, and staff hike, camp, bird watch, view wildlife, photograph scenery and wildlife, and engage in other vocational, educational, scientific observation, and recreational activities within the ONF, including the Project area and adjacent lands. Amended Complaint, ECF No. 12 at ¶ 8. BMBP submits the declaration of its long-time member Marilyn Miller ("Miller Decl.") to establish that she is one of those BMBP supporters. Miller Decl.at  ¶ 4; *see also* Declaration of Paula Hood ("Hood Decl.") at ¶¶ 10–12.

The approved logging would negatively affect Miller's bird-watching and wildlife viewing opportunities in the area, will harm her ability to view and utilize the area in its undisturbed state, and will impede her spiritual, aesthetic, professional, and recreational use and enjoyment of the area. *See* Miller Decl. ¶¶ 4, 10, 12, 14. Specifically, Miller believes that the

proposed logging will negatively impact the visual and aesthetic qualities of the places she uses and intends to use again. *Id.* If the Project moves forward, Miller, who frequently uses the Project area for bird watching, hiking, camping, wildlife observation, and nature photography, will avoid using the Walton Lake area because of the harm that the logging will inflict on wildlife, the visual and aesthetic quality of the area, and her sense of spiritual peace with the forest. Miller Decl. ¶ 12;  *see also* Hood Decl. ¶ 12. Miller uses both the forest in units 1 and 5 where commercial thinning would remove "competing" large fir and the mixed-conifer forest in units 2–4 where logging would remove all fir trees. The removal of these fir trees would significantly harm her aesthetic and recreational use of these forests, and she would avoid using these areas if the planned commercial logging occurs. Miller Decl. ¶ 12.

The Ninth Circuit has held that the logging of mature trees, if indeed incorrect in law, cannot be remedied easily, if at all. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) ("*Connaughton*") (concluding that proposed logging of mature trees, "as with many instances of this kind of harm," established irreparable harm for the purposes of the preliminary injunction analysis). Moreover, the Ninth Circuit has granted injunctions in cases involving only smaller trees and in areas that have previously been burned. *See AWR,* 632 F.3d at 1129, 1135. Here, the Forest Service's Project will involve logging many large trees, including firs up to 60" dbh. AR 4964; AR 7583. Even if the Project involved replanting logged areas with the same tree types, most BMBP supporters would not live to see the trees reach the maturity of those currently standing in the Project area. Thus, BMBP supporters will be irreparably harmed if Defendants move forward with the Project.

## II.    BMBP is Likely to Succeed on the Merits.

Judicial review of agency actions brought under the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq* ("NEPA") and the National Forest Management Act, 16 U.S.C. § 1600–

1614 ("NFMA"), are governed by the Administrative Procedure Act ("APA"). 5 U.S.C. §§701–706; *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 964 (9th Cir. 2002). Under the APA, a court shall hold unlawful and set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). Under this standard: an "agency must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). An agency's decision is arbitrary and capricious if the agency fails to consider an important aspect of a problem, offers an explanation for the decision that is contrary to the evidence, is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law. *Id.*

The arbitrary and capricious standard does not shield agency action from a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971). Deference to agency expertise is required, but the agency must "explain the conclusions it has drawn from its chosen methodology and the reasons it considers the underlying evidence to be reliable." *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008) (en banc). This Court may uphold the Forest Service's decision only on the basis of the reasoning found in that decision. *Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997). Consistent with these standards for review, BMBP demonstrates below that it is likely to succeed on the merits. However, because the balance of hardships tips sharply towards BMBP, all BMBP is required to show is that it has raised "serious questions going to the merits," *AWR*, 632 F.3d at 1135.

### a. The Forest Service Violated NEPA by Having an Unreasonably Narrow Purpose and Need Statement (Claim 1, Count 2).

NEPA requires an agency to specify an underlying purpose and need and to use that purpose and need to identify alternatives to the proposed action. *See* 40 C.F.R. § 1502.13

(2019).[7] The Forest Service unreasonably defined the purpose and need for the project too

narrowly such that it ignores Forest Plan management objectives for the Walton Lake area and

excludes the consideration of reasonable alternatives. "An agency may not define the objectives

of its action in terms so unreasonably narrow that only one alternative . . . would accomplish the

goals of the agency's action, and the EIS would become a foreordained formality." *Nat'l Parks

Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070 (9th Cir. 2010). As explained by the court in

*Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997):

> "The 'purpose' of a project is a slippery concept, susceptible of no hard-and-fast
> definition. One obvious way for an agency to slip past the strictures of NEPA is to
> contrive a purpose so slender as to define competing 'reasonable alternatives' out of
> consideration (and even out of existence). The federal courts cannot condone an agency's
> frustration of Congressional will. If the agency constricts the definition of the project's
> purpose and thereby excludes what truly are reasonable alternatives, the EIS cannot fulfill
> its role. Nor can the agency satisfy [NEPA]."

In this case, two of the four purpose and need statements suffer from the exact deficiency

the court warned of in *Simmons*. The first purpose and need statement states: "[t]here is a need to

curb the laminated root rot infestation where it occurs within the Developed Recreation

Management Area around Walton Lake, to develop a healthy stand of vegetation, and provide for

public safety." AR 7573. The fourth states: "[t]here is a need to amend the Ochoco Land and

Resource Management Plan." AR 7574. Overall, the reasonableness of the purpose and need

statement must be assessed by considering the legal context of the action. In this case the legal

context is the ONF Plan, which provides management direction for areas based on their

---

[7] The Council on Environmental Quality ("CEQ") promulgated regulations to implement NEPA
that are binding on all federal agencies. Those regulations are found at 40 C.F.R. §§ 1500–1508
(2019). The Project was developed and analyzed under the 2019 CEQ regulations, and thus
BMBP relies upon the 2019 regulations in its analysis of the relevant project documents. The
CEQ amended its regulations effective September 14, 2020. *See* 40 C.F.R. § 1506.13 (2020)
(effective date). Because the new regulations are not retroactive, the Forest Service's NEPA
analysis must comply with the requirements of the old, 2019 version of the CEQ regulations.

classification. *See Friends of Southeast's Future v. Morrison,* 153 F.3d 159, 167 (9th Cir. 1996) (upholding purpose and need based on applicable management plan). The Walton Lake area is designated under the ONF Plan to be managed such that, among other things, (1) it is safe; (2) it is beautiful; (3) it is relatively natural; (4) timber activities will normally not be visually evident, but may be used for safety and visual enhancement; (5) scenic views may be enhanced through harvest or thinning but will appear natural; and (6) "thinning may be done to meet the visual quality objectives and *maintain* healthy stands." AR 7574–5; AR 7597 (emphasis added); AR 1486. The Plan also provides the goal for the Developed Recreation Management areas to "provide safe, healthful, and aesthetic facilities for people to utilize while they are pursuing a variety of recreational experiences within a relatively natural outdoor setting." AR 7573.

