Tom Buchele, OSB # 081560
Earthrise Law Center
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

Jesse A. Buss, OSB # 122919
Willamette Law Group
411 Fifth Street
Oregon City, OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

*Attorneys for Plaintiff Blue Mountains Biodiversity Project*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| **BLUE MOUNTAINS BIODIVERSITY PROJECT**, an Oregon nonprofit corporation, | Case No. 2:20-cv-2158-MO |
| Plaintiff, | REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION OR IN THE ALTERNATIVE FOR A TEMPORARY RESTRAINING ORDER (ECF No. 41) |
| v. | |
| **SHANE JEFFRIES**, in his official capacity as Ochoco National Forest Supervisor; and **UNITED STATES FOREST SERVICE,** an agency of the United States Department of Agriculture, | |
| Defendants. | |

# TABLE OF CONTENTS

Page Nos.

TABLE OF AUTHORITIES ..............................................................................iii

TABLE OF ACRONYMS ................................................................................ vi

INTRODUCTION ............................................................................................1

ARGUMENT ....................................................................................................2

I.      BMBP's declarations show exactly the type of irreparable harm that the Ninth
        Circuit—and this Court—have found sufficient to support an injunction..........................2

II.     BMBP is likely to succeed on the merits. ..............................................................6

        a.      The purpose and need statement is unreasonably narrow because the
                Forest Service put the cart before the horse, impermissibly letting the
                Forest Plan amendment alternatives inform the need (Claim 1, Count 2)..............6

                i.      The fourth purpose and need statement impermissibly transforms
                        an element of the preferred alternative into a "need." ................................7

                ii.     The first purpose and need statement is unreasonably narrow
                        and inconsistent with the Ochoco Forest Plan. ............................................8

        b.      The Forest Service failed to meaningfully consider an adequate range
                of alternatives (Claim 1, Count 3)..........................................................10

                i.      The purpose and need statement unreasonably limited the range
                        of alternatives considered and prevented meaningful consideration
                        of the non-preferred alternatives. .............................................................11

                ii.     The Forest Service neglected to consider reasonable alternatives that
                        both address relevant safety concerns and better preserve the qualities
                        that make Walton Lake unique. .................................................................12

                        1.      Posting signs around the relevant units..........................................12

                        2.      Shrinking the developed recreation boundary ..............................14

        c.      The Forest Service irretrievably committed resources to the Project
                before conducting its NEPA process (Claim 1, Count 4). ....................................16

                i.      The 2016 Contract irretrievably committed financial resources...............16

ii.    The 2016 Contract irretrievably committed natural resources. ................19

d.    The Service claims to meet a soil compaction standard that does not exist and its analysis fails to account for all soil disturbance (Claim 1, Count 7; Claim 2, Count 4)...... .........................................................................................20

e.    Project's FONSI is arbitrary and capricious (Claim 1, Count 5)..........................22

i.    Context: The Forest Service's FONSI never addresses the significance of impacts on the Walton Lake Recreation Area itself. ...........................22

ii.    Intensity: the Project's concentrated, intense impacts are significant for the Walton Lake Recreation Area..........................................24

III.    Equity and the public interest favor the status quo. ...........................................29

a.    Continued hazard tree removal, along with a continued closure order in units 2-4, will protect the public from any LRR-infected trees that may fall while a preliminary injunction is in place ......................................................................29

b.    The record does not reflect an imminent wildfire risk ...........................................32

c.    The minimal economic costs of a delay in Project implementation are more than offset by the benefits. ......................................................................................33

d.    The balance of equities and the public interest analyses have not changed since the Court issued its preliminary injunction in 2016.....................................33

IV.    The bond requirements should be waived. ........................................................................34

CONCLUSION ...........................................................................................................................35

# TABLE OF AUTHORITIES

**Case**                                                                        **Page Nos.**

*All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127 (9th Cir. 2011) .......................................4, 33

*Anderson v. Evans,* 371 F.3d 475 (9th Cir. 2004)...........................................................23, 26, 27

*Benton Cty. v. U.S. DOE*, 256 F. Supp. 2d 1195 (E.D. Wash. Feb. 28, 2003) ............................15

*City of Carmel-by-the-Sea v. U.S. DOT*, 123 F.3d 1142 (9th Cir. 1997).......................................7

*Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878
    (9th Cir. 2003)......................................................................................................................34

*Ctr. for Biological Diversity v. Hays,* No. 2:15-cv-01627-TLN-CMK, 2015 WL 5916739
    (E.D. Cal. Oct 8, 2015) .........................................................................................................4

*Ctr. For Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172
    (9th Cir. 2008)................................................................................................................10, 15

*Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836 (9th Cir. 2013)...............................15

*Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183 (2021) ....................................................25

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069
    (E.D. Cal. Oct. 15, 2004) .....................................................................................................11

*Kleppe v. Sierra Club,* 427 U.S. 390 (1976)...............................................................................23

*LOWD/BMBP v. Connaughton*, 752 F.3d 755 (9th Cir. 2014).....................................3, 5, 22, 32

*LOWD/BMBP v. Connaughton*, No. 3:12-cv-02271-HZ, 2014 WL 6977611
    (D. Or. Dec. 9, 2014) ...........................................................................................................4

*LOWD/BMBP v. Turner,* No. 2:16-cv-01648-MO (D. Or. 2016)........................................ *passim*

*LOWD/BMBP v. USFS*, 689 F.3d 1060 (9th Cir. 2012) ...............................................................11

*Lydo Enterprises, Inc. v. City of Las Vegas,* 745 F.2d 1211 (9th Cir. 1984).................................5

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000)........................................................................19

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) .............28, 29

PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

*Nat'l Parks Conservation Ass'n v. BLM*, 606 F.3d 1058 (9th Cir. 2010)..........................................8

*Nat'l Parks Conservation Ass'n v. Babbitt,* 241 F.3d 722 (9th Cir. 2001)..................................22

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-cv-0640-SI,
    2017 WL 1829588 (D. Or. Apr. 3, 2017) ...........................................................17, 18, 19

*Native Ecosystems Council v. U.S. Forest Service ex rel. Davey*, 866 F. Supp. 2d 1209
    (D. Id. June 6, 2012) ...........................................................................................25

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.,* 137 F.3d 1372 (9th Cir. 1998) ....................5

*Oakland Tribune, Inc. v. Chronicle Publishing Company, Inc.*, 762 F.2d 1374
    (9th Cir. 1985)....................................................................................................5

*Valdez v. U.S.*, 56 F.3d 1177 (9th Cir. 1995) ...............................................................13

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) ..................................12

*W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002 (D. Or. June 5, 2019)....................34

*Westlands Water Dist. v. U.S. DOI*, 376 F.3d 853 (9th Cir. 2004)...............................7

*WildWest Inst. v. Bull*, 547 F.3d 1162 (9th Cir. 2008).....................................16, 17, 19

## Codes and Regulations

40 C.F.R. § 1502.2(f) (2019) ...............................................................................18, 19

40 C.F.R. § 1502.13 (2019) ...................................................................................7

40 C.F.R. § 1506.1(a) (2019) ...........................................................................17, 18, 19

40 C.F.R. § 1508.7 (2019) ...................................................................................28

40 C.F.R. § 1508.27(a) (2019) .........................................................................22, 24

40 C.F.R. § 1508.27(b) (2019)..........................................................................24, 25

40 C.F.R. § 1508.27(b)(3) (2019)........................................................................25

40 C.F.R. § 1508.27(b)(4) (2019)........................................................................26

40 C.F.R. § 1508.27(b)(6) (2019)........................................................................26

40 C.F.R. § 1508.27(b)(7) (2019) ...............................................................27

**<u>Other</u>**

Forest Service Handbook, zero-code § 5 ........................................................7

**TABLE OF ACRONYMS**

| | |
|---|---|
| BMBP | Blue Mountains Biodiversity Project |
| DBH | Diameter at Breast Height (also: "dbh") |
| DN | Decision Notice |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| LRR | Laminated Root Rot |
| NEPA | National Environmental Policy Act |
| ONF | Ochoco National Forest |

PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

## INTRODUCTION

This is the second time Plaintiff Blue Mountains Biodiversity Project ("BMBP") has been before this Court seeking an injunction to prevent the commercial logging of hundreds of large and old trees in the Walton Lake Recreation Area. Although five years have passed since the Court issued a preliminary injunction in 2016 in *LOWD/BMBP v. Turner,* No. 2:16-cv-01648-MO (D. Or. 2016) (*"Turner"*), many things have not changed. Substantively, in terms of environmental impact, there is almost no difference between the enjoined *Turner* proposal and the 2020 proposal. The Forest Service still proposes more than 175 acres of logging within a 218-acre recreation area, including a "sanitation harvest" removing all but three trees per acre from 35 acres of old growth mixed conifer forest. The logging contract from 2016 is still in place, and is scheduled to be implemented this October, starting with logging of the largest trees.