Consistent with these Plan provisions a more appropriate initial purpose and need statement would be: "There is a need to determine how best to address public safety in light of the existing LRR in the undeveloped visual influence portion of the recreation management area." There are numerous potential ways to address public safety other than completely eliminating the hundreds of large LRR susceptible firs that currently contribute to the Walton Lake recreation area's scenic beauty and natural outdoor setting. But the Forest Service has impermissibly construed its own already overly narrow initial purpose and need statement to require exactly that. Similarly there was no legitimate reason to include a "need to amend the forest plan" in the purpose and need statement. Including such a "need" allowed the Forest Service to improperly predetermine that its drastic approach to public safety, requiring four amendments to current Plan direction, was the only acceptable solution to public safety issues.

The Forest Service's decision to unreasonably define the purpose and need of the project and then propose to amend the Forest Plan in response was arbitrary and capricious in violation

of the APA and NEPA. 5 U.S.C. § 706; 40 C.F.R. §§ 1502.13, 1502.14 (2019). As is discussed below the Forest Service used its unduly narrow purpose and need definitions to arbitrarily reject or consider at all several reasonable alternatives.

> **b.  The Forest Service Violated NEPA by Failing to Evaluate All Reasonable Alternatives (Claim 1, Count 3).**

NEPA requires federal agencies to give full and meaningful consideration to all reasonable alternatives in an EA. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) (agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives to a proposed project."); 40 C.F.R. § 1502.14 (2019). This requirement includes an analysis of alternatives that "will avoid or minimize" a proposal's adverse effects. 40 C.F.R § 1500.2(e) (2019); *see also* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981). Here, despite being presented with multiple reasonable alternatives for the Walton Lake Project— including the use of warning signage *without* closing units to public use, and limiting the area needing to be sanitized by shrinking the developed recreation boundary—the Forest Service failed to fully and meaningfully consider said alternatives, arbitrarily and capriciously violating NEPA. 40 C.F.R § 1500.2(e) (2019); *see W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) ("The existence of a viable but unexamined alternative renders an [EA] inadequate.")

As a result of the unduly narrow purpose and need statement, discussed above, the Forest Service considered a constrained range of possible alternatives, consisting of the following:

- **Alternative 1** (No Action)
- **Alternative 2** (Proposed Action), including 35 acres of "sanitation harvest" (essentially a clear cut) removing *all* grand and Douglas-fir of all ages and sizes in units 2–4, commercial and non-commercial thinning in units 1 & 5, non-commercial thinning in units 6–8, with .41 miles of temporary road construction.

- **Alternative 3:** mirrors most elements of the Proposed Action but limits the sanitation logging in units 2–4 to within 150 feet of the loop road, closes the untreated portion of those units to public use, and relocates the hiking trial.
- **Alternative 4:** mirrors most elements of Alternative 3, but eliminates *all* treatments in units 2–4 and instead implements a public closure for those units.

Final EA (AR 7582–88). Alternatives 2 and 3 would require Plan amendments to avoid violation of the ONF Plan, AR 7582–85, while Alternatives 1 and 4 would not require amendments.

By framing the Forest Plan amendments as basic project "needs," AR 7574, the Forest Service demonstrated that it did not intend to give meaningful consideration to any alternatives which did *not* include a Plan amendment, or which would not entirely "curb" LRR in all areas. AR 7582; AR 7587. Indeed, the No-Action Alternative was rejected because it did not address the narrowly stated needs in any units. AR 8728. Alternative 3, which only eliminated fir trees in a portion of units 2–4, was rejected because it did not totally "curb" firs from the visual influence portion of the recreation area. *Id.* (did not "tackle the whole area.") But Alternative 3 actually presents a true middle ground between "no action" and Alternative 2's "cut down all firs" approach to public safety. Alternative 3 would have left hundreds of large firs in place while removing firs only from the areas near roads and trails where they arguably present an actual threat to public safety. AR 7585–6. Alternative 4 also was rejected because eliminating treatment in units 2–4 conflicted with the Forest Service's perceived need to address public safety by "curbing" all trees susceptible to LRR. AR 8728.

Advancing an alternative for supposed consideration in an EA that does not meet a project's unreasonably narrowly-defined "need" is an exercise in futility and essentially acts as a space-filler to create the perception that the Forest Service considered a full range of alternatives.

The Forest Service never intended to meaningfully consider these options.[8] Instead of populating the EA with throw-away alternatives, the Forest Service should have dedicated its analysis to fully considering these alternatives and to considering other serious alternatives that were proposed by BMBP and by Forest Service staff.

 For example, BMBP suggested in its scoping comments that the Forest Service consider alternatives that reduce the unnecessary logging of large and old growth trees, yet still meet the Forest Service's stated public safety goal, such as posting adequate signage around units of concern while leaving them open to recreationists. AR 6199. The units for which BMBP suggested this alternative are part of the undeveloped and much less used visual influence area, and thus would not impact safety in the "developed" portion of the Walton Lake area. Posting such signage is a recognized and acceptable way to address safety issues. *See, e.g., Valdez v. U.S.,* 56 F.3d 1177, 1180 (9th Cir. 1995) (dismissing tort claim for injury in national park where plaintiff was adequately warned). Signage warns users while saving hundreds of large and old growth firs and allowing the public to decide for themselves whether any safety risk is worth taking in order to recreate in that undeveloped area of the forest.