But while the substantive Project has not changed much since 2016, the Forest Service's legal position has weakened considerably. On the merits, the Forest Service's post-2016 NEPA process has been even more seriously flawed than its 2015 NEPA process that led to the injunction in *Turner*. The Forest Service's position on the non-merits factors has similarly weakened since 2016, while BMBP's position remains unchanged. In 2016 the Forest Service submitted a declaration from District Ranger Turner that insisted it would have to close the entire Walton Lake campground if the Court prevented it from logging immediately. The Court's 2016 injunction, of course, prevented the 2016 logging, but the campground opened for the 2017 camping season and for each year since. As BMBP suggested, the Forest Service addressed public safety by posting signs and issuing a closure order for the area it considers dangerous.

The Service has now abandoned its threat to close the entire campground and, with it, its foremost balancing and public interest argument from *Turner*. Now, instead, a declaration from

Forest Supervisor Jeffries insists that another temporary injunction is unacceptable because it would "extend the time that the public and Forest Service employees are at risk." Jeffries makes no attempt to explain why it was acceptable to take four years to reauthorize this project (a process he supervised), but an additional short-term delay now suddenly creates an unacceptable safety risk. Indeed, although Jeffries points to a 2015 Forest Service report as justifying the dramatic shift in management he approved, that report actually endorses a much more limited response, similar to alternatives that the Service either rejected or refused to consider.

BMBP has satisfied all four factors showing it is entitled to a preliminary injunction against the Forest Service's reauthorized commercial logging at Walton Lake and the Court should issue that injunction to prevent logging from beginning this October.

## ARGUMENT

I.  **BMBP's declarations show exactly the type of irreparable harm that the Ninth Circuit—and this Court—have found sufficient to support an injunction.**

In its opening brief, BMBP, citing to the declarations of its members and controlling Ninth Circuit precedent, established that the Forest Service's proposed commercial logging of hundreds of large trees, including old growth firs, would irreparably harm its members' use of the Walton Lake area for bird watching and their ability to view and use the area in its "undisturbed state." ECF 41 ("Motion") at 19–20, citing Declaration of Marilyn Miller ("Miller Decl.") ECF 42 at ¶¶ 4, 10, 12, 14. The Forest Service buried its responding irreparable harm arguments near the end of its opposition brief, *see* ECF 49 at 37–41, and for a good reason: they are entirely without merit. With only one exception, this Court addressed and rejected essentially the same arguments

from the Forest Service in 2016.[1] For example, in 2016 the Forest Service also seized on the phrase "undisturbed state" and argued that, because some of the Walton Lake area is actually developed, BMBP would not be irreparably harmed by logging in such a "disturbed area." *Compare* 2021 Response, ECF 49 at 37–39, *with* 2016 Response, *Turner* ECF 17 at 31–32. In rejecting that argument, the Court first made clear that the case law uses the term "undisturbed state" to mean "undisturbed by future action." Supp. Buss Decl. Ex. 1 at 42. The Court further explained that: "[y]ou can enjoy a managed forest in its current condition without future cutting and make a claim." *Id*. at 43. No intervening case law or new facts exist that could change this conclusion.

The Forest Service's other arguments regarding BMBP's supposed lack of irreparable harm are equally without merit, having, with one exception, been rejected by the Court in 2016. In its one new irreparable harm  argument, the Forest Service attempts to distinguish *LOWD/BMBP v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) ("*Connaughton*"), in a bid to undermine the irreparable harm detailed in the declaration of BMBP supporter Marilyn Miller. In *Connaughton*, the Ninth Circuit had little trouble finding the plaintiff had established irreparable harm:

> [T]he Supreme Court has instructed us that environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. The LOWD plaintiffs have shown that the Snow Basin project will lead to the logging of thousands of mature trees. The logging of mature trees, if indeed incorrect in law, cannot be remedied easily if at all. Neither the planting of new seedlings nor the paying of money damages can normally remedy such damage. The harm here, as with many instances of this kind of harm, is irreparable for the purposes of the preliminary injunction analysis."

752 F.3d at 764 (internal quotation marks and citations omitted). The Forest Service now attempts to distinguish *Connaughton* by arguing that it involved "healthy mature trees," while

---

[1] The type and location of the logging at issue, *compare* AR 5058 *with* AR 8716–7, and even the identity of one of BMBP's declarants—Marilyn Miller (*see Turner* ECF 11; current ECF 42)—were the same in 2016 as they are now in 2021.

this case involves trees infected with laminated root rot ("LRR"). ECF 49 at 38. There are

multiple problems with this argument. First, there is nothing in the *Connaughton* opinion

limiting its irreparable harm holding to "healthy" trees or even suggesting that the mature trees at

issue in that case were in fact "healthy."[2] Second, as the Service admits, not all, or even most, of

the trees at issue here are infected with LRR. *See, e.g., id.* ("Here the Forest Service is proposing,

*in significant part,* [to log trees] dying from a laminated root rot infestation") (emphasis added);

AR 6311–12 (patches of LRR). Indeed a significant issue in the 2016 case was whether the

Forest Service could use a categorical exclusion that allowed it to log diseased trees to *also* log

surrounding, uninfected trees. *See* 2016 Motion, *Turner* ECF 9 at 38–39 (quoting Forest Service

spokesperson saying "disease is only about 25 percent of the project"). Third, nothing about

BMBP's irreparable harm is dependent on the logging of only healthy trees. That harm is also

largely tied to the logging of LRR-infected trees. Miller testifies that her irreparable harm in

great part will be caused by the loss of wildlife habitat, especially for birds, Miller Decl. ¶¶ 10–

11**,** and the Forest Service's own analysis admits that the large firs, even after they die from

LRR, provide good wildlife habitat. *See* AR 5048.

    The Forest Service cites to *Ctr. for Biological Diversity v. Hays,* No. 2:15-cv-01627-TLN-

CMK, 2015 WL 5916739, *11 (E.D. Cal. Oct 8, 2015), to support its "healthy mature trees"

limitation on the Ninth Circuit's holding in *Connaughton*, and, in fact, *Hays* does attempt to limit

*Connaughton* in that way. But *Hays* was wrongly decided on that issue, and this Court should not

follow it. There is no basis in the *Connaughton* opinion itself for such a limitation. Further, such

a limitation would be impossible to reconcile with the Ninth Circuit's holding in *All. for the Wild*

---

[2] In fact, as the district court's summary judgment opinion on remand makes clear, the Forest Service was arguing that some of the trees it had targeted for logging were diseased and others endangered overall forest health. *See LOWD/BMBP v. Connaughton*, No. 3:12-cv-02271-HZ, 2014 WL 6977611, *28 (D. Or. Dec. 9, 2014).

*Rockies v. Cottrell,* 632 F.3d 1127, 1129, 1135 (9th Cir. 2011), which expressly held that the logging of trees that had recently burned, and were dead or dying, would have caused the plaintiff irreparable harm. The Forest Service fails to even plausibly distinguish *Cottrell* or *Connaughton*, which both directly support a finding that BMBP has shown clear irreparable harm here in 2021, just as this Court found in 2016. Supp. Buss Decl. Ex. 1 at 43.

Realizing this, the Forest Service argues, as it did in 2016, that BMBP's supposed "delays" show it will not suffer irreparable harm. ECF 49 at 39. As this Court explained in 2016, "delay… has precious little to do with irreparable harm." Supp. Buss Decl. Ex. 1 at 42. While the cases the Service cites are readily distinguishable, they fail to cite to *Connaughton,* 752 F.3d at 765, which expressly rejected a delay argument in the context of a challenge to the logging of large trees, citing *Neighbors of Cuddy Mountain v. U.S. Forest Serv.,* 137 F.3d 1372, 1381–82 (9th Cir. 1998), another case the Service ignores.[3] In *Cuddy Mountain* the plaintiff waited to sue until more than two years after the logging at issue began*, id.*, but that delay did not stop the it from obtaining an injunction against future logging. In this case, by contrast, BMBP sued only a few days after the Forest Service issued its Decision Notice ("DN"), AR 8713, 8734; ECF 1**,** and it sought a preliminary injunction about two months before logging was to begin. ECF 41 at 3.

Overall, the Forest Service's "delay" argument is difficult to understand. Apparently the Forest Service believes that BMBP has gained some sort of advantage by seeking a preliminary injunction, where it has to satisfy four different requirements, instead of seeking summary judgment, where it only has to prove success on the merits. BMBP fails to see how this gives

---

[3] Rather than citing to these much more on-point cases, the Forest Service cites to *Lydo Enterprises, Inc. v. City of Las Vegas,* 745 F.2d 1211, 1212 (9th Cir. 1984) and *Oakland Tribune, Inc. v. Chronicle Publishing Company, Inc.,* 762 F.2d 1374, 1376 (9th Cir. 1985). Those plaintiffs did not seek relief until several years after the conduct supposedly causing the irreparable harm had begun. BMBP in contrast seeks relief before any logging has started.

BMBP some unfair advantage or actually prejudices the Forest Service, and the Service cites no actual prejudice. If BMBP had filed its motion immediately after it sued, the Forest Service would undoubtedly have argued that such a motion was premature because the Forest Service did not intend to start logging until the fall and BMBP's harm was therefore not "imminent."

In summary, the Forest Service's irreparable harm arguments are inconsistent with binding Ninth Circuit case law and this Court's irreparable harm ruling in 2016 that addressed essentially the same logging and almost identical irreparable harm evidence.[4] BMBP's declarations show it will clearly be irreparably harmed if the Forest Service is allowed to begin logging in October before the Court can fully address the merits of its claims.