 The Forest Service points to the need for public safety within the Developed Recreation Management Area as a reason it must so aggressively "sanitize" the relevant units, AR 7573, but only advances solutions that involve logging the Visual Influence Area to the same level of "safety" as the Developed Site itself. AR 7573. What the Forest Service fails to acknowledge, however, is that there is more than one way to achieve its stated safety goals. One such solution was provided by BMBP, above, and another was directly presented to the Forest Service by one

---

[8] This was clearly demonstrated by one internal email where the Forest Service environmental coordinator asked that two expert reports be "refresh[ed]" to "address a couple additional alternatives. Should not be much work at all[.]" Buss Decl. Ex. 1 at 1.

of its own staff; Kent Koeller, a Forest Service recreational planner, who advanced a simple and

viable alternative which would have addressed the issue of safety within developed areas *and*

helped to reduce the number of large and old growth fir trees being cut. "I have from day one of

this project two plus years ago recommended at least shrinking the developed recreation

boundary in places to within (two tree lengths) 150 feet of loop road and promoting a sanitation

treatment for LRR within that boundary."[9] AR 7901 (parenthetical in original). This reasonable

alternative would reduce the burden on the Forest Service to maintain an adequately "safe"

developed recreation environment for recreationists by reducing the area it must administer and

would spare many acres of the visually desirable LOS areas in units 2–4 from unnecessary and

untimely "sanitation." Mr. Koeller indicates that trails (and perhaps roads), would not need to

undergo this sanitation process if they did not fall within the developed recreation designation,

"as it is only within [the] developed recreation boundary that we address safety. We wouldn't

safe proof a trail otherwise." *Id.* There is no evidence in the EA that the Forest Service evaluated

Mr. Koeller's proposed alternative. Here, the existence of "viable but unexamined alternative[s]"

renders the Walton Lake EA inadequate. *Abbey*, 719 F.3d at 1050. The Service's decision to not

evaluate all reasonable alternatives and reject other viable solutions was arbitrary and capricious

in violation of the APA and NEPA. 5 U.S.C. § 706; C.F.R. § 1502.14 (2019).

### c.   The Service's Ongoing Contract with T2 Violates NEPA (Claim 1, Count 4).

A likely explanation for the Forest Service's odd, extremely limiting purpose and need

statement and its arbitrary rejection of and failure to even consider certain reasonable alternatives

is the logging contract it entered into in 2016. That contract is paid for with appropriated funds

---

[9] This alternative differs significantly from Alternative 3 because it actually removes certain acreage from the official Developed Recreation Area and thereby both saves hundreds of trees and  would not require closure of these currently forested acres because they would be outside the developed recreation boundary.

and the Service will lose that funding if the contract is changed significantly and terminated. NEPA stipulates that an agency "shall not commit resources prejudicing selection of alternatives before making a final decision." 40 C.F.R. § 1502.2(f) (2019). EAs are meant to analyze the impacts of a proposed action "rather than justify[] decisions already made." *Id.* § 1502.2(g) (2019). The Forest Service violated these regulations by not terminating and instead leaving in place the 2016 logging contract while it conducted its 2017 EA and its 2020 EA.

The meaning of these NEPA regulations was explored in detail in *Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000), a case which involved two federal agencies entering into a written contract with a tribe before any NEPA analysis had been completed on the tribe's whaling proposal. In that case, the Makah Tribe wished to reinitiate hunting of gray whales, and sought the support of federal agencies to bring this proposal before the International Whaling Commission (IWC) on its behalf. *Id.* at 1138. Those federal agencies entered into a signed agreement with the Makah to support its application and to provide for cooperation with the tribe once the harvests were underway. *Id.* at 1139. It was only after this written agreement had been executed, however, that the agencies undertook to prepare an EA for the proposal. After the draft EA was put out for public comment, one agency and the Makah entered into a new written agreement which mirrored the original in most regards. *Id.* Four days after this second agreement was signed, the agencies issued a final EA and FONSI. *Id.* at 1140.

As the court appropriately noted with regard to the preparation of NEPA documents, "proper timing is one of NEPA's central themes. An assessment must be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made." *Id.* at 1142. The Ninth Circuit held that the federal agencies failed to take a hard look at the environmental consequences of

their actions where they entered into a contract with the tribes before conducting the EA. By making such a firm commitment before the EA was completed, the court agreed the agencies had irretrievably committed resources and the EA was "demonstrably suspect because the process under which the EA was prepared was fatally defective." *Id.* at 1146. Such is also the case here.

Similar to the situation in *Metcalf*, here too an agency has entered into an agreement before required NEPA analysis was conducted. The agreement at issue here – a logging contract – was put in place in May of 2016 in preparation for a nearly identical logging proposal at Walton Lake. *See* AR 5170–73. In a memo giving direction on the 2017 Walton Lake EA, District Ranger Turner stated that "[a] stewardship contract was prepared and awarded and project implementation was scheduled to begin in October, 2016" before the preliminary injunction in the *LOWD/BMBP v. Turner* suit was granted. AR 7883. Turner went on to say that "[t]he proposed action *will remain as documented in the 2015 Decision Memo.*" *Id.* (emphasis added). In other words, the project parameters would remain as they were reflected in the contract. That 2016 contract, which was entered over three years before the NEPA process was ever begun for the current iteration of the Walton Lake Project proposal, has remained in place ever since, and has continued to dictate the Forest Service's priorities and tainted its consideration of alternatives that are inconsistent with that contract.[10]

The Forest Service has represented to the public that the logging contract does not bind the agency and that it can modify or terminate the contract.[11] AR 7900. If the contract is in fact a meaningless, illusory contract that the Forest Service can terminate at will, then why has it not yet done so?  The contract with T2 is a stewardship contract that requires the Service to pay T2

---

[10] In response to BMBP's FOIA request, the Service has acknowledged that its "stewardship contract" to log the area in question is still in place. *See* AR 7900; AR 7897; and AR 7886.
[11] That, of course, is true of almost any contract so long as the breaching party also pays any actual damages.