## II.     BMBP is likely to succeed on the merits.

### a.   The purpose and need statement is unreasonably narrow because the Forest Service put the cart before the horse, impermissibly letting the Forest Plan amendment alternatives inform the need (Claim 1, Count 2).

The Forest Service denies that its purpose and need statement is unreasonably narrow, suggesting that it was appropriate to include Forest Plan ("Plan") amendments in the purpose and need statement where such amendments were a part of its proposed action and arguing the purpose and need statement is consistent with the Ochoco Forest Plan. The Service's arguments are unavailing because the National Environmental Policy Act ("NEPA") requires that the purpose and need inform the creation of alternatives, not the other way around, and because agencies may not define a need in so narrow a manner as to predetermine the outcome.

---

[4] In at least one respect the evidence of immediate irreparable harm to BMBP's interests is somewhat stronger here than it was in 2016 when the Court noted that it was not entirely clear how much of the harmful logging of large trees would occur in the immediate future. *See* Supp. Buss Decl. Ex. 1 at 43. The Jeffries Declaration, however, clarifies that in 2021 the "[s]anitation harvest would be prioritized to complete first[.]" ECF 49-1 ¶ 13. It is of course the "sanitation harvest" that will target the most large and old growth firs. AR 7583.

### i. The fourth purpose and need statement impermissibly transforms an element of the preferred alternative into a "need."

In its Motion, BMBP noted there was "no legitimate reason to include a 'need to amend the forest plan' [AR 7574] in the purpose and need statement" because doing so improperly narrows the purpose and need, thus allowing the Service to "improperly predetermine" its selected, preferred alternative. ECF 41 at 23. In response, the Forest Service asserts that "[i]f a proposed action includes amendments, then it is appropriate to address that need in an [Environmental Assessment ("EA")]." ECF 49 at 20. While it may be appropriate to discuss potential amendments or potentially using an amendment as part of an alternative to *meet* a legitimate need in an EA, it is not appropriate to *transform the amendment*, an element of the proposed action/preferred alternative, *into a need*. This is the opposite of what NEPA requires. The purpose and need informs the selection of alternatives; the preferred alternative should *not* inform the formulation of the purpose and need. "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives." *City of Carmel-by-the-Sea v. U.S. DOT*, 123 F.3d 1142, 1155 (9th Cir. 1997).[5] By using elements of the preferred alternative to define the "need" of the action, the Service put the cart before the horse, violating NEPA's requirement that the purpose and need be used to identify alternatives. *See* 40 C.F.R. § 1502.13 (2019).

The Service asserts that "[c]ourts review purpose and need statements for reasonableness giving the agency considerable discretion to define a project's purpose and need." ECF 49 at 18. However, "this discretion is not unlimited." *Westlands Water Dist. v. U.S. DOI*, 376 F.3d 853, 866 (9th Cir. 2004). A purpose and need statement fails if it unreasonably narrows the agency's

---

[5] Even the Forest Service Handbook acknowledges this order of operations. *See* FSH 1909.15 zero-code § 5 ("Definitions") ("Proposed Action [Alternative]. A proposal made by the Forest Service to authorize or implement an action *to meet* a specific purpose and need[.]" (emphasis added)). Supp. Buss Decl. Ex. 3 at 14.

consideration of alternatives so that the outcome is preordained. *Nat'l Parks Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070 (9th Cir. 2010). Including a desired *element* of the preferred alternative/proposed action (amending the forest plan) as *part of the purpose and need* allowed the Service to avoid selecting an alternative that did *not* contain the element (because it did not meet the unreasonably narrow purpose and need). The Service characterizes BMBP's position as "boil[ing] down to an objection that the Plan Amendment is listed in the purpose and need statement, not that it was actually analyzed so as to preclude alternatives that did not include Plan amendments." ECF 49 at 21. That is not correct. BMBP objects to the inclusion of plan amendments listed in the purpose and need statement *because doing so violates NEPA* by precluding the meaningful consideration of alternatives, which in fact happened here. *See* discussion below at 11–12.

### ii. The first purpose and need statement is unreasonably narrow and inconsistent with the Ochoco Forest Plan.

The first purpose and need statement states: "[t]here is a need to curb the laminated root rot infestation where it occurs within the Developed Recreation Management Area around Walton Lake, to develop a healthy stand of vegetation, and provide for public safety." AR 7573. This first "need" is both overly specific and not consistent with the Ochoco Forest Plan. The need requires that LRR be "curbed" wherever it occurs within the Developed Recreation Area, but this fails to account for the distinct management requirements of the *two* sub-areas within the Developed Recreation Area. The Service correctly noted that "[t]he Forest Plan provides that the emphasis within Developed Recreation is to 'provide safe, healthful, and aesthetic facilities for people to utilize while they are pursuing a variety of recreational experiences within a relatively natural outdoor setting.'" ECF 49 at 19, quoting the 2020 EA (AR 7573), which quotes the Forest Plan at 4-71 (AR 1486). But the Plan also provides that the Developed Recreation Area

"includes the *developed site* and *a visual influence area* that surrounds each site." AR 1486 (emphases added). The Plan sets forth separate standards for the developed site and the visual influence area. AR 1629 (in the developed site, "[h]arvest only for the purpose of maintaining safe and attractive recreational sites[,]" and in the visual influence area, "[p]recommercial thinning and commercial thinning may be done to meet the visual quality objectives and maintain healthy stands"). The Service acknowledged these different timber standards in the 2020 EA. AR 7575 (acknowledging that the management area "includes the *developed site* and a *visual influence area*") (emphasis in original); *id.* ("standards and guidelines apply at three different scales in this MA: 1) entire Developed Recreation MA; 2) *within developed site only*; and 3) *within the visual influence area only*.") (emphasis added).

By framing the "need" in a way that required the same treatment of LRR on all portions of the Developed Recreation Area, the Service made it impossible to then select any reasonable alternative that completely "curbs" LRR only in the developed site (where public safety is most crucial due to extended exposure to potential hazards), but not within the visual influence area (where potential exposure to hazards is transitory, or non-existent where closure orders exist).[6] Additionally, this "need" framing ignores the Forest Plan's intention to manage timber in each sub-area based on its respective unique prescription. AR 1629.

In its Motion, BMBP provided an example purpose and need statement illustrating how a statement could have more consistently reflected relevant Forest Plan provisions. ECF 41 at 23. BMBP did not suggest that this was the *only* appropriate formulation of the purpose and need

---

[6] "Developed sites are places where people often congregate and are exposed for longer than normal time periods to damaged or defective trees. The longer the time frame of exposure to hazard trees, the greater the potential for property damage or personal injury." AR 3656 (1992 Long-Range Planning for Developed Sites in the Pacific Northwest: The Context of Hazard Tree Management).

statement for this project. Nevertheless, the Forest Service faults BMBP's hypothetical purpose and need by stating it "ignores… Forest Plan direction to 'remove' laminated root rot[,]" and it "treats the Project area as though it were two separate project areas – a developed and 'undeveloped' area." ECF 49 at 20. But there is no Plan directive to entirely remove LRR. And, as discussed above, the Plan calls for different management prescriptions for those two areas.

There is no "direction to 'remove' laminated root rot" in the Plan. ECF 49 at 20. The Forest Service quotes the Plan's Pest Management Strategies to support its argument, but the quoted Plan language is provided in a column titled "Management Strategies[,]" AR 1566, *not* "management directives." The text introducing this table indicates that the strategies are not mandatory (rather, the Service has discretion to "[s]elect strategy through the environmental analysis process") and that "[e]xceptions for individual management areas" exist. AR 1564. So, no, there is no Plan requirement to "remove" LRR wherever it is found.

By framing the purpose and need statement to include a "need" to "curb" LRR in *all areas* of the Recreation Management Area, the Service preordained the chosen alternative to be selected; it was the only alternative that would "curb" LRR everywhere. This was both arbitrary and capricious, and in violation of the APA and NEPA.

### b.  The Forest Service failed to meaningfully consider an adequate range of alternatives (Claim 1, Count 3).

The Service argues it gave meaningful consideration to an adequate range of alternatives, citing the fact that it "considered four alternatives and discussed them in detail[.]" ECF 49 at 22. It then states "the only question before the court here is whether the Forest Service adequately considered the alternatives[.]" *Id*. However, discussing alternatives does not fulfill an agency's NEPA obligation to give alternatives "full and meaningful consideration," *Ctr. For Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008), if the

range of alternatives discussed is not reasonable in the first place. The more accurate questions before the Court are whether the Service reasonably considered the alternatives it did address and whether the range of alternatives was adequate. The answer to both questions is no.

### i. The purpose and need statement unreasonably limited the range of alternatives considered and prevented meaningful consideration of the non-preferred alternatives.

The Ninth Circuit "review[s] the purpose and need, along with the choice of alternatives, under a 'reasonableness standard'… first determin[ing] whether the statement of purpose and need was reasonable, and then whether the range of alternatives considered was reasonable in light of that purpose and need." *LOWD/BMBP v. USFS*, 689 F.3d 1060, 1069 (9th Cir. 2012). As discussed in Section II(a) above, the purpose and need statement was not reasonable, thus, the range of alternatives considered was also unreasonable. "NEPA mandates that an agency consider and discuss the range of all reasonable alternatives to the proposed action, to 'provid[e] a clear basis for choice among options by the decisionmaker and the public.'" *Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069, 1088 (E.D. Cal. Oct. 15, 2004).