$78,262 in appropriated funds (a significant portion of the contract requires T2 to conduct unprofitable, non-commercial thinning). AR 5170; AR 8242. The remaining balance of the service work, which totals approximately $114,000, is funded by the value of the commercial timber which T2 gets to keep (estimated to be $36,000 at the time the contract was signed). AR 8242–45. One reason the Forest Service has not terminated this contract can be found in documents that the Service *did not* want to share with the public; in an October of 2019, internal email Mark Phillip, a Forest Service contracting officer explained that the contract was merely put on hold, elaborating that "[i]f the treatment prescription changes drastically or wood product value continues to decline that contract awarded years ago will be terminated without performance and *we will lose those appropriated dollars and likely not have the funds to compete and complete a new project*." AR 7897 (emphasis added). In this email, Mr. Phillip also indicated that "already having an awarded contract and not having the funds is the second part of the scenario that doesn't meet the good news category that I would prefer not to share with a potentially less than understanding public." *Id*. *See also* AR 8242. This described use-it-or-lose-it situation clearly incentivizes the Service to make use of the previously appropriated funds, but only in a manner that does not deviate far from the original logging proposal in terms of treatment prescription, lest the contract be terminated and appropriated funds lost.

Even if the contract were illusory, the fact that appropriated funds may be lost if the treatment prescriptions change too much and the contract is terminated puts a thumb on the scale of the agency's NEPA analysis, in violation of 40 C.F.R. § 1502.2(f) (2019), which mandates that an agency "shall not commit resources *prejudicing selection* of alternatives before making a final decision." (emphasis added). It is clear the Forest Service is invested in the current terms of the existing contract so as not to lose appropriated funds, and the EA process served only to

justify the Forest Service's decision to log as it has been planning to do for five years. Similar to

the agencies in *Metcalf*, here the Forest Service has irretrievably committed resources before the

relevant NEPA analysis was undertaken, and the EA here is similarly "demonstrably suspect

because the process under which the EA was prepared was fatally defective." Metcalf, 214 F.3d

at 1146. The point of the holding in *Metcalf* is that by entering into a written, formal contract the

Forest Service has manifested a clear intent that is inconsistent with NEPA's objective analysis

of a proposal's impacts before approving that proposal. Entering into a logging contract and

leaving it in place, thereby committing appropriated dollars (i.e. resources) prejudiced the

selection of alternatives before the relevant NEPA process was even started, much less complete.

This is arbitrary and capricious and violates 40 C.F.R. §§1502.2(f) and 1502.2(g) (2019).[12]

> **d.  The Forest Service's Soils Analysis Violates NEPA (Claim 1, Count 7) and NFMA (Claim 2, Count 4).**

The ONF Plan, which provides applicable standards and thresholds for detrimental soil

disturbance in the forest, acknowledges that "timber management has the greatest potential for

detrimental impacts." AR 1611. The Plan instructs the Forest Service to "[s]trive to reduce

compaction and displacement to get as close to 90 percent of the total activity area … remaining

in a non-compacted/non-displaced condition," AR 1612, with "[t]he minimum [being] 80 percent

of the total activity area." *Id*.; Appendix at 1[13]; *see also* AR 7476 (Soils Report). Stated

differently, this means that soil disturbance must not exceed 20% of the total activity area.[14] The

---

[12] In *Metcalf*, the court determined that the remedy was to order a new EA be prepared that ensured an "objective evaluation free of the previous taint." *Metcalf*, 214 F.3d at 1146. Here, a revised NEPA document is also appropriate, but for the reasons discussed below, that revised document should be an Environmental Impact Statement (EIS).

[13] The complete soil compaction/displacement standard from the ONF Plan is reproduced in the attached Appendix, at 1.

[14] As noted by the Forest Service in its July 2020 Soils Specialist Report, "[a]n activity area is the total area for which a ground disturbing activity is planned, for example, a unit for a timber

Service acknowledged this standard when its Soils Specialist Report cited to the Forest Service

Manual policy to design new activities in a way "that do[es] not exceed detrimental soil

conditions on more than 20 percent of an activity area." AR 7476.

The Final EA describes several forms of detrimental soil disturbance that could result

from the Project's logging, including soil compaction from several different sources,

displacement, and puddling. AR 7695–700. In its discussion of Alternative 2's (the Preferred

Alternative) impact to soils, AR 7696–700, the EA includes a table, Table 26, titled "[e]stimate

of detrimental compaction by unit[.]" AR 7696; *see also* Appendix at 2.[15] The complete Table 26

is reproduced in the Appendix at the end of this memorandum. Table 26 includes an initial

column listing all eight logging units, a second column providing the acreage for each unit, then

three columns providing the amount of soil compaction in each logging unit from three specific

types of activities: skid trails, landings and temporary roads. Then a sixth column provides the

total soil compaction from these three activities expressed as a percentage of surface area of each

logging unit. A seventh and final column labeled "[e]stimated % detrimental disturbance before

restoration[,]" provides different larger percentage impacts for each unit. The last column

includes a percentage range for units 2–4, 17-22%, that includes percentages that would exceed

the permitted 20% disturbance threshold, *id.; see also* Table 26 set out in Appendix.

Other parts of the EA's analysis of soil impacts strongly indicate that Table 26 does not

include all soil compaction and displacement and thus underestimates by how much the logging

activities in units 2–4 will exceed the mandatory 20% compaction and displacement limitation. It

is unclear whether the broad wording of the final, seventh column of the EA's detrimental

---

sale, slash disposal project, or grazing allotment. The area would also include transportation
systems within and directly adjacent to the project." AR 7476.
[15] Table 26 from the EA, AR 7696, is reproduced in the attached Appendix, at 2.

compaction chart is intended to encompass compaction from all sources. For example although the EA indicates that compaction from off-trail activities will occur, AR 7697 (third paragraph), soil compaction from that source is not specifically listed in the Table. *See* AR 7696 (Table 26, also set out in Appendix). It is even less clear whether the Table's seventh column totals include other forms of detrimental disturbance, such as displacement and/or puddling. *See* AR 7698–99. The EA contains no table that clearly accounts for the total percentage of *all* compaction and displacement, and therefore it is unclear by how much the 20% threshold is actually exceeded. As noted by the Plan, "[c]ompaction, displacement, puddling, and severely burned soils *are to be considered collectively*, when assessing impacts[.]" AR 1611 (emphasis added).