In its unreasonably narrow statement of purpose and need, the Service included a "need" to "curb the laminated root rot infestation where it occurs within [the entire project area]." AR 7573. The Service then discussed alternatives that *did not* curb LRR in the whole area. AR 7585 (describing Alternative 3); AR 7587 (describing Alternative 4). The Forest Service ultimately rejected Alternatives 3 & 4 on those grounds. *See* AR 8728 (Alternative 3 rejected because it did not "tackle the whole area infested with laminated root rot within the Developed Recreation Management Area"); *id.* (Alternative 4 rejected, in part, because "there is no remediation of the forest health issues in Units 2, 3, and 4"). The Forest Service's own 2019 Forest Health

Biological Evaluation, authored by six Forest Service experts, specifically endorsed Alternative 3. AR 6300. The DN does not explain why their advice was not accepted.

Despite the Service's claim that "[no alternatives] were rejected based on whether or not the alternative required [forest] plan amendments[,]" ECF 49 at 21–22, citing AR 7582–88, in fact they were.[7] Similar to the "need" discussed immediately above, the Forest Service included a "need to amend the [Forest Plan,]" AR 7574, in order to conduct desired logging of large trees ($\geq$ 21" diameter at breast height ("DBH")) in certain units. AR 7598. The Service then advanced an alternative that *did not* involve amending the Forest Plan (and thus would not allow the desired logging of large trees). AR 7587 (describing Alternative 4); AR 8728 (Alternative 4 developed in a way "to eliminate any Forest Plan amendments"). The Forest Service then rejected Alternative 4 on those grounds. *See* AR 8728 (Alternative 4 rejected, in part, because "large fir… would not be thinned out" where the desired "thinning" would have required plan amendments).

### ii. The Forest Service neglected to consider reasonable alternatives that both address relevant safety concerns and better preserve the qualities that make Walton Lake unique.

"The existence of a viable but unexamined alternative renders an [EA] inadequate." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013). In its Motion, BMBP highlighted two unexamined reasonable alternatives that the Forest Service should have considered as part of its alternatives analysis.

### 1. Posting signs around the relevant units.

Raised in its scoping comments, AR 6199, and explained in its Motion, ECF 41 at 26, BMBP proposed an alternative of posting adequate signage around units of concern while leaving them

---

[7] Although the Service cites AR 7582-88 twice to support this assertion, *see* ECF 49 at 21 and 22, that is a citation to the EA's description of the four alternatives. It is the DN, AR 8728, that addresses why other alternatives were rejected.

open for recreation. This alternative still allows logging in the "developed site" area, thus promoting public safety, while also reducing unnecessary logging of large trees in the "visual influence area," consistent with the management prescription for each area. AR 1486.

The Forest Service's response faults BMBP for citing *Valdez v. U.S.*, 56 F.3d 1177 (9th Cir. 1995). There, the Ninth Circuit determined that posting signage to warn visitors of the dangers of a waterfall adequately balanced the agency's goal of public safety with competing policy concerns. *Id.* at 1180. The Service, however, says "the Forest Service's concern is to ensure safety, not to avoid tort liability."[8] ECF 49 at 23. The Service then refers to a "tree failure...fatality" without providing any context,[9] before explaining its rejection of BMBP's suggested "signage" approach by discussing an entirely different approach involving a fence.[10] *Id.* The Service additionally asserts that a signage strategy would address neither the public safety goals nor the LRR situation in affected units. ECF 49 at 23–24. This is incorrect. BMBP's suggested approach does address these matters, just in a different way than the Service is apparently determined to implement. The Forest Service additionally notes that:

> The safety concerns are serious enough to warrant a formal closure rather than just signage alone. *If the stand were not part of a Developed Recreation Management Area, where people are invited to recreate and spend time, general warnings about entering the Forest would be more appropriate.*

[8] The Service's *Long-Range Planning for Developed Sites in the Pacific Northwest: The Context of Hazard Tree Management* 1992 guidance document, AR 3647–775, which the Service relies on regularly in its EA (*see* AR 7769; AR 7773; AR 7775; AR 7779) reveals that at least part of the impetus for developing that guidance was to combat "an increasing indefensibility of management decisions in [Federal] Tort Claim [Act] actions against the agency." AR 3661, 3663. Tort liability is again raised in the 2014 *Field Guide for Hazard-Tree Identification and Mitigation on Developed Sites in Oregon and Washington Forests*. AR 4644.

[9] It is unclear how this event is relevant to Walton Lake. The incident did not occur at or near Walton Lake, AR 8697, did not involve LRR, AR 8699, and occurred during a high wind event, AR 8697.

[10] BMBP notes that the "fence" alternative appears to have been ultimately rejected due to the inconvenience of maintaining such a fence, *not* based on human safety concerns, which presumably underlie the basis for rejecting BMBP's signage approach. AR 7601.

ECF 49 at 13, citing to AR 7767 (emphasis added). Thus, the Forest Service's own explanation perfectly illustrates the second alternative the Service should have considered, which was actually advanced by Forest Service personnel.

## 2. Shrinking the developed recreation boundary.

The Service should have considered an alternative that shrank the developed recreation area boundary to within 150 feet of the loop road and limited sanitation harvest to that area. This alternative was raised by Kent Koeller, Forest Service recreational planner, AR 7901, and was highlighted by BMBP in its objection comments,[11] AR 7843–44, and Motion, ECF 41 at 26–27.

The Service first argues that it already considered an alternative limiting logging to the loop road corridor. ECF 49 at 24, citing to AR 7585. But unlike a simple reduction in the logging area, shrinking the size of the developed recreation area would reduce the Forest Service's burden (perceived or real) to make all of units 2–4 within the visual influence area "safe," even if rarely visited.[12] The entire forest cannot be made safe, and the Service must focus on spaces where safety is a true priority. This alternative suggests adjusting the boundary of the Walton Lake recreation area to more closely reflect the area that actually *requires* a high level of safety.

The Service asserts that "[m]oving the management area boundary would not remove the risk to public safety and the Forest Service could still close the area to protect public health and safety." ECF 49 at 24. Perhaps, but "[i]f visitors wish to recreate in forested habitats, they must accept a certain amount of hazard." AR 3662–3. And even the Service admits that moving the boundary would make "general warnings about entering the Forest… more appropriate." ECF 49

---

[11] The objection comment period was the first opportunity that BMBP had to raise this issue, because it did not receive the document containing Mr. Koeller's suggested approach, provided to BMBP by the Forest Service in response to a February 2020 Freedom of Information Act request, until after the prior comment period had closed. *See* AR 7844, n.9.

[12] *See* note 8 above.

at 23, *see also* AR 7901 ("it is only within developed recreation boundary that we address safety. We wouldn't safe proof a trail otherwise").[13]

The Service also argues that "this proposal was not brought forward by BMBP or any other members of the public during scoping or comment periods and cannot be brought forward now in briefing." ECF 49 at 24. This exhaustion argument is meritless because the Forest Service had more than sufficient notice of this proposed alternative, and its source is not relevant. "The exhaustion doctrine serves to permit administrative agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention in the process." *Great Old Broads for Wilderness v. Kimbell,* 709 F.3d 836, 846 (9th Cir. 2013); s*ee also, Benton Cty. v. U.S. DOE,* 256 F. Supp. 2d 1195, 1198–99 (E.D. Wash. Feb. 28, 2003) ("a plaintiff, *or another,* must bring sufficient attention to an issue to stimulate the agency's attention and consideration of the issue during the environmental analysis comment process") (emphasis added).

Here, this alternative was raised by a member of the Service both during the project scoping comment period and prior to that comment period. AR 6058–64 (scoping notice setting comment period for August 7 through September 6, 2019); AR 7901 (August 27, 2019 email stating "I have from day one of this project two plus years ago recommended at least shrinking the developed recreation boundary in places to within (two tree lengths) 150 feet of the loop road and promoting a sanitation treatment for LRR within that boundary" (parenthetical in original)). And BMBP clearly raised it in its pre-decisional Objection. AR 7843–44. The agency is instructed to "give[] full and meaningful consideration" to alternatives. *Ctr. for Biological Diversity,* 538 F.3d at 1217. This requirement does not discriminate based on the origin of those

---

[13] "[I]t is not reasonable to eliminate all hazards (i.e. all trees) from a recreation site, line officers must decide what constitutes an acceptable level of risk, then treat or mitigate as necessary to achieve that level while minimizing disturbances and impacts on aesthetics and recreation enjoyment." AR 3670.

alternatives. Accepting the Service's argument would elevate form over substance and lead to absurd results, allowing the Service to unreasonably reject reasonable alternatives simply because they were suggested by Service employees instead of the public.

### c. The Forest Service irretrievably committed resources to the Project before conducting its NEPA process (Claim 1, Count 4).