This lack of clarity surrounding the disturbance totals specifically, and the soils analysis generally, is a violation of NEPA, 40 C.F.R. §§ 1500.2, 1502.8 (2019), and the Forest Service's exceedance of the mandatory compaction and detrimental disturbance soil standard set forth in the Plan is in clear violation of the NFMA, 16 U.S.C. § 1604(i).

NEPA's "hard look" requirement entails "both a complete discussion of relevant issues as well as meaningful statements regarding the actual impact of proposed projects." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1172 (9th Cir. 2006). Additionally, an agency's NEPA analysis must also be concise, clear, and written in plain language so that "decisionmakers and the public can readily understand them." 40 C.F.R. §§ 1500.2, 1502.1 and 1502.8 (2019). Here, the Forest Service failed to take a hard look by failing to provide "meaningful statements regarding the actual impact of [the] proposed project[]" on the soils in the project area. *Earth Island*, 442 F.3d at 1172. As discussed above, it is unclear how figures in the "[e]stimated % detrimental disturbance" column of Table 26 are calculated, and whether those figures include disturbances other than compaction. AR 7696; Appendix at 2. Without this information, it is

impossible to gauge the actual total anticipated impact to soils, and by how much it violates the Plan's standards. "[T]he public should not be required to parse the agency's statements to determine how an area will be impacted[.]" *Connaughton*, 752 F.3d at 761. If the Service neglected to consider these combined impacts then it violated NEPA by failing to take a hard look at impacts to soils. If the Forest Service did consider these combined impacts but failed to present that analysis in a way that "the public can readily understand[,]" then it violated NEPA by unlawfully impeding the public participation process. 40 C.F.R. §§ 1502.1, 1502.8 (2019).

The lack of clarity regarding the total impacts to soils not only implicates NEPA, but NFMA as well. NFMA requires the Forest Service to develop and implement a Forest Plan for each unit of the National Forest System. 16 U.S.C. § 1604. Projects in each forest must be consistent with its relevant Forest Plan, *see Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 850 (9th Cir. 2013), and reviewing courts must be able to reasonably ascertain that the Forest Service complied with that Forest Plan. *Native Ecosystems Council v. U.S. Forest Serv.,* 418 F.3d 953, 963 (9th Cir. 2005). Here, the Walton Lake Project is subject to the ONF Plan and its soil disturbance standards. Also here, the Forest Service has violated NFMA by planning to exceed the 20% disturbance threshold established in the ONF Plan.

As noted above, the Plan requires that a minimum of "80 percent of the total activity area" must remain in a "non-compacted/non-displaced condition[.]" AR 1612. The Plan's only mention of exceeding this threshold is to note that "*[e]xisting areas* exceeding these standards will be scheduled for rehabilitation as soon as possible[.]" *Id.* (emphasis added). It does not indicate that the threshold may be intentionally temporarily exceeded as long as it is mitigated later, as the Forest Service seems to suggest. AR 7696–7 (referring to "total estimated percent detrimental disturbance *before* restoration" (emphasis added)); AR 7697 ("[a] soils [project

design criteria] is included to restore compacted skid trails and landings in units 1 through 5 if they exceed the 20% detrimental threshold following [treatment activities.]"). This "exceed then restore" interpretation is inconsistent with the Plan's soils disturbance standard, and is not entitled to deference. *See Gifford Pinchot Task Force v. Perez*, No. 3:13-cv-00810-HZ, 2014 WL 3019165, *20 (D. Or. July 3, 2014) (although an agency's interpretation of its own regulation is usually entitled to deference, "forest plan directives are equivalent to federal regulations adopted under the APA" and thus courts need not defer where those directives are "susceptible to more than one meaning" and "the interpretation is plainly erroneous or inconsistent with the directive"). Here, the Plan clearly establishes a "minimum" of 80% undisturbed soil (20% maximum disturbance). AR 7476. The Forest Service clearly anticipates exceeding this soil disturbance threshold, AR 7696; AR 7699 ("the cumulative sum of these effects may temporarily exceed the 20% threshold"), and makes repeated reference to "restoration" or "mitigation" in order to meet the 20% standard. AR 7696–7; AR 7699. The decision to interpret the disturbance threshold in this way directly contradicts policy established by the Regional Forester in the Forest Service Manual to "[e]mphasize protection over restoration[,]" AR 7476, and violates NFMA, 16 U.S.C. § 1604(i), by approving the violation of a mandatory Forest Plan standard.

### e. Project is Significant Under NEPA and Requires an EIS (Claim 1, Count 5).

NEPA requires that agencies prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(C). The potential "significance" of a proposed action is determined by evaluating the context of those actions and the intensity of the effects within that proper context. 40 C.F.R. § 1508.27 (2019). The agency advancing or approving an action has the responsibility to demonstrate why an impact is not significant. *See Nat'l Parks Conservation Ass'n v. Babbitt*, 241

F.3d 722, 730 (9th Cir. 2001) (Forest Service failed to articulate a "convincing statement of reasons to explain why a project's impacts are insignificant"). "[T]o prevail on a claim that the Forest Service violated its statutory duty to prepare an EIS, a 'plaintiff need not show that significant effects will in fact occur.' It is enough for the plaintiff to raise 'substantial questions whether a project may have a significant effect' on the environment." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). The FONSI in the DN, AR 8731–8733, does not present a "convincing statement of reasons" to explain why the project's impacts are insignificant. Most fundamentally the FONSI fails to consider the project's impacts within the local context of the Walton Lake Recreation Area itself.