The Forest Service denies it violated NEPA by irretrievably committing resources to the Project before conducting its NEPA process, arguing that it only pre-committed *financial* resources, which is allowed under NEPA, and not *natural* resources, which is disallowed under NEPA. ECF 49 at 25–27. The Forest Service is wrong on the law and the facts: the pre-decisional commitment of financial resources *can* (and here, does) violate NEPA, and the Forest Service did, in fact, make a pre-decisional commitment of natural resources.

### i. The 2016 Contract irretrievably committed *financial* resources.

In its response to BMBP's arguments regarding the 2016 logging contract with T2, the Forest Service does not dispute that the contract is still in place, nor that the Service is relying on performance of that contract for implementation of the Project. *See* ECF 49 at 25–27. Rather, the Service argues that "appropriated funds are not the type of natural resources that would constitute a premature irreversible and irretrievable commitment." *Id.* at 26. The Forest Service relies entirely on *WildWest Inst. v. Bull*, 547 F.3d 1162 (9th Cir. 2008), and the cases cited therein, to support its position. *See* ECF 49 at 25–27. That reliance is misplaced.

No case says that *only* the premature commitment of *natural* resources violates NEPA. *WildWest* itself states that "a financial commitment can, in some instances, constitute an irretrievable commitment. For example, if an agency spent most or all of its limited budget on preparations useful for only one alternative, it may well have taken action limiting the choice of reasonable alternatives." 547 F.3d at 1169. That example from *WildWest* is very similar to what

the Forest Service has done in this case by making the Project's financial feasibility dependent on the selection of an action alternative that emphasizes profitable commercial logging.

As explained in BMBP's motion, ECF 41 at 30, the Service's contracting officer admitted that the 2016 logging contract with T2, which remains in place, is a use-it-or-lose-it agreement: "[i]f the treatment prescription changes drastically or wood product value continues to decline that contract awarded years ago will be terminated without performance and *we will lose those appropriated dollars and likely not have the funds to compete and complete a new project.*" *Id.* (citing AR 7897) (emphasis added)).[14] Because the Project's financing is contingent on the selection of a logging plan that is similar to the logging plan in the 2015 decision, the contracting officer was worried about "already having an awarded contract and not having the funds" to pay for it. *Id.* In other words, if the Forest Service changed the Project too much from that contemplated by the 2015 decision, the Forest Service would "likely" not be able to pay for or implement *any* version of the Walton Lake Project. *See id.* at 27–31. Similar to *WildWest*, this is an example of "an agency spen[ding] most or all of its limited budget on preparations useful for only one alternative" (i.e. the alternative selected in 2015 and reflected in the 2016 T2 contract), thus "limiting the choice of reasonable alternatives." 547 F.3d at 1169. That is a violation of NEPA under 40 C.F.R. § 1506.1(a) (2019).

There are two additional reasons that *WildWest* does not aid the Forest Service here, both of which were noted and relied upon by Judge Simon in *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-cv-0640-SI, 2017 WL 1829588 (D. Or. Apr. 3, 2017)("*Nat'l Wildlife Fed'n*"). In that case, the plaintiffs sought to enjoin federal agencies from spending large amounts of money on capital improvements for the four Lower Snake River dams while the

---

[14] The contracting officer also bluntly states that the 2016 contract "was awarded essentially pre-decision of the current NEPA documentation." AR 7897.

NEPA process was incomplete. The plaintiffs argued the pre-decisional commitment of financial

resources would, under 40 C.F.R. § 1502.2(f) (2019), "prejudic[e the] selection of alternatives,"

therefore biasing the NEPA process, and, under § 1506.1(a), "[l]imit the choice of reasonable

alternatives." *Id.* at *11. In opposition, the federal agencies argued that, under the *WildWest*, a

financial commitment alone can only violate NEPA if it would spend "all or most of an agency's

limited budget in preparation for only one alternative." *Id.* at *13. Because, they said, the

example from *WildWest* did not apply to the facts of the case (presumably because the agencies

had a large budget for the project and were not financially constrained), there was no violation of

NEPA. Judge Simon rejected the government's reliance on *WestWest* for two reasons:

> First, the Ninth Circuit [in *WildWest*] was providing only one example of when a
> financial commitment may be considered limiting an agency's alternatives [under §
> 1506.1(a)], and there is no indication that example was meant to be exclusive.

> Second, the discussion by the Ninth Circuit in *WildWest* does not mean that a similar
> level of commitment is required under 40 C.F.R. § 1502.2(f), which prohibits agencies
> from 'prejudicing' the selection of alternatives. The Court must give meaning to the fact
> that the agency used the term 'prejudicing' in § 1502.2(f) and 'limiting' in §
> 1506.1(a)….If 'prejudicing' alternatives is construed identically as 'limiting' alternatives
> in § 1506.1(a), then § 1502.2(f) would be superfluous. This is contrary to 'the canon of
> construction that courts interpret statutes so as not to render any section meaningless.'

> The term 'limiting' connotes a more definitive restriction than does 'prejudicing.' *See*
> BLACK'S LAW DICTIONARY (10th ed. 2014) (defining 'limit' as: '1. A restriction or
> restraint. 2. A boundary or defining line. 3. The extent of power, right, or authority.' and
> defining 'prejudice' as '1. Damage or detriment to one's legal rights or claims . . . . 2. A
> preconceived judgment or opinion formed with little or no factual basis; a strong and
> unreasonable dislike or distrust. — Also termed *preconception*." (emphasis in original)).
> **Thus, the level of commitment required to 'limit' an agency's alternatives is higher
> than the level [of] commitment required to 'prejudice' an agency's alternatives.
> Accordingly, even if it were required for an agency to spend most or all of its budget
> on one alternative before it could be found to violate § 1506.1(a) (which the Court
> does not find is necessitated by the holding in *WildWest*), the Court holds that a
> lesser commitment may nonetheless violate § 1502.2(f).**

*Nat'l Wildlife Fed'n* at *29–31 (internal citations omitted)(bolding added).

Judge Simon's interpretation of *WildWest* was correct, and the Court should apply the same analysis here. Even if the 2016 T2 logging contract did not neatly fit within the *WildWest* court's example (although it does fit neatly), there is no indication that the example was meant to be exclusive. *See* 547 F.3d at 1169. Under *WildWest*, the crucial question is whether, under 40 C.F.R. § 1506.1(a) (2019), a pre-decisional financial commitment would, as a practical matter, "limit" the agency's choice of reasonable alternatives. *Id.* Here, the agency is reliant on a pre-existing contract to keep the Project's appropriated funding. The exigencies of keeping that contract do, as a practical matter, "limit" the agency's choice of reasonable alternatives under § 1506.1 where some of those alternatives, if selected, would jeopardize funding under the existing contract. Those exigencies are discussed above and in BMBP's motion, ECF 41 at 27–31.

Further, as Judge Simon noted, even *if* the *WildWest* decision required an agency to spend most or all of a limited budget on one alternative before it could be found to violate § 1506.1(a), a "lesser commitment [of financial resources] may nonetheless violate § 1502.2(f)." *Nat'l Wildlife Fed'n* at *14. Here, for the reasons explained above and in BMBP's motion, the Forest Service's financial dependence on the viability of the 2016 T2 logging contract "prejudices" the selection of alternatives in violation of NEPA under § 1502.2(f). *See also Metcalf v. Daley*, 214 F.3d 1135, 1145 (9th Cir. 2000).

### ii.    The 2016 Contract irretrievably committed *natural* resources.

The Forest Service's insistence on keeping its logging contract in place before and during the NEPA process not only illegally committed *financial* resources, it also committed *natural* resources in violation of NEPA.[15] To the extent the Service argues that it did not pre-commit

---

[15] The Forest Service argues that the pre-marking of trees for logging at Walton Lake did not constitute an irretrievable commitment of resources. ECF 49 at 26. BMBP never argued otherwise, and therefore will not further respond to the Forest Service's argument.

natural resources, ECF 49 at 26, it is ignoring the fact that it entered into a binding contract with T2 for the specific purpose of extracting natural resources (i.e. logging) from the Walton Lake Project area. Such an agreement is a quintessential example of a commitment of natural resources that "limits" the choice and "prejudices" the selection of alternatives under NEPA.

The T2 contract has remained in place for over five years and was entered into well before any consideration of alternatives under the current NEPA process began. *See* ECF 41 at 29–30. Once this Court issued its preliminary injunction in late 2016, and the Forest Service withdrew its 2015 decision, it should have abandoned its contract with T2. Its refusal to do so even while conducting an alternatives analysis under NEPA was an error, albeit an error in line with the initial decision-maker's commitment, throughout the process, to his preferred alternative: "[t]he proposed action will remain as documented in the 2015 Decision Memo." AR 7883.

### d. The Service claims to meet a soil compaction standard that does not exist and its analysis fails to account for all soil disturbance (Claim 1, Count 7; Claim 2, Count 4).