### i. Context

Significance "must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests*, and the locality*," and it "varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a) (2019) (emphasis added). For "a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole." *Id.* Here, the Forest Service not only refers to the proposed logging plan as "the site-specific Walton Lake Restoration Project," Final EA (AR 7598), but it has also proposed to adopt "site-specific forest plan amendment[s][,]" AR 7729, to the Plan in order to allow such logging to occur.[16] AR 8682. This characterization of both the project and forest plan amendments as "site-specific," as well as the localized nature of the project's direct and indirect impacts, indicate the appropriate context for evaluating the significance of this project is the locality–the Walton Lake project area–and not the ONF as a whole.

---

[16] See description of amendments above at 7–8.

Despite this clear guidance and the Forest Service's acknowledgement of the site-specific nature of the proposed project, the agency instead chose to analyze significance only in the context of the Developed Recreation Area designations for the entire forest and the ONF as a whole. The FONSI's ultimate conclusion regarding significance is solely based on the project's impacts being "narrowly focused on a very small piece of the Forest with no effects extending outside the project area." AR 8731. In discussing its "significance" determination the FONSI then begins the "Context" discussion by noting that while the project is limited to the 218-acre Walton Lake area, "the [ONF] includes about 845,498 acres; of those, about 1,810 acres were allocated in the Forest Plan to Developed Recreation Areas (MA-13)." *Id.* It then attempts to further minimize the perceived importance of impacts to the Walton Lake area by stating "the project area represents about .03% of the [ONF] and 12% of MA-13." *Id.* It then concludes that "[g]iven the area affected by the project *at the Management Area and Forest scale*, [the Forest Service] find[s] that the effects of the project are not significant" and "will have a negligible effect at the *Forest scale*." *Id.* (emphasis added). The Forest Service follows through with using an overly-broad scale in the body of the Final EA and DN/FONSI. In defending its proposed 35-acre sanitation harvest, the Service states that the "effects as disclosed in the EA for the 35 acres of sanitation harvest are minor on the *landscape*[,]" but provides no observations about the scope of the impact on the local area. AR 7781; AR 8762 (emphasis added).[17] The Service thus improperly attempts to obfuscate the localized impacts by reducing the entire Walton Lake Recreation Area, a whole unto itself, into but a small fraction of a much larger whole.

---

[17] Not only does the Forest Service's "Context" discussion fail to provide adequate analysis under 40 C.F.R. § 1508.27(a) (2019), it also contradicts the agency's admission that the proper scale to evaluate direct effects is "at the *project level*[.]" AR 7782, AR 8763 (emphasis added).

PLAINTIFF'S MOTION AND MEMORANDUM FOR A PRELIMINARY INJUNCTION

Establishing the proper setting and scale ("context") within which to evaluate the impact of an action is critical. The Forest Service is not allowed to sweep the significant impacts to the Walton Lake Area under the rug by pointing to the vastness of the surrounding forest. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035–37 (9th Cir. 2001) (agency cannot minimize the impact of an activity by adopting a scale of analysis so broad that it trivializes the site-level impact); *Cascadia Wildlands v. Bureau of Land Management,* 410 F. Supp. 3d 1146, 1157–58 (D. Or. 2019) (agency cannot marginalize effects to project area by comparing them to much larger surrounding watershed). Any one thing may seem small when compared to the universe. While a single housefire may be inconsequential on the scale of the city, the impacts on the effected home are devasting. So too, here, when evaluated in the proper local context, the Project will devastate about 25% of the visual influence portion of the 218-acre Walton Lake Recreation Area, including almost all of the area's moist mixed-conifer forest in units 2–4. AR 7575, AR 7583. This will likely have a significant impact on that relatively small but very popular recreation area and weighs toward requiring an EIS. *See Anderson v. Evans*, 371 F.3d 475, 490–92 (9th Cir. 2004) ("In short, the record establishes that there are 'substantial questions' as to the significance of the effect on the *local* area").

Here, the FONSI never addresses impacts of the Project in the local context. *Even if* the forest scale were a proper context in which to evaluate these impacts, the Forest Service would still need to *also* look at the significance of local impacts of the project, including visual impacts which the Service admits will be like a "[c]learcut with reserve trees," Buss Decl. Ex. 2 at 2, and "extremely noticeable" to visitors *Id.* Ex. 3 at 3. *See also* AR 7608 (describing how over 3,000 trees will be removed from units 2–4, including over 500 large or old growth trees, leaving on average only three large trees per acres); AR 7610, Figure 16 (illustration of how units will look

after prescribed logging). Because of this extensive logging the soil productivity in Units 2–4 likely would be significantly harmed by violating the Plan's mandatory soil disturbance limitation. AR 7696–7. The fact that the Forest Service approved four plan amendments for this relatively small area, amendments that completely reverse key environmental protection mandates, also implicate the overall local significance of the impacts and each of the intensity factors addressed below. The Forest Service's failure to evaluate significance in the local context is itself more than enough to invalidate the FONSI, but the record shows that the intensity of local impacts also raises "substantial questions" about the significance of those impacts.

### ii.  Intensity

The intensity element refers to the severity of impact and offers a non-exhaustive list of ten factors for consideration when evaluating the significance of a projects impacts, *BARK v. U.S. Forest Service*, 958 F.3d 865, 869 (9th Cir. 2020), several of which are implicated by the Walton Lake Project. *See* 40 C.F.R. § 1508.27(b) (2019). The presence of even just "one of these factors may be sufficient to require an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005). Taken together, all of the Walton Lake Project's impacts, including but not limited to those implicated by these specific factors, indicate that those impacts are indeed significant, especially at the local level, meriting an EIS.

In terms of unique characteristics, 40 C.F.R. § 1508.27(b)(3) (2019), that must include the most visited recreation site in the ONF, AR 7625, a site that contains beautiful old growth and large trees, which the Forest Service has targeted for almost complete removal in units 2–4, about 25% of the visual influence area. AR 7583. These scenic heavily forested areas are part of the draw of the area, as the Forest Service learned during its initial scoping. AR 4930; *see also* Miller Decl. at ¶¶ 6, 12. The Forest Service itself explains that Walton Lake is unique in that it is

the only developed recreation areas with a lake surrounded by both moist and dry mixed-conifer forests. AR 7729; *see also* AR 8771. And yet the Forest Service intends to almost entirely destroy the moist mixed conifer forest for this unique site.