The Forest Service argues that the Plan only requires that total soil compaction be reduced to 20% after any necessary restoration. ECF 49 at 28–30. If the Forest Service had intended to establish a standard that simply required "no more than 20% total soil disturbance after rehabilitation or restoration," such a standard would have been easy enough to write in a single declarative sentence. The Plan's soil standard contains four sentences, and none contains such a standard. The first sentence creates a goal to plan all activities "to reduce soil compaction and displacement to the lowest reasonable level." The second sentence creates another goal to "strive to reduce compaction to get as close to 90 percent of the total activity area…remaining in a non-compacted/non-displaced condition, as realistically possible, one year after any land management activity." The third sentence contains a mandatory standard: "[t]he minimum will

be 80 percent of the total activity area." Finally, the fourth sentence contains a separate mandate: "existing areas exceeding these standards will be scheduled for rehabilitation as soon as possible." The only part of the Plan's soil standard that even mentions "rehabilitation" or "restoration" is the fourth sentence addressing "existing" soil conditions, which has no application here. ECF 41 at 46, AR 1612.

In its brief, the Forest Service creates the standard it claims to have satisfied by piecing together language from the 90% goal created by the second sentence with the mandatory 80% standard from the third sentence, and then adding non-binding language from the Regional Guide to allow for "restoration" to be used to meet the 80% standard. ECF 49 at 27 (citing language from the Soils Report and Regional Guide, but not directly from the Plan itself). The only place in the Plan standard where rehabilitation is expressly mentioned is for existing soil compaction. The Service apparently is arguing that the "one year after any land management activity" language from the second sentence (which is about the 90% uncompacted goal) necessarily implies that rehabilitation can be used during that subsequent one year. If that were so, the EA's analysis should have discussed achieving that 90% goal using rehabilitation. Instead the EA only addresses using rehabilitation to get soil disturbance below the Plan's 80% mandatory standard. Moreover, if rehabilitation were allowed by the Plan to meet the 80% standard, the Forest Service would not need to rely on the non-binding Regional Guide as justification to seek only 80% undisturbed soils *after restoration*. *See* ECF 49 at 27. As already noted, it would have been easy to write a simple declarative sentence in the Plan creating such a standard, but no such sentence exists. The Forest Service cannot, as it does in its brief, selectively edit the Plan's language to get around the Plan's mandatory standard, which it actually violates.

As for its confusing analysis in the EA regarding soil compaction, *see* ECF 41 at 32–34, the Forest Service insists that the final column in its Table 26 accounts for off-trail compaction, citing to an EA paragraph on a different page than Table 26. ECF 49 at 28 (not citing but apparently referencing AR 7697; Table 26 is at AR 7696). But the Service admits the chart does not include other detrimental displacement and puddling that will occur. In order to understand where and how much displacement and puddling will occur the public must find that information several pages later in the EA's narrative. ECF 49 at 28–29, citing AR 7699. Also missing from Table 26 is existing soil compaction in units 1, 2, and 3 that the EA acknowledges several pages earlier. AR 7695. It was the failure to account for this existing soil compaction that was the focus of BMBP's draft EA comments, AR 6744–48, and its objection, AR 7868–71.[16] A chart that purports to summarize soil compaction and disturbance, but which does not include all types of soil displacement and prior compaction, cannot demonstrate whether the Project complies with overall soil disturbance limitations. In order to understand all the relevant impacts, the public must search for and piece together information from the chart and from the narrative discussion on several pages both before and after the chart. This violates NEPA. *Connaughton,* 752 F.3d at 761 (public should not be required to "parse" agency analysis to understand actual impacts).

### e. The Project's FONSI is arbitrary and capricious (Claim 1, Count 5).

#### i. Context: The Forest Service's FONSI never addresses the significance of impacts on the Walton Lake Recreation Area itself.

The Forest Service had the burden in its finding of no significance ("FONSI") to offer a "convincing statement of reasons" for why the Walton Lake Project's impacts are not significant. *Nat'l Parks Conservation Ass'n v. Babbitt,* 241 F.3d 722, 730 (9th Cir. 2001). 40 C.F.R. §

---

[16] The soils cumulative effects discussion does not mention this compaction from prior activities and only address compaction from future activities. AR 7701.

1508.27(a) (2019) explains that "in the case of a site-specific action, significance would usually depend upon the effects in the locale." For a project specific to Walton Lake the most relevant significance determination that a FONSI must make will relate to the significance of the project's impacts on the Walton Lake area itself. But the Forest Service's FONSI simply never does this. Instead it minimizes the local impacts by comparing them to all Developed Recreation Areas (1810 acres) in the Ochoco National Forest ("ONF") and to the ONF as a whole (845,498 acres), AR 8731, and does not evaluate the significance of those impacts on the 218 acre Walton Lake area itself. Then the FONSI asserts that because those impacts occur only within 218 acres they are not significant and "have a negligible effect *at the Forest scale*." *Id.* (emphasis added). The failure to properly address the significance of the local impacts is a fatal and "major analytical lapse." *See Anderson v. Evans,* 371 F.3d 475, 492 (9th Cir. 2004) (agency violated NEPA by failing to evaluate significance of impacts of authorized whaling on local whale population).

The Forest Service's response evades this issue, rather than addressing it, and ignores the relevant case law cited in BMBP's motion, including the *Anderson* case. *See* ECF 41 at 36–39. The Forest Service instead cites to numerous sections of its 2020 EA where it does disclose the local impacts of the actions authorized by the Project on various resources such as forested vegetation, scenic quality, and wildlife. *See* ECF 49 at 31. None of those citations even mention, must less address, whether those local impacts *are significant*, alone or collectively, for the Walton Lake Recreation Area. Instead, when they do address the intensity of the impacts, they dismiss them by comparing them to a much broader area. *See*, e.g. AR 7781, 8762 (dismissing the impacts of the 35 acres of sanitation logging as "minor on the landscape").

The Service correctly cites to *Kleppe v. Sierra Club,* 427 U.S. 390, 413–14 (1976) for the proposition that agencies generally have great discretion "when defining an appropriate spa[t]ial

scope for their analysis." ECF 49 at 31. But *Kleppe* does not address the mandatory significance

determination required by Section 1508.27(a) or the very specific mandatory duty it imposes on

agencies to evaluate the significance of impacts on the locality. The Service not only failed to do

that here, but its FONSI improperly sought to dilute the significance of those local impacts by

repeatedly comparing them to much larger areas. This strongly suggests the Service understood

that if it had made the required evaluation solely in terms of the local impacts to Walton Lake it

could not have avoided a finding that those localized impacts are significant.

> ### ii.  Intensity: the Project's concentrated, intense impacts are significant for the Walton Lake Recreation Area.

As the Forest Service acknowledges, 40 C.F.R. § 1508.27(b) (2019) offers a non-exclusive

list of factors for evaluating the intensity of impacts. ECF 49 at 31. In this case, however, it is the

concentrated nature of the proposed activities in such a relatively small area that is most relevant

to assessing the intensity of their impacts. The Forest Service has authorized logging on 178

acres of the 218-acre Walton Lake recreation area, about 82% of the area, removing more than

4,000 commercially valuable trees (trees between 8 and 20.9 inches DBH) and 571 large trees

over 21 inches DBH from this small local area. AR 7608.[17] The sanitation logging would remove

almost all trees from 35 acres within the visual influence area, over 25% of the total visual

influence area for the local area, and that logging will destroy the ability of those 35 acres to

achieve a primary purpose, to provide scenic views for this local area, for at least a decade. AR

1608; AR 7575–6; AR 7583–4; AR 7808. The Service admits that the forested areas, especially

the "very large" pine and firs, are "a major part of the aesthetics surrounding the lake." AR 6290.

The sanitation logging will completely destroy some of that "aesthetic": the moist mixed conifer

---

[17] This comparison actually understates the percentage of the impacted forested land because about 18 acres of the area is the water body of Walton Lake itself.

LOS/old growth forest that is part of what makes the Walton Lake Recreation area "unique." In order to authorize this the Forest Service had to approve four different site-specific amendments, creating exceptions to Plan provisions including those preventing logging within LOS, logging of trees over 21 inches DBH, logging patches over five acres, and modifying the "retention" visual quality standard that typically protects the Walton Lake area from these precise types of impacts. AR 7598–9. Under any rational definition of the term "significant," such concentrated, intense impacts in the context of a small 218-acre recreation area are significant, and the Forest Service offers no convincing statement of reasons to find otherwise. Several of § 1508.27(b)'s more specific intensity factors add to and underscore this conclusion.

The NEPA regulations instruct agency to look at the "[u]nique characteristics of the geographic area *such as* proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3) (2019) (emphasis added). In its DN, the Service incorrectly concluded that because none of the specifically listed examples of unique characteristics are present at the site, this factor did not weigh in favor of an Environmental Impact Statement ("EIS"). AR 8732; ECF 49 at 32. But the uniqueness factors listed in § 1508.27(b)(3) are a list of non-exclusive examples. *Native Ecosystems Council v. U.S. Forest Service ex rel. Davey*, 866 F. Supp. 2d 1209, 1228 (D. Id. June 6, 2012).[18] The Service's dismissal of this uniqueness factor is also expressly contradicted by the agency's own documents describing Walton Lake as "unique" because "it is the only Developed Recreation Management Area that has a lake with the combination of moist mixed

---

[18] This reading is the most consistent with the plain-language of the regulation; the presence of the words "such as" preceding a list is a strong indication that the drafters intended for what followed to be a non-exhaustive set of examples. *Google LLC v. Oracle America, Inc*., 141 S. Ct. 1183, 1197 (2021).

conifer and dry mixed conifer forest surrounding it." AR 7729; *see also* AR 8771. Because the unique characteristics of the site are directly jeopardized by the Service's plan to destroy the moist mixed conifer forest, the uniqueness factor weighs in favor of requiring an EIS.