With regard to controversial impacts, 40 C.F.R. § 1508.27(b)(4) (2019), such controversy exists where "a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use." *Found. For N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1182 (9th Cir. 1982)."A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI … casts serious doubt upon the reasonableness of an agency's conclusions." *Nat'l Parks Conservation Ass'n.,* 241 F.3d at 736. A substantial dispute exists regarding the impacts of the proposed logging activities on the incidence of laminated root rot in the project area. While the Forest Service claims that the proposed logging will curb the LRR problem, BMBP pointed out that logging may not only *not* resolve the issue, but may actually *spread* LRR. *See* AR 11118. Logging to control LRR would not significantly reduce LRR unless entire root systems of affected trees are removed (though, even then, wood fragments with the disease would likely persist in the soil). The Project's effects were also contested by a giant in the field of forest health and ecology, Chad Hanson, Ph.D., who commented during the 2015 scoping period. AR 11002 ("the project would not reduce LRR occurrence, as claimed, and would likely increase LRR occurrence through logging… due to the presence of infected stumps and root systems"). This would still be the case under the proposed action, which anticipates leaving stumps of harvested trees, as well as any infected root systems. AR 7595. Hanson pointed out that "stumps spread or increase LRR and 'pine trees may be infected when growing mixed with more susceptible conifers'" indicating that the remaining pine themselves could become infected. AR 11002. (citing Hanson and Goheen 2000, AR11006–

11030). The Service responded that it reviewed the information provided by Mr. Hanson, but that for this project "[t]here is no evidence that the proposed treatments would exacerbate [LRR][.]" AR 8760. This response improperly chooses to ignore rather than address the scientific controversy regarding the effects of using commercial logging to "curb LRR." [18]

The proposed action also implicates  40 C.F.R. § 1508.27(b)(6) (2019) because the use of forest plan amendments and commercial logging to treat LRR[19] sets a novel precedent. *See* AR 7729 (emphasizing that these amendments are unprecedented). As BMBP has pointed out before, LRR exists throughout the Ochoco and other eastern Oregon forests and is a native and necessary natural disturbance agent in our forests which fulfills valuable functions, like soil nutrient cycling and creation of habitat for wildlife.

With regard to cumulative impacts, 40 C.F.R. § 1508.27(b)(7) (2019), although the FONSI claims the EA's analysis considered the cumulative effects of the Project and any ongoing or reasonably foreseeable future actions, AR 8732–33, this is not accurate. The DN acknowledged that the EA did not address the cumulative impacts of the proposed amendment to the Eastside Screens themselves. AR 8733. The proposed amendment to the Eastside Screens was reasonably foreseeable long before the EA for this project was finalized in July 2020.[20] The

---

[18] Other studies the Forest Service reviewed also call into doubt the supposedly beneficial effects of this project in terms of curbing LRR. *See* AR 8448–485 (Thies and Sturrock, *Laminated Root Rot in Western North America* (April 1995)); AR 8394–445 (Shaw, et al., *Managing Insects and Diseases of Oregon Conifers* (June 2009)). They identify western larch, which the Service intends to replant the area with, as moderately susceptible to LRR. AR 8452; AR 8417.

[19] The Forest Service admits that it has never before used commercial logging to treat LRR in the ONF. AR 8389 (a response to BMBP's FOIA request on the topic).

[20] The ONF team would have been aware of this development, including its specific proposed scope, the outcome of which will impact the whole ONF, because public meetings were already being conducted on this proposal as of May 2020 (with planning likely occurring for weeks or months in advance), AR 8066, and because Shane Jeffries, the ONF supervisor, is also the deciding official for the Eastside Screens amendments. AR 8378.

elimination of the 21" standard in the project area combined with the potential (and now actual) elimination of the 21" mandatory standard across the entire ONF will invariably result in a cumulative impact to the number and distribution of large trees and LOS across the forest once new logging projects are implemented which take advantage of the relaxed protections.

Finally, the Project violates both NEPA and NFMA, including a violation of the Plan's soil disturbance limitation, which is also relevant to whether effects are significant. 40 C.F.R. § 1508.27(b)(10) (2019). The Project only arguably avoids other legal violations by including four different Plan amendments that exempt the Project from Plan provisions that would otherwise protect large trees, old growth, forested areas, and visual quality in the project area. BMBP challenges the legality of these amendments in claims that are not argued here for purposes of obtaining preliminary relief. *See* ECF No. 12 at 23–26. But even if the amendments were technically legal, the need to create so many exceptions to the Plan's environmental protection mandates indicates that the impacts of the Project on the Walton Lake area are significant.

The Forest Service has not here met its burden to articulate a "convincing statement of reasons to explain why a project's impacts are insignificant" and has totally failed to evaluate the significance of the projects impacts in the correct, local context, making the FONSI arbitrary and capricious. Moreover, BMBP has itself raised substantial questions about whether this project will have a significant effect on the environment, indicating that the Forest Service should prepare an EIS instead of this EA. Its decision not to do so is arbitrary and capricious.

### III.  The Balancing of the Equities and the Public Interest Strongly Favor a Preliminary Injunction Against the Logging of Large and Old Growth Fir Trees.

When the government is the defendant, the balancing of the equities and public interest factors generally merge. *W. Watersheds Project v. Bernhardt,* 392 F. Supp. 3d 1225, 1259 (D.

Or. 2019). Both these factors, whether considered together or separately, strongly favor a preliminary injunction against the proposed commercial logging.

The balancing of the equities factor focuses on the impacts of the requested preliminary injunction on the parties. *Id*. Here, the harm to the Forest Service from an injunction would be negligible and does not outweigh the interests of BMBP, its supporters, and the public in preventing irreparable environmental harm. In weighing the harms, the Ninth Circuit considers only the portion of the harm that would occur while the preliminary injunction is in place. *Connaughton*, 752 F.3d at 765. The focus must be on any interim harm to the Forest Service caused by delaying the implementation of the commercial logging portion of the Walton Lake Project to a future date, rather than October 15, 2021. *See AWR,* 632 F.3d at 1137–38 (balancing plaintiffs' irreparable injury absent injunction against harm to defendants from delay caused by injunction and rejecting arguments based on project never occurring as "speculative").