The Forest Service, addressing 40 C.F.R. § 1508.27(b)(4) (2019), argues that the contrary opinion of one scientist regarding the significance of a project's impacts is insufficient to create a scientific controversy that requires analysis in an EIS. ECF 49 at 33. That might be true under many circumstances, but the circumstances here are unusual: the scientist BMBP points to, Dr. Chad Hanson, claims the Service is acting inconsistently with regard to a scientific report the Forest Service itself cites as an authoritative source in the EA. *See* AR 11002 (Hanson citing Hansen and Goheen 2000, AR 11006–11030); AR 7605 (EA citing to Hansen and Goheen 2000 in its discussion of LRR). This distinguishes this controversy from those in the cases cited by the Forest Service. *See* ECF 49 at 33–34. Perhaps more importantly, the Ninth Circuit in *Anderson,* 371 F.3d at 493, explains that even if the evidence regarding one of the intensity factors is insufficient by itself to require an EIS, that evidence can combine with other evidence of intensity to establish that there are substantial questions overall regarding whether a project's impacts may have a significant effect on the environment. That is the case here. The EA only devotes a few paragraphs to addressing the fundamental issues Dr. Hanson raises about whether the Forest Service's unprecedented attempt to address LRR using commercial logging will work. AR 7775–6. This controversy deserves a much more thorough discussion in an EIS.

The Service's FONSI, and its brief, appear to assume that only actions that establish a formal or binding precedent are relevant for the intensity factor addressed by 40 C.F.R. § 1508.27(b)(6) (2019). *See* ECF 49 at 34; AR 8732. But unprecedented actions that could be used as a precedent for future environmentally harmful actions must be considered under this factor. *Anderson,* 371

F.3d at 493. Here the Forest Service's action is unprecedented in at least three respects. This is the first time the Forest Service has used commercial logging to treat LRR. ECF 41 at 41, n.19. It is also the first time the Forest Service has amended a plan provision requiring a visual quality standard of "retention" in order to allow for commercial logging. *See* AR 7729. And the Forest Service points to no prior instance where it has used four site-specific amendments to eliminate plan provisions designed to protect the ONF from harmful environmental impacts and to thereby allow a single commercial logging project to go forward. The FONSI contains a self-serving conclusion that the project's unprecedented actions are "unlikely" to set a precedent and asserts that any future action seeking to take similar unprecedented actions would have to undergo NEPA review. AR 8732. But such conclusory assertions are not a substitute for the Service actually considering the precedential impact of such truly unprecedented actions in its NEPA analysis. This factor supports the need for an EIS. *Anderson,* 371 F.3d at 493.

For the cumulative impacts intensity factor, 40 C.F.R. § 1508.27(b)(7) (2019), the agency failed to address cumulative impacts flowing from "the amendment *to the Eastside Screens*." ECF 49 at 35.[19] Those changes to the Eastside Screens would make it easier to log large trees in nine national forests, including the ONF, by eliminating the current mandatory restriction on logging trees over 21 inches DBH. *Compare* AR 3846 (prior Screens 21" restriction) *with* AR 8072 (proposed amendment). Although these proposed amendments to the Eastside were known to the Forest Service at the time the Walton Lake EA was under development, *see* ECF 41 at 41,

---

[19] The Forest Service incorrectly cites to a portion of the EA, AR 7614–18, that discusses impacts flowing from site-specific " *Walton Lake project Eastside Screens amendments*," AR 7615 (emphasis added), which are completely different from the much broader proposed programmatic amendments to the *Eastside Screens* itself, and which are associated with a completely different scale of impacts. The Forest Service points to amendments that "are specific to the Walton Lake Restoration project… and only to activities included" within this specific project. AR 7574. By contrast, BMBP is concerned with the then-proposed regional amendments to the Eastside Screens *themselves*.

n.20, and were therefore reasonably foreseeable, the Forest Service admits they were "not included in cumulative effects analysis[.]" AR 8733; ECF 49 at 35.

The Forest Service instead argues that "there is no potential for cumulative effects because the proposed action was not released until after the final Walton Lake EA was issued." ECF 49 at 35. But "cumulative impacts" includes consideration of actions "past, present, and reasonably foreseeable." 40 C.F.R. § 1508.7 (2019) (emphasis added), and for purposes of this proposal being "reasonably foreseeable" the date the EA was publicly released is irrelevant. "[P]rojects need not be finalized before they are reasonably foreseeable... '[R]easonably foreseeable future actions need to be considered even if they are not specific proposals.'" *N. Plains Res. Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067, 1078–79 (9th Cir. 2011). The Service does not dispute it was conducting public meetings regarding the proposal in May of 2020, months before the Walton Lake EA was released in July, or that defendant Jefferies, who was also the decision-maker for that proposal, knew about it before it was publicly announced. *See* ECF 41, at 41, n.20, citing AR 8066 and 8378.

The Forest Service maintains that there will be no cumulative effects from the Project when combined with impacts of the amendments to the Eastside Screens because the latter "will not authorize on-the-ground actions[.]" AR 8733. Even if the Eastside Screens amendments did not authorize specific projects, the Service *did* estimate that its preferred alternative ("Adaptive Management Alternative") would "increase the available volume for treatment" (timber that may be cut) across the management area by 45% (an increase of 2.05 million board-feet), AR 8126–7, and admitted "[i]t is reasonable to assume that additional volume could be treated under the forest management of projects of each Forest." AR 8127. These admissions undercut the Service's position that did not need to include the estimated impacts from the forest-wide

Eastside Screens amendments in its cumulative impacts analysis here. NEPA requires agencies to "engage in reasonable forecasting. Because speculation is . . . implicit in NEPA, [ ] we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquiry." *N. Plains*, 668 F.3d at 1079.

### III.    Equity and the public interest favor the status quo.

The Forest Service identifies the following equitable and public interest factors as disfavoring the issuance of a preliminary injunction: (1) the public safety risk posed by trees infected with LRR; (2) wildfire risk; and (3) financial and resource implications. ECF 49 at 36-37. Each factor is discussed in turn below.

> **a.    Continued hazard tree removal, along with a continued closure order in units 2–4, will protect the public from any LRR-infected trees that may fall while a preliminary injunction is in place.**

Arguing that the equities and public interest do *not* favor the issuance of an injunction, the Forest Service states that LRR-infected trees pose an "unacceptable public safety risk at Walton Lake" such that "[d]elaying the Project will extend the time that the public and Forest Service employees continue to be at risk." ECF 49 at 36–37. The Forest Service overstates the risk. It relies on paragraphs 4 and 5 of the Jeffries Declaration. ECF 49 at 36–37. Paragraph 4 describes what LRR is. ECF 49-1 at ¶ 4. In paragraph 5 Jeffries states that "[a] 2015 report from Forest Service, Forest Health Protection staff determined that the extent and severity of laminated root rot has created an unacceptable risk within units 2, 3, and 4 because infected trees may break and fall without warning at any time." *Id.* at ¶ 5. The Service, therefore, hinges its "unreasonable

public safety risk" argument on the 2015 Forest Health report.[20] That 2015 report, however, is not nearly so apprehensive about the public safety risks posed by LRR at Walton Lake.

The final, signed 2015 Forest Health report is found in the 2016 AR at 6314–6331. *See* Supp. Buss Decl. Ex. 2. At no point does it say that there is an "unacceptable" public safety risk at Walton Lake. The closest it comes is stating "[w]here trees are within striking distance of *the access road*, weakened root structures and steadily progressing mortality from laminated root rot [] threaten visitor safety." *Id.* at 2 (emphasis added). What's more, the 2015 Forest Health report does *not* recommend a sanitation harvest throughout units 2–4. Instead, the report recommends "[r]emov[ing] all highly susceptible [LRR] hosts within 100- to 150 [feet] (if these trees are 150+ tall) of *the access road and trail* in order to prevent the continuous hazard tree problem at present and over the next several decades at least." *Id.* at 8 (emphasis added). The report even specifically recommends "[l]eav[ing] groups of hosts (and root disease) 150 feet or more from the road and trail" in units 2–4. *Id.* These leave groups "will continue to deteriorate but will also provide habitat (e.g. snag retention) for late seral species, visual screening and structural diversity in the short-term." *Id.* at 9. So, far from supporting the Forest Service's broad assertion about an "unacceptable public safety risk at Walton Lake," the 2015 Forest Health report merely identifies a safety hazard along roads and trails within units 2–4.[21] The report raises no concerns

[20] Incredibly, the 2015 Forest Health report is not attached to the Jeffries Declaration, nor is it included in the 2021 AR (although it should be). *See* Buchele Decl. Ex. E, Item 85 (signed Nov. 30, 2015, forest health report not included in 2021 AR), ECF 11-5. Only a previous unsigned draft is in the 2021 AR, but Jeffries, appropriately, does not cite to that non-final version. AR 5043 (draft dated Nov. 24, 2015, unsigned); Jeffries Decl. at ¶ 5 (no citation to AR). If the 2015 Forest Health report is necessary to the Forest Service's equitable arguments here in 2021, then it is hard to understand why that final document from the 2016 AR is not included in the 2021 AR.