Here, the balance of the harms tip sharply in BMBP's favor. While a preliminary injunction may temporarily postpone any permanent alleged public safety, forest health or economic benefits from the Project, once the mature trees in the project area are cut down, those trees, along with the aesthetic quality and recreational opportunities they provide, are irreparably lost. *See AWR*, 632 F.3d at 1137. The Forest Service has had in place a closure order preventing public access to units 2–4 for several years that has and will continue to address any public safety issues while an injunction is in place. AR 7627. Furthermore, given that the Forest Service has already lagged roughly five years behind its original plan to begin cutting in late 2015, AR 5068, temporarily enjoining the Project will have a negligible effect on its interests. Laminated root rot, the target of much of the commercial logging, spreads very slowly, AR 5836, AR 4521, and therefore a short-term delay would have almost no impact on that aspect of forest health or

any increased threat to public safety. Additionally, BMBP does not seek to enjoin the removal of real hazard trees immediately adjacent to roads and campgrounds. *See* Motion at i.

The public interest also weighs heavily in favor of preserving the status quo and preventing irreparable environmental and other harms until this Court has fully reviewed the merits. *See Southeast Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1101 (9th Cir. 2006). Overall, because BMBP seeks to enforce federal laws designed to protect the environment, and because the injunction would preserve the status quo until the case is resolved, the injunction would serve the interests of the public. *See AWR,* 632 F.3d at 1138; *W. Watersheds,* 392 F. Supp. 3d at 1260–63. It would take many decades for seedlings to replace the old growth and large fir trees if they are logged. These mature trees, along with the aesthetic quality and recreational opportunities they lend to the Walton Lake Project area, will be enjoyed not principally by BMBP and its supporters but by many generations of the public at large. *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1382 (9th Cir. 1998). Thus, the public interest weighs heavily in favor of a preliminary injunction.

## IV.    The Bond Requirements Should be Waived.

BMBP respectfully requests that this Court waive the bond requirement or require only a nominal bond under FRCP 65(c). Longstanding Ninth Circuit precedent instructs that bonds should not be required if the effect would be to discourage public interest environmental litigation. *See W. Watersheds Project v. Bernhardt,* 391 F. Supp. 3d at 1026 (citing cases and waiving bond requirement). In determining whether to require a bond, courts consider factors such as the size of the plaintiff's organization and its ability to pay. *See, e.g., Ctr. for Food Safety v. Vilsack*, 753 F.Supp.2d 1051, 1061–62 (N.D. Cal. 2010) (dispensing with the bond requirement as applied to a small non-profit organization ), *vacated on other grounds,* 636 F.3d 1166 (9th Cir. 2011). BMBP is a small, non-profit organization bringing suit in the public

Page 34:    PLAINTIFF'S MOTION AND MEMORANDUM FOR A PRELIMINARY
             INJUNCTION

interest and does not have the resources to post a substantial bond. Hood Decl. ¶¶ 7–9. This

Court should exercise its discretion and waive or require only a nominal bond.

## CONCLUSION

For the reasons set forth above, and its supporting declarations, BMBP respectfully

requests that the Court issue an order, consistent with its motion, preliminarily enjoining, or

temporarily restraining, the Forest Service from allowing or implementing any of the commercial

sanitation logging or commercial thinning authorized in units 1–5 by the December 7, 2020

Decision Notice.

Respectfully submitted this 19th day of August, 2021.

 s/Tom Buchele
Tom Buchele, OSB # 081560
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland OR 97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

s/Jesse A. Buss
Jesse A. Buss, OSB # 122919
Willamette Law Group
411 Fifth Street
Oregon City OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

*Attorneys for Plaintiff Blue Mountains Biodiversity Project*

**APPENDIX**

**1989 Ochoco National Forest Land & Resource Management Plan (LRMP)**
**Soils, Forest-Wide Standards and Guidelines**
**LRMP at 4-196, AR 1612**

## Soil Compaction and Displacement

The threshold level of detrimental compaction is defined as any bulk density increase of 15 percent or more, or any macro pore space reduction of 40 percent or below 15 percent. These values are critical changes over the natural state in the top 12 inches of soil.

In order to maintain site productivity, all project activities will be planned to reduce soil compaction and displacement to the lowest reasonable level. Strive to reduce compaction and displacement to get as close to 90 percent of the total activity area (including permanent, rocked, and non-surface roads) remaining in a non-compacted/non-displaced condition, as realistically possible, one year after any land management activity. The minimum will be 80 percent of the total activity area. Existing areas exceeding these standards will be scheduled for re-habilitation as soon as possible

**Walton Lake Restoration Project July 2020 EA Soils Analysis Table 26
EA at 127, AR 7696**

Table 26:  Estimate of detrimental compaction by unit

| Unit | Unit Acres | *Skid Trails | Landings/ Acres | Temporary Roads | Estimated percent in landings, skid trails and temp. roads | Estimated % detrimental disturbance before restoration |
|---|---|---|---|---|---|---|
| 1 | 25 | 7172 ft (1.3 ac) | 3 (0.75 ac) | 1 @ 370 ft (0.1 ac) | 13 | 15-20% |
| 2 | 8 | 2129 ft (0.4 ac) | 1 (0.50 ac) | 1 @ 360 ft (0.1 ac) | 17 | 17-22% |
| 3 | 7 | 2159 ft (0.4 ac) | 1 (0.50 ac) | 1 @ 360 ft (0.1 ac) | 17 | 17-22% |
| 4 | 20 | 5425 ft (1.0 ac) | 2 (1.0 ac) | 1 @ 1080 ft (0.3 ac) | 17 | 17-22% |
| 5 | 18 | 4627 ft (0.8 ac) | 1 (0.25 ac) | Existing road | 13 | 15-20% |
| 6 | 55 | none | none | none | none | <10% |
| 7 | 38 | none | none | none | none | <10% |
| 8 | 7 | none | none | none | none | <10% |

**\*Skid trails are estimated to be eight feet in width, landings an acre in size and temporary roads
approximately 12 feet in width.**