[21] This potential safety hazard along roads and trails is recognized in BMBP's motion. BMBP specifically states that it does not seek a preliminary injunction against logging of "actual hazard trees in the developed site and immediately adjacent to roads and designated trails." ECF 41 at 2. Therefore, regardless of whether a preliminary injunction is issued or not, the Forest Service

about public safety risks from LRR in the other parts of those units or in any other unit where commercial logging will occur. *See id.* at 9–10.

The Forest Service also incorrectly asserts that during any delay in implementing the Project "[v]isitors will continue to visit the affected stands. *Id.* ¶ 7." ECF 49 at 37. Although the Service relies on the Jeffries declaration to support this assertion, a careful reading of that declaration reveals it says no such thing. Instead Jeffries testifies that "people *could* continue to go into the closed area." ECF 49-1 at ¶ 6 (emphasis added). He then states without citation to any evidence that "Forest Service staff have reported visitor use in the forested stands[.]" *Id.* Significantly he does not say when that occurred or that it occurred in a "forested stand" when it was subject to the closure order. The only evidence the Forest Service has ever cited of visitors using the forested areas in units 2–4 was the Forest Service citing to the use of the area by BMBP's own supporters and others in the 2017 EA, before the area was closed. AR 5451. The 2020 EA states that "[t]o date no citations have been issued for closure violations. Analysis assumes the public would continue to adhere to the closure." AR 7627.

This is not the first time the Forest Service has inflated the severity of the public safety risk posed by LLR to argue against a preliminary injunction for this Project. In opposing BMBP's motion for a preliminary injunction in *Turner*, the Forest Service repeatedly represented to the Court that "[i]f the laminated root rot problem is not addressed in Walton Lake this winter [of 2016–2017], the campground and associated roads and trails *will be closed* in 2017, and possibly beyond, to protect the recreating public and Forest Service employees." *Turner* ECF 17 at 34

---

will be free to cut hazard trees along roads and trails (and in and around the campground). This is consistent with the Court's preliminary injunction order in 2016. *Turner* ECF 25 at 1 ("This Order does not apply to the removal of actual hazard trees near campsites or along roads, pursuant to the Field Guide for Hazard-Tree Identification and Mitigation on Developed Sites in Oregon and Washington Forests (Filip *et al*, 2014)").

(emphasis added); *see also* 2016 Decl. of Slater Turner, *Turner* ECF 18 at ¶ 19 ("If this Project is not implemented during the upcoming closure of the campground, I will have to keep the campground, and associated road and trails within the designated recreation area, closed in 2017, and possibly beyond, to protect the recreating public and our employees from hazards"). Of course, the Project was not implemented during the winter of 2016–2017 and, despite its threats to do so, the Forest Service did not close the campground. The Walton Lake campground has remained open during its regular season every year since the Court issued its 2016 preliminary injunction. AR 7625 (describing continuing use of campground). To manage the public safety risk from LLR in units 2–4, the Service adopted one of BMBP's suggestions and posted signage along those unit boundaries, advising the public regarding the LRR and prohibiting entry. AR 5594–5600, AR 7629. There is no reason that this tried-and-true approach to public safety in units 2–4, combined with the annual hazard tree mitigation (along the roads and trails), cannot continue while a preliminary injunction is in place, and the Forest Service offers none.

### b. The record does not reflect an imminent wildfire risk.

The Forest Service devotes one paragraph to arguing that, until the Project is implemented, fuel loading and other site conditions "raise[] the potential for catastrophic wildfire." ECF 49 at 37. A similar argument was made and rejected by this Court, in *Turner*. *See Turner* ECF 17 at 7, 9, 18–20, 33–36; Supp. Buss Decl. Ex. 1 at 48 (granting preliminary injunction). "Raising the potential for catastrophic wildfire" is not the applicable standard. In the preliminary injunction context there must be an "imminent" threat of fire in order to outweigh the public's interest in maintaining old growth trees: "[w]ithout evidence of an imminent threat [of fire], we cannot say that the inability to mitigate such risks for a temporary period outweighs the public's interest in maintaining elk habitat and mature trees in the Forest." *Connaughton*, 752 F.3d at 766. The

Service has not presented evidence of an imminent threat of fire. While Jeffries cites current

"extreme heat" and "drought" conditions as increasing the risk of wildfire, Jeffries Decl., ECF

49-1 at ¶ 8, those concerns do not show an "imminent" threat of fire, and are irrelevant. Whether

or not there are "extreme heat" or "drought" conditions at Walton Lake *this* summer says nothing

about what conditions will be like *next* summer, should the logging be postponed.

### c.    The minimal economic costs of a delay in Project implementation are more than offset by the benefits.

Project delays caused by a preliminary injunction, the Forest Service says, will "require[] the

Forest Service to expend additional resources" and "result[] in a decline in the value of the

timber." ECF 49 at 37. While that may be true to some extent, those economic impacts identified

are incremental: the Service has been incurring those costs annually at Walton Lake for years.

Although economic impacts are a proper consideration in the public interest analysis:

> [W]e recognize the well-established 'public interest in preserving nature and avoiding irreparable environmental injury.' *Lands Council*, 537 F.3d at 1005. This court has also recognized the public interest in careful consideration of environmental impacts before major federal projects go forward, and we have held that suspending such projects until that consideration occurs 'comports with the public interest.' *S. Fork Band Council*, 588 F.3d at 728.

*All. for the Wild Rockies*, 632 F.3d at 1138 (preliminary injunction in the public interest despite

assertions that logging project would provide local economic benefit). Whatever incremental

economic costs the Forest Service may incur from the delay in logging caused by a preliminary

injunction, those costs are far outweighed by the environmental benefits of preserving the status

quo at Walton Lake until a final decision on the merits is made.

### d.    The balance of equities and the public interest analyses have not changed since the Court issued its preliminary injunction in 2016.

Perhaps the best evidence that the balance of equities tips sharply in BMBP's favor is the fact

that this Court said so in *Turner* under very similar circumstances. In *Turner* this Court said:

"The real ballgame is balance of hardships. The plaintiff doesn't have a lot that it has to offer here. Its hardship is the same as its irreparable harm, the lost trees. So the Forest Service is the one that has to show, well, this is going to be a hardship on us if we have to wait to see this thing resolved at trial."

Supp. Buss Decl. Ex. 1 at 43–44. The Forest Service then cited, as its primary "harm," the

closure of the Walton Lake campground in 2017 (which, of course, never occurred). *Id.* at 44–45.

This Court rejected that argument and found that the balance of harms, hardships, and equities

"sharply tips in plaintiff's favor." *Id.* at 47–48.

There is no reason for the Court's analysis to change during this new round of litigation,

where the Project remains nearly identical to that at issue in the 2016 litigation and the same

harms, hardships, and equities are involved. Indeed, if anything, the equities *even more* sharply

tip in BMBP's favor now than they did in 2016 because the Forest Service's main complained-of

"harm" in 2016 — the threatened closure of the campground — has not been advanced by the

Forest Service this time. In other words, if the harms, hardships, and equities tipped sharply in

BMBP's favor in 2016, they do so even more so now.

## IV.    The bond requirements should be waived.

The Forest Service argues BMBP should be required to post a $10,000 bond, but under

FRCP 65(c) the burden rests with the party requesting a bond to produce evidence supporting the

desired bond amount. *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321

F.3d 878, 882–83 (9th Cir. 2003). Here, the Service arrived at the $10,000 estimate based upon

what they believe BMBP can afford and not based on any showing of what costs might be

imposed by a preliminary injunction. ECF 49 at 41–42.

In *W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1026 (D. Or. June 5, 2019),

Judge Simon refused to require a bond from a significantly larger public interest organization

because it would be "unjust." BMBP presented evidence with its Motion, Hood Decl. ¶ 9, and

presents additional evidence here, Hood Suppl. Decl. ¶¶ 5, 6, 7, that imposing a bond like that requested by the Service would create enormous financial hardship on the organization. That amount would be almost 18% of BMBP's total revenues in 2021, chilling the group's ability to engage in its core public function of protecting Eastern Oregon's forests. *Id.* This Court declined to set even a nominal bond when granting a preliminary injunction enjoining the Service's first iteration of the Project, *Turner* ECF 22, and it should do so again.

**CONCLUSION**

For the reasons set forth above, in its Motion, and in its supporting declarations, BMBP respectfully requests that the Court issue an order, consistent with the Motion, preliminarily enjoining, or temporarily restraining, the Forest Service from allowing or implementing any of the commercial sanitation logging or commercial thinning authorized in units 1–5 by the December 7, 2020 Decision Notice.

Respectfully submitted this 10th day of September 2021.

 s/Tom Buchele
Tom Buchele, OSB # 081560
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland OR 97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

s/Jesse A. Buss
Jesse A. Buss, OSB # 122919
Willamette Law Group
411 Fifth Street
Oregon City OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

*Attorneys for Plaintiff Blue Mountains Biodiversity Project*