Tom Buchele, OSB # 081560
Earthrise Law Center
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

Jesse A. Buss, OSB # 122919
Willamette Law Group
411 Fifth Street
Oregon City, OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

*Attorneys for Plaintiff Blue Mountains Biodiversity Project*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| **BLUE MOUNTAINS BIODIVERSITY PROJECT**, an Oregon nonprofit corporation, | Case No. 2:20-cv-2158-MO |
| Plaintiff, | PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT |
| v. | |
| **SHANE JEFFRIES**, in his official capacity as Ochoco National Forest Supervisor; and **UNITED STATES FOREST SERVICE,** an agency of the United States Department of Agriculture, | ORAL ARGUMENT REQUESTED |
| Defendants. | |

## MOTION

Plaintiff Blue Mountains Biodiversity Project ("BMBP") hereby moves the Court for an order, pursuant to Federal Rule of Civil Procedure ("FRCP") 56, granting it summary judgment against Defendants Shane Jeffries ("Jeffries") and the United States Forest Service (collectively "the Forest Service" or "the Service") on its claims for relief under the Administrative Procedure Act, 5 U.S.C. § 701–706 ("APA") and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq., *see* ECF No. 12, Claim 1, Counts 1–7, ¶¶ 60–78, and on its claims for relief under the APA and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604, Claim 2, Counts 2 and 4. *See* ECF No. 12, ¶¶ 79, 83, 89.[1] Those claims challenge the December 7, 2020 Decision Notice ("DN") and Finding of No Significant Impact ("FONSI") signed by Jeffries on behalf of the Forest Service, AR 8713–8793, and the underlying July 2020 Final Environmental Assessment ("EA"), AR 7566–7810, for the Walton Lake Restoration Project ("the Project").[2] BMBP also requests that the Court vacate the Service's DN/FONSI and the EA. In support of its motion BMBP offers the following memorandum and the previously filed declarations of Marilyn Miller, ECF No. 42, and Paula Hood, ECF Nos. 43 and 55.

As Required by Local Rule 7-1(a)(2), on February 17, 2022 BMBP conferred by telephone with counsel for the Service regarding each claim that is the subject of this motion.

---

[1] Respectfully, BMBP has chosen not to pursue its NFMA claims under Claim 2, Counts 1 and 3 on summary judgment, in large part because BMBP's motion to complete the record (ECF No. 10) was denied (ECF No. 40). In light of the Court's ruling on that motion, numerous documents supporting BMBP's NFMA claims are not available for use on summary judgment, and BMBP is therefore unable to sufficiently support its NFMA claims under Claim 2, Counts 1 and 3. For this additional reason, BMBP reserves the right to assign error to the Court's ruling on BMBP's motion to complete the record.

[2] The Service filed its Administrative Record with the Court. *See* ECF Nos. 13 and 18. As noted in footnote 1, BMBP unsuccessfully challenged that record as being incomplete. BMBP will cite to the record as "AR____," referencing the bates numbering inserted by the Service in the lower right-hand corner of each page in its record.

The parties were unable to reach a resolution. Wherefore, BMBP requests for the reasons set forth in its accompanying memorandum and supporting declarations that the Court enter judgment for BMBP on its claims and issue an order setting aside and vacating the illegally-issued DN/FONSI and EA.

# TABLE OF CONTENTS

**Page Nos.**

MOTION ...................................................................................................................... i

TABLE ON CONTENTS ........................................................................................... iii

TABLE OF AUTHORITIES ........................................................................................ v

TABLE OF ACRONYMS ........................................................................................... ix

INTRODUCTION ...................................................................................................... 1

STANDING ................................................................................................................. 3

STANDARD OF REVIEW ......................................................................................... 4

PROJECT HISTORY ................................................................................................. 4

ARGUMENT .............................................................................................................. 5

I.      The Service's Flawed Public Involvement Process
        Violates NEPA (Claim 1, Count 1) ............................................................. 5

II.     By Entering into a Logging Contract Long Before the NEPA Process was Complete,
        the Forest Service "prejudiced the selection of alternatives before making a
        final decision" and took action "limit[ing] the choice of reasonable alternatives,"
        in Violation of NEPA (Claim 1, Count 4) ................................................. 11

        a.      The 2016 Contract Impermissibly Committed Natural Resources Before
                the NEPA Process was Complete. .................................................. 12

        b.      The 2016 Contract Impermissibly Committed Financial Resources Before the
                NEPA Process was Complete. ......................................................... 14

III.    The Service Violated NEPA by Having an Unreasonably Narrow Purpose and
        Need Statement (Claim 1, Count 2) ............................................................ 16

IV.     The Service Violated NEPA When it Failed to Meaningfully Consider an
        Adequate Range of Alternatives (Claim 1, Count 3) ................................. 20

V.      The Forest Service's Soils Analysis Violates NEPA (Claim 1, Count 7)
        and NFMA (Claim 2, Count 4). .................................................................. 24

VI.     The Forest Service's Inadequate Cumulative Impacts Analysis violates NEPA
        (Claim 1, Count 6) ....................................................................................... 24

VII.    The Project is Significant Under NEPA and Requires an EIS (Claim 1, Count 5) ..........26

      a.    Context...............................................................................................26

      b.    Intensity.............................................................................................30

VIII.   Under NFMA, the Site-Specific Forest Plan Amendments Result in a "Significant Change" to the Forest Plan, so Additional Procedures are Required (Claim 2, Count 2)..36

CONCLUSION...........................................................................................................39

# TABLE OF AUTHORITIES

**Case**                                                                                           **Page Nos.**

*Anderson v. Evans,* 371 F.3d 475 (9th Cir. 2004)........................................................26, 29, 34, 35

*Bair v. California Dep't of Transp.*, 982 F.3d 569 (9th Cir. 2020) ....................................................5

*Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020) ...............................................................30

*Benton Cty. v. U.S. DOE*, 256 F. Supp. 2d 1195 (E.D. Wash. Feb. 28, 2003) ............................23

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ..................26

*Cascadia Wildlands v. Bureau of Land Mgmt.,* 410 F. Supp. 3d 1146 (D. Or. 2019) ................28

*City of Carmel-by-the-Sea v. U.S. DOT*, 123 F.3d 1142 (9th Cir. 1997) .....................................19

*Ctr. for Biological Diversity v. Gould*, No. 1:15-01329 WBS GSA, 2016 WL 3418437 (E.D. Cal. June 21, 2016)...........................................................................................................................10

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008) ..........................................................................................................................................20

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) .................................................10

*Friends of Southeast's Future v. Morrison,* 153 F.3d 1059 (9th Cir. 1998) ................................17

*Friends of the Earth v. Laidlaw,* 528 U.S. 167 (2000) ...................................................................3

*Found. For N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172 (9th Cir. 1982) .............33

*Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165 (D. Or. July 3, 2014)............................4

*Great Old Broads for Wilderness v. Kimbell,* 709 F.3d 836 (9th Cir. 2013)................................23

*Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183 (2021) ......................................................32

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (en banc)................................................4

*League of Wilderness Def. v. Turner*, 16-cv-1648-MO ................................................................29

*League of Wilderness Def./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060 (9th Cir. 2012) .................................................................................................................20

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) ..................................................................12, 16

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067 (9th Cir. 2011) .................25

*Native Ecosystems Council v. Dombeck*, 304 F.3d 886 (9th Cir. 2002) .......................37

*Native Ecosystems Council v. U.S. Forest Serv. ex rel. Davey*, 866 F. Supp. 2d 1209 (D. Id. June 6, 2012) ..................................................................................................32

*Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001) ...........................26, 33

*Nat'l Parks Conservation Ass'n v. BLM*, 606 F.3d 1058 (9th Cir. 2010) ..............................16, 17

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-cv-0640-SI, 2017 WL 1829588 (D. Or. Apr. 3, 2017).............................................................................................11

*Nw. Coal. for Alternatives to Pesticides (NCAP) v. Lyng*, 844 F.2d 588 (9th Cir. 1988) .............8

*Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 855 F. Supp. 2d 1199 (D. Or. 2012) ...............4

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005) ........................30

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028 (9th Cir. 2001) ..................................................................................................28

*Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.,* 113 F.3d 1505 (9th Cir. 1997) ..............5

*Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664 (7th Cir. 1997)...................................16

*Valdez v. U.S.,* 56 F.3d 1177 (9th Cir. 1995) ...........................................................22

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) ...........................................21, 24

*Westlands Water Dist. v. U.S. DOI*, 376 F.3d 853 (9th Cir. 2004) ................................17

*WildWest Inst. v. Bull*, 547 F.3d 1162 (9th Cir. 2008)..........................................5, 7, 14

## Codes and Regulations

5 U.S.C. § 701–706................................................................................................. i

5 U.S.C. § 706................................................................................................20, 24

5 U.S.C. § 706(2)(A) .....................................................................................4

16 U.S.C. § 1604 ............................................................................................. i

16 U.S.C § 1604(d) .................................................................................37, 38

16 U.S.C. § 1604(d)(1) ..........................................................................36, 38

16 U.S.C. § 1604(e) ......................................................................................36

16 U.S.C. § 1604(f) .......................................................................................36

16 U.S.C. § 1604(f)(4) .............................................................36, 37, 38, 39

42 U.S.C. §§ 4321 et seq............................................................................... i

42 U.S.C. § 4332(C) ....................................................................................26

36 C.F.R. § 218.25 .....................................................................................9, 10

36 C.F.R. § 219.10(f) (1996) .......................................................................37

36 C.F.R. § 219.13(b)(3) ..................................................................37, 38, 39

36 C.F.R. § 219.16(a)(2) ...............................................................................37

40 C.F.R. §§ 1500–1508 ................................................................................5

40 C.F.R. § 1500.2(d) (2019).................................................................5, 8, 9

40 C.F.R. § 1500.2(e) (2019) ..................................................................20, 21

40 C.F.R. § 1501.4(b) (2019) .....................................................................5, 9

40 C.F.R. § 1502.2(f) (2019) ...................................................................11, 15

40 C.F.R. § 1502.2(g) (2019) .......................................................................11

40 C.F.R. § 1502.13 (2019) ....................................................................16, 20

40 C.F.R. § 1502.14 (2019) ....................................................................20, 24

40 C.F.R. § 1506.1(a)(2) (2019) .............................................................11, 15

40 C.F.R. § 1506.6 (2019) ..............................................................................5

40 C.F.R. § 1506.6(a) (2019)......................................................................5, 9

40 C.F.R. § 1506.6(b) (2019)..........................................................................7

40 C.F.R. § 1506.6(b)(1) (2019) ........................................................................5, 7, 8

40 C.F.R. § 1506.6(b)(3)(iii) (2019) ...........................................................................5

40 C.F.R. § 1506.13 (2020) ........................................................................................5

40 C.F.R. § 1508.7 (2019) .........................................................................................24

40 C.F.R. § 1508.27 (2019) .......................................................................................26

40 C.F.R. § 1508.27(a) (2019) ..............................................................26, 27, 28, 36

40 C.F.R. § 1508.27(b) (2019) ............................................................................30, 32

40 C.F.R. § 1508.27(b)(3) (2019) .............................................................................32

40 C.F.R. § 1508.27(b)(4) (2019) .............................................................................33

40 C.F.R. § 1508.27(b)(6) (2019) .............................................................................34

40 C.F.R. § 1508.27(b)(7) (2019) .............................................................................35

40 C.F.R. § 1508.27(b)(10) (2019) ...........................................................................35

## **Other**

77 Fed. Reg. 68, 21238 (Apr. 9, 2012) ....................................................................38

Fed. R. Civ. P. 56 .................................................................................................. i, 4

Forest Service Handbook 1909.15 zero-code § 5 ("Definitions") ..............................20

Forty Most Asked Questions Concerning CEQ's National Environmental Policy
Act Regulations, 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981) ....................................20

Local Rule 7-1(a)(2) .................................................................................................. i

**TABLE OF ACRONYMS**

APA                             Administrative Procedure Act

BMBP                        Blue Mountains Biodiversity Project

DBH                          Diameter at Breast Height (also: "dbh")

DN                             Decision Notice

EA                             Environmental Assessment

EIS                            Environmental Impact Statement

FOIA                         Freedom of Information Act

FONSI                       Finding of No Significant Impact

FRCP                        Federal Rules of Civil Procedure

LRR                          Laminated Root Rot

NEPA                        National Environmental Policy Act

NFMA                       National Forest Management Act

ONF                          Ochoco National Forest

**MEMORANDUM IN SUPPORT OF MOTION**

**INTRODUCTION**

BMBP challenges the Forest Service's approval of the Walton Lake Restoration Project, which the Service intends to implement on 178 acres of the 218-acre Walton Lake Recreation Area, the Ochoco National Forest's ("ONF") most popular recreation site. The Service initially approved the Project in 2015 using a Categorical Exclusion, a NEPA process that did not require it to consider any alternatives to the extensive and intensive management it preferred. In 2016 the Service entered into a logging contract, paid for in part by the promise to allow the logging company to cut numerous large firs, that committed the Service to the intensive logging it had initially approved. The Service has left that contract in place, even after BMBP obtained a preliminary injunction against the commercial logging and the Service withdrew its initial 2015 approval in October of 2016. Uncontradicted record evidence shows that the contract remains in place because if that contract is withdrawn or significantly altered so that the authorized commercial logging is not sufficiently lucrative for the logging company, the Service would then likely not have the ability to complete the Project.

After the Service withdrew its 2015 decision, it changed its approach in terms of NEPA compliance – it prepared an EA and FONSI – but it approved essentially the same intensive and extensive management in 2017. However, the Service once again withdrew its decision in late 2017, this time in response to BMBP's administrative objection which argued that the Project violated mandatory forest plan provisions designed to protect Walton Lake's natural resources.

In June of 2019, the Service restarted the Project's NEPA process by holding a "pre-scoping" meeting, open to the public. Inexplicably, BMBP's employees and its attorneys, who had requested to receive all notices about the Project, were left off of the otherwise extensive list

of those who received email invitations to this public meeting. At this meeting the Service may have unveiled its proposal to approve four different "site-specific" plan amendments, which would eliminate the protective plan provisions that stopped the Project in 2017. The Service released a new draft EA for public comment in February of 2020 just as the COVID pandemic shutdowns began, but the Service denied the requests of BMBP and others to extend or repeat that comment process because of the disruptions caused by the pandemic.

After this seriously flawed NEPA public process, the Service issued another DN and FONSI in December of 2020, the decision at issue in this litigation. This DN reaffirms the Service's decision to conduct intensive and extensive management on more than 80% of the Walton Lake Recreation Area and approved multiple amendments to the Ochoco National Forest Land and Resource Management Plan (the "ONF Plan") that removed otherwise mandatory provisions designed to protect Walton Lake's scenic beauty and forested landscape. In order to allow for the commercial logging the DN approved four different ONF Plan amendments, as follows: (1) a Plan amendment to "allow harvest within LOS stages that are below HRV" (i.e., to allow logging in old growth areas); (2) a Plan amendment to allow removal of large trees (i.e., trees 21" DBH or greater); (3) a Plan amendment to modify the visual quality standard away from "retention," ("retention" means human activities are not evident to casual forest visitor); and (4) a Plan amendment waiving the 5-acre harvest patch size limit. AR 7582. The Forest Service included these four amendments because, without the first two amendments, the Project would violate the 1995 Eastside Screens (*see* AR 7598, describing the standards that would be violated), and without the second two amendments, the Project would violate the original 1989 ONF Plan. *See* AR 7599 (describing the standards that would be violated). The FONSI for this Project was only possible because the Service ignored the significance of these four plan

amendments, which required special public participation procedures and an Environmental

Impact Statement ("EIS") under NFMA, as well as the localized significant impacts of such

intensive and extensive management on a small but popular 218-acre recreation area.

On September 29, 2021, this Court preliminarily enjoined the commercial logging

authorized by the Service's December 2020 DN. ECF No. 60. The Court should now issue a

final ruling upholding BMBP's NEPA and NFMA claims and vacate the DN/FONSI and EA.

## STANDING

BMBP has Article III standing to bring this action because its members have standing to

sue in their own right, the interests BMBP seeks to protect are germane to the organization's

purpose, and individual members' participation is not necessary for the Court to provide relief.

*Friends of the Earth v. Laidlaw,* 528 U.S. 167, 181 (2000). BMBP's members have standing

because they have suffered an injury in fact that was caused by the challenged action, and that is

likely to be redressed by the requested relief. *Id.* at 180–81. BMBP is a non-profit environmental

advocacy organization dedicated to the conservation of the natural ecosystems of the Pacific

Northwest. BMBP's supporters, officers, and staff hike, camp, bird watch, view wildlife,

photograph scenery and wildlife, and engage in other vocational, educational, scientific

observation, spiritual, and recreational activities within the Ochoco National Forest, including

the Walton Lake Project area and adjacent lands. BMBP filed declarations from its members

Marilyn Miller and Paula Hood. *See* Declaration of Marilyn Miller ("Miller Decl."), ECF No. 42;

Declaration of Paula Hood ("Hood Decl."), ECF No. 43; Supplemental Declaration of Paula

Hood ("Suppl. Hood Decl."), ECF No. 55. These declarations set forth facts establishing

BMBP's standing to bring this action. *See generally Friends of the Earth,* 528 U.S. at 180–81.

## STANDARD OF REVIEW

BMBP's claims regarding the Service's violations of NEPA and NFMA are governed by the APA. In APA cases, courts use summary judgment procedures under FRCP 56 to "determine whether the evidence in the administrative record permitted the agency to make that decision as a matter of law." *Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 855 F. Supp. 2d 1199, 1204 (D. Or. 2012). The APA instructs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law[.]" 5 U.S.C. § 706(2)(A). For an agency decision to withstand APA scrutiny the agency "must examine the relevant data and articulate a satisfactory explanation for its action." *Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165, *3 (D. Or. July 3, 2014). When presented with scientific uncertainties, an agency must include a full and fair discussion of said uncertainties. *Lands Council v. McNair*, 537 F.3d 981, 1002 (9th Cir. 2008) (en banc), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). An action is arbitrary and capricious "if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nw. Envtl. Advocates*, 855 F. Supp. 2d at 1204.

## PROJECT HISTORY

BMBP adopts and incorporates herein the PROJECT HISTORY section from its August 19, 2021 Motion for a Preliminary Injunction and Supporting Memorandum. ECF No. 41, 14–18.

## ARGUMENT

I.    **The Service's Flawed Public Involvement Process Violates NEPA (Claim 1, Count 1).**

Meaningful public participation is integral to an agency's lawful implementation of NEPA. Indeed, involving the public in the decision-making process is one of the statute's central purposes. 40 C.F.R. §§ 1500.2(d) & 1506.6 (2019); *Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.,* 113 F.3d 1505, 1511 (9th Cir. 1997). Specifically, NEPA dictates that federal agencies "shall to the fullest extent possible … [e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment[,]" which includes making "diligent efforts" and seeking public input "to the extent practicable" when producing EAs. 40 C.F.R. §§ 1500.2(d) (2019), 1501.4(b) (2019), & 1506.6(a) (2019); *WildWest Inst. v. Bull*, 547 F.3d 1162, 1170 (9th Cir. 2008).[3] To that end, when the Service holds informational public meetings or makes environmental documents available to the public, "[i]n all cases" the agency is to mail notice directly to those who requested information on an individual action. 40 C.F.R. § 1506.6(b)(1) (2019). And, in the case of an action of primarily local concern, public notice may also include social media and local newspaper postings, as well as notice to "potentially interested" community organizations. *Id*. § 1506.6(b)(3)(vi) (2019).

_____

[3] The Council on Environmental Quality ("CEQ") promulgates regulations to implement NEPA that are binding on all federal agencies. Those regulations are found at 40 C.F.R. §§ 1500–1508. The CEQ amended its regulations effective September 14, 2020. *See* 40 C.F.R. § 1506.13 (2020) (effective date). This Project, however, was developed and analyzed under the earlier 2019 version of the CEQ regulations. *See* AR 8731 (DN applying Section 1508.27, which does not exist under the revised 2020 regulations). Because the 2020 regulations are not retroactive and the Service's NEPA analysis followed the 2019 version of the regulations, BMBP cites to the 2019 regulations throughout this memorandum and this Court should use the requirements of the 2019 regulations to evaluate the Service's compliance with NEPA. *Bair v. California Dep't of Transp.*, 982 F.3d 569, 582 n.20 (9th Cir. 2020).

Here, a number of actions (and inactions) establish the Service did not make diligent efforts to involve the public in its decision-making process for the Walton Lake Project; in fact, the agency seems to have gone out of its way to exclude critics of the Project, including BMBP, from participating at certain key points. The Service began the current iteration of the Project by holding a public informational meeting in June 2019, where it received comments. AR 7579. The Service invited nearly 200 potentially interested parties to this meeting by directly emailing them and inviting them, AR 8486–87, yet BMBP's employees and attorneys did not receive such an invitation from the Forest Service. This is despite the fact that BMBP has been involved in all previous iterations of the Project – even to the point of bringing litigation challenging elements of the Project – and could not be more clearly "interested" in the fate of Walton Lake. There is no question as to whether the Service had email contact information for both BMBP employees and for its attorneys. BMBP has been in communication with the Service regarding this very project since 2015. *See, e.g.,* AR 4999, AR 5603. On July 4, 2019, after it came to BMBP's attention that a public information meeting had taken place, BMBP director Paula Hood emailed defendant Shane Jeffries her concerns about the organization being left off the email distribution list. AR 6038. Jeffries stated simply that, "Your views on actions to address forest health in the Walton Lake developed recreation area are already well documented[.]" AR 6037.

The Service published a formal scoping notice for the Project on August 7, 2019. AR 6058. BMBP submitted comments on September 5 and 6, 2019, AR 6161–89; AR 6193–202, but because it was not timely informed of the June 2019 public meeting, its officers were unable to attend and BMBP was thus unable to address the information disclosed at that meeting. BMBP was surprised to see that in this new August 2019 scoping notice the Service now proposed four amendments to the Ochoco National Forest Plan, as the 2017 proposal had only two. AR 5201–

02; AR 6063–64. It seems likely that the new proposed amendments were also disclosed or discussed at the June 2019 public meeting. Prior to receiving BMBP's scoping comments, the Service could not have been aware of BMBP's positions regarding these two new amendments.

In *WildWest Inst.,* the Ninth Circuit addressed a federal agency's general NEPA public engagement responsibilities under Section 1506.6(b). The court noted that Section 1506.6(b) does not specify the particular form that an agency's "public notice" of a meeting must take. In that case  the Service had posted notice in the paper, issued a press release, and held two public informational meetings. *WildWest Inst.*, 547 F.3d at 1170. Because the plaintiff ultimately received notice of the meeting indirectly through the Service's email distribution list (the notice went to a "predecessor" organization), the Ninth Circuit held that the Service met its general duty under Section 1506.6(b) to diligently engage the public in the decision-making process. *Id.*

The *WildWest* decision however does not address the much more specific notice requirements of Section 1506.6(b)(1) that are at issue here. That regulation requires that  "[*i*]*n all cases* the agency *shall* mail notice to those who have requested it on an individual action." 40 C.F.R. § 1506.6(b)(1)(2019) (emphasis added). BMBP's involvement with all previous iterations of this ongoing project – including several requests for information about the action[4] and an email subscription to project updates[5] – entitled the organization to actual mail notification of the June 2019 public meeting. Here, however, the Service not only failed to include BMBP on a rather extensive email list of nearly 200 interested parties, but that failure *appears* to have been intentional given the Service's blunt response that it was already aware of BMBP's positions,

---

[4]   Over the past six years, BMBP has submitted several requests for information about the Walton Lake Project under the Freedom of Information Act. Of those requests, two are contained in the AR: a March 17, 2017 request and a February 25, 2020 request. AR 8379–82; AR 8385–88.
[5]   BMBP's co-director, Paula Hood, and one of BMBP's attorneys have been on the Service's email subscription list for Walton Lake Project updates since at least 2017. AR 6065.

and in light of BMBP's well-known interest in the Project. *See Nw. Coal. for Alternatives to Pesticides (NCAP) v. Lyng*, 844 F.2d 588, 595 (9th Cir. 1988) ("[Plaintiff], as a litigant earlier in this action, was clearly an interested person."). Indeed, at no point has the Service claimed that BMBP's absence from the list was inadvertent, despite having had several opportunities to do so. AR 6037; AR 7802; AR 7557. In sum, the Service directly violated Section 1506.6(b)(1) and more generally did not meet its duty to encourage public participation "to the fullest extent possible." 40 C.F.R. § 1500.2(d) (2019).

Further, BMBP's absence from the June 2019 public information meeting undoubtedly prejudiced its ability to fully participate in the NEPA process for the Project. For instance, had BMBP been present at the meeting, it would have had the opportunity to engage with the Service regarding the laminated root rot science that was apparently presented, AR 6017–30, or regarding any proposed plan amendments that may have been discussed. BMBP also would have had the opportunity to provide comments earlier in the process, as other meeting attendees did, AR 6035–36, potentially impacting the alternatives the Service ultimately considered.[6] It is also likely that BMBP would have responded to information disseminated at this meeting in its scoping comments, but was ultimately unable to do so without knowing what was discussed. According to the meeting agenda drafted by the Ochoco Forest Restoration Collaborative ("OFRC"), the meeting's goals were to "engage the local public in this discussion to get their input about what is important" and to "inform the public and increase engagement in the NEPA process [to] get more input from local people[,]" AR 5997, but BMBP, a local organization

---

[6]  Oddly, all four comments submitted to the Service at the conclusion of the June 2019 meeting vehemently supported the harvesting that BMBP opposes. One simply read, "Cut all the trees in the 40 acres by Oct 1 2019." AR 6035–6. BMBP cannot know exactly what information was disseminated at the meeting, but it seems opposing voices were conspicuously absent.

whose members often hold different values from OFRC's members, was denied this important opportunity for engagement.

The Project's flawed NEPA process also failed to allow for an adequate amount of time for public comment, where additional time was made necessary as a result of the then-developing COVID-19 pandemic. On February 18, 2020 the Service made its draft EA available for a 30-day public comment period. AR 6601. On March 18, 2020, BMBP requested an extension of the comment period, or a second comment period, primarily because the comment period occurred just as the COVID-19 pandemic was escalating. AR 6720–22. At that early time in the pandemic, and as a result of the declaration of both local and state-wide emergencies, many public facilities such as libraries and universities began closing their facilities to the public, AR 6720, and people's lives and workflows were dramatically interrupted. Despite what the agency claimed in its response to BMBP's extension request, BMBP was *not* the only member of the public to request such an extension for this reason. AR 7262 (extension request from Margaret Chapple, not a BMBP member, due to COVID-19). Nonetheless, the Service denied BMBP's request. AR 6762. Further, the Service arbitrarily denied BMBP's request for additional time for public comment due to the electronic comment link not working. AR 6724–26; AR 7280.

While the Service claimed that under its own regulation, 36 C.F.R. § 218.25, it had no discretion to extend the comment period, AR 6762, this rigid interpretation of its regulations is not consistent with the CEQ's public participation regulations, with agency precedent in other circumstances, or with the unprecedented nature of the COVID pandemic. NEPA requires that agencies facilitate public involvement, 40 C.F.R. §§ 1506.6(a), 1500.2(d), 1501.4(b) (2019), and the Service has extended other types of NEPA comment periods on its own accord or at the

request of commenters in order to meet its NEPA duty.[7] *See Ctr. for Biological Diversity v.*

*Gould*, No. 1:15-01329 WBS GSA, 2016 WL 3418437, at *2 (E.D. Cal. June 21, 2016) ("the

agency must accept comments on the proposed project for a *minimum* of thirty days") (emphasis

added) (citing 36 C.F.R. § 218.25). The Service also had the discretion to open a second

comment period in order to meet NEPA's public participation demands, but failed to provide any

reason for why BMBP's request for the agency to do so here was refused. *See* AR 6762. As

BMBP pointed out to the Service, AR 7280–83, the Daniel Boone National Forest's response to

the COVID-19 emergency was to postpone the objection period for a habitat restoration project

EA. It is hard to conceive of a better reason to not rigidly apply regulations and to provide the

public with an extended or second comment period than an unprecedented pandemic disrupting

virtually every member of the public's routines, responsibilities, and access to public resources.

The Service violated the spirit and letter of NEPA – a statute of process for which public

participation is the lodestar – when it likely deliberately hindered BMBP's ability to participate

in the public information meeting and denied the public an extended or second comment period

for the Walton Lake Project. All of these flaws, especially when viewed in the aggregate,

prejudiced the public's and BMBP's ability to meaningfully participate in the Service's decision-

making process for a project that would drastically alter a rare ecosystem in a highly popular

recreation area. The Service's apparently deliberate omission of BMBP from its email

---

[7] For example, the Service extended the comment period for the Eastside Screens amendment
EA on September 7, 2020, https://www.regulations.gov/document/FS_FRDOC_0001-3380, and
for the Mission Project timber sale scoping period,
https://www.fs.usda.gov/nfs/11558/www/nepa/104067_FSPLT3_3081933.pdf. This Court can
take judicial notice of these agency documents posted on the agency's own website. *Daniels-
Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).

distribution list and its denial of the various requests set forth above were arbitrary and capricious in violation of the APA and NEPA.

> **II.    By Entering into a Logging Contract Long Before the NEPA Process was Complete, the Forest Service "prejudiced the selection of alternatives before making a final decision" and took action "limit[ing] the choice of reasonable alternatives," in Violation of NEPA (Claim 1, Count 4).**

The Forest Service first decided to log old growth, then justified that decision after-the-fact via the NEPA process. That violates NEPA, which requires the Service to conduct the NEPA process *before* deciding to log trees.

In 2016 the Forest Service contractually agreed to let a company called T2 Inc. cut down more than 35 acres of old growth forest at Walton Lake (in addition to approximately 140 acres of other timber management activities). AR 05058 (decision memo); AR 05170 (contract with T2 Inc.). Those 35+ acres are at issue in this case. As explained below, the Service's contract with T2 Inc. prematurely and unlawfully committed both natural resources (i.e., trees to be logged) and financial resources (appropriated funds) before the NEPA process was completed.

NEPA mandates that an agency "shall not commit resources prejudicing selection of alternatives before making a final decision." 40 C.F.R. § 1502.2(f) (2019). Similarly, an agency shall not take any pre-NEPA action that may "[l]imit the choice of reasonable alternatives." *Id.* § 1506.1(a)(2) (2019).[8] These prohibitions align with one of NEPA's primary purposes: namely, to facilitate informed decision-making after full consideration of reasonable alternatives, "rather than justifying decisions already made." *See id.* § 1502.2(g) (2019).

---

[8]  Judge Simon has found that "the level of commitment required to 'limit' an agency's alternatives [under 40 C.F.R. § 1506.1(a)(2)] is higher than the level [of] commitment required to 'prejudice' an agency's alternatives [under 40 C.F.R. § 1502.2(f)]." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-cv-0640-SI, 2017 WL 1829588, at *14 (D. Or. Apr. 3, 2017), aff'd in part on other grounds, appeal dismissed in part, 886 F.3d 803 (9th Cir. 2018).

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000), is illustrative. In *Metcalf,* the Makah Tribe wished to reinitiate hunting of gray whales, and sought the support of two federal agencies in bringing its proposal before the International Whaling Commission. *Id.* at 1138. Those federal agencies agreed and entered into a signed contract with the Makah to support its application and to provide for cooperation with the tribe once the harvests were underway. *Id.* at 1139. It was only *after* this written agreement had been executed, however, that the agencies undertook to prepare an EA. After the draft EA was put out for public comment, one agency and the Makah entered into a new written agreement which mirrored the original in most regards. *Id*. Four days after this second agreement was signed, the agencies issued a final EA and FONSI. *Id.* at 1140.

In holding that the federal agencies violated NEPA by entering into a contract before conducting NEPA, the Ninth Circuit in *Metcalf* noted that "proper timing is one of NEPA's central themes. An assessment must be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made." *Id.* at 1142. As for the EA in *Metcalf*, the court found it "demonstrably suspect because the process under which the EA was prepared was fatally defective." *Id.* at 1146. As described below, the same "fatally defective" process occurred here.

a. **The 2016 Contract Impermissibly Committed *Natural* Resources Before the NEPA Process was Complete.**

Unlike a typical timber sale, where the purchaser pays the Forest Service for the right to log on public lands, for the Walton Lake Project *the Forest Service* agreed to pay T2 Inc. to do the work. That is because the Project is classified as a "stewardship contract" intended to shift the Walton Lake area "towards a desired future resource condition."[9] In other words, the Walton Lake Project is not intended to make money for the Service, but rather to modify the landscape

---

[9] https://www.fs.fed.us/restoration/Stewardship_Contracting/overview.shtml

surrounding Walton Lake in a certain way. That is expensive, unprofitable work, so in this type

of "stewardship" logging project private logging contractors get paid by the Service to do the

work instead of the other way around. Such is the case here: a significant portion of the contract

requires T2 to conduct unprofitable, non-commercial thinning. AR 5170; AR 8242–43.

But payment is not always in the form of money. In its 2016 bargain with T2 Inc. the

Service gave two types of consideration in exchange for T2's work at Walton Lake: (1) payment

in the form of valuable timber; and (2) payment in the form of money. AR 05170 (accepted T2

contract). Specifically, the Service agreed that T2 can keep "[t]he value of timber" that it logs –

estimated to be $36,000 at the time the contract was signed – plus $78,262 in cash paid by the

Service to T2. *Id.*; AR 8242–45. And so, the Service entered into a contract with T2 for the

specific purpose of extracting natural resources (i.e., logging) from the Walton Lake Project area,

and used those same natural resources as partial payment. Such an agreement is a quintessential

example of a commitment of natural resources that "limits" the choice and "prejudices" the

selection of alternatives in violation of NEPA.

This situation mirrors that in *Metcalf*, because here, too, an agency has entered into a pre-

NEPA agreement committing natural resources to a particular purpose. But even more

regrettable than in *Metcalf*, here the Service is using *the natural resources themselves* as partial

payment for the fulfillment of that contract. This puts a heavy thumb on the scale by

"prejudicing" and "limiting" the choice of alternatives once the NEPA process is underway. The

T2 contract has remained in place for over five years[10] and was entered into well before any

consideration of alternatives under the current NEPA process began. *See* ECF No. 41 at 29–30.

---

[10]   In response to BMBP's FOIA request, the Service has acknowledged that its "Stewardship
Contract" to log the area in question is still in place. *See* AR 7900; AR 7990; AR 7897; and AR
7886.

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY          13
JUDGMENT

Once this Court issued its preliminary injunction in late 2016, and the Service withdrew its 2015 decision, it should have abandoned its contract with T2. Its refusal to do so even while conducting an alternatives analysis under NEPA was an error, albeit an error in line with the initial decision-maker's commitment, throughout the process, to his preferred alternative: "[t]he proposed action will remain as documented in the 2015 Decision Memo." AR 7883. In summary, the 2016 contract with T2 impermissibly committed natural resources, in the form of logging large and old trees, as consideration for the bargain. And it did so well before the current NEPA process was underway. That is arbitrary and capricious under the APA and violates NEPA.

**b. The 2016 Contract Impermissibly Committed *Financial* Resources Before the NEPA Process was Complete.**

While the premature commitment of *natural* resources violates NEPA, the premature commitment of *financial* resources can, too. In *WildWest Inst.*, the Ninth Circuit acknowledged this agency risk: "For example, if an agency spent most or all of its limited budget on preparations useful for only one alternative, it may well have taken action limiting the choice of reasonable alternatives" in violation of NEPA. 547 F.3d at 1169. That example from *WildWest* is very similar to what the Service has done here by making the Project's financial feasibility dependent on logging valuable old growth trees.

Indeed, one reason the Service has not terminated the 2016 T2 contract can be found in an October 2019 internal email from Forest Service Contracting Officer Mark Phillipp. In it Mr. Phillipp explained that the ongoing financial feasibility of the Project was dependent on the continuity of the logging prescription called for by the 2015 decision memo (which included the 35+ acres of clearcut old growth):  "[i]f the treatment prescription changes drastically or wood product value continues to decline that contract awarded years ago will be terminated without performance and *we will lose those appropriated dollars and likely not have the funds to*

*compete and complete a new project*." AR 7897 (emphasis added). In this email, Mr. Phillipp also indicated that "already having an awarded contract and not having the funds is the second part of the scenario that doesn't meet the good news category that I would prefer not to share with a potentially less than understanding public." *Id*. *See also* AR 8242. This use-it-or-lose-it situation described by the Forest Service's Contracting Officer clearly incentivized the Service to make use of the previously appropriated funds, but only in a manner that did not deviate far from the original logging proposal in terms of treatment prescription, lest the contract be terminated and appropriated funds lost.

The fact that appropriated funds may have been lost if the treatment prescriptions changed too much and the contract was terminated put a thumb on the scale of the agency's NEPA analysis, in violation of 40 C.F.R. § 1502.2(f) (2019), which mandates that an agency "shall not commit resources *prejudicing selection* of alternatives before making a final decision." (Emphasis added). It is also a violation of 40 C.F.R. § 1506.1(a)(2) (2019), which prohibits an agency from taking any pre-NEPA action that may "limit the choice of reasonable alternatives." It is clear from the record that the Service was and is invested in the terms of the 2016 contract so as not to lose appropriated funds, and the EA process served only to justify the Service's decision to log as it has been planning to do for five years. Similar to the agencies in *Metcalf*, here the Service has committed resources before the relevant NEPA analysis was undertaken[11], and the EA here is similarly "demonstrably suspect because the process under which the EA was prepared was fatally defective." *Metcalf*, 214 F.3d at 1146. The point of the holding in *Metcalf* is that by entering into a written, formal contract the Service has manifested a clear intent that is inconsistent with NEPA's objective analysis of a proposal's impacts before approving that

---

[11]  Indeed, the Forest Service's Contracting Officer bluntly admitted that the 2016 contract "was awarded essentially pre-decision of the current NEPA documentation." AR 7897.

proposal. Entering into a logging contract and leaving it in place, thereby committing appropriated dollars (i.e., financial resources) prejudiced the selection of alternatives before the relevant NEPA process was even started, much less complete. This is arbitrary and capricious under the APA and violates NEPA.[12]

### III.    The Service Violated NEPA by Having an Unreasonably Narrow Purpose and Need Statement (Claim 1, Count 2).

NEPA requires an agency to specify an underlying purpose and need and to use that purpose and need to identify alternatives to the proposed action. *See* 40 C.F.R. § 1502.13 (2019). The Service unreasonably defined the purpose and need for the project too narrowly such that it ignores ONF Plan management objectives for the Walton Lake area and excludes the consideration of reasonable alternatives. "An agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative . . . would accomplish the goals of the agency's action, and the EIS would become a foreordained formality." *Nat'l Parks Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070 (9th Cir. 2010). As explained by the court in *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997):

> "The 'purpose' of a project is a slippery concept, susceptible of no hard-and-fast definition. One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence). The federal courts cannot condone an agency's frustration of Congressional will. If the agency constricts the definition of the project's purpose and thereby excludes what truly are reasonable alternatives, the EIS cannot fulfill its role. Nor can the agency satisfy [NEPA]."

In this case, two of the four purpose and need statements suffer from the exact deficiency the court warned of in *Simmons*. The first states: "[t]here is a need to curb the laminated root rot

---

[12] In *Metcalf*, the court determined that the remedy was to order a new EA be prepared that ensured an "objective evaluation free of the previous taint." *Metcalf*, 214 F.3d at 1146. Here, a revised NEPA document is also appropriate, but for the reasons discussed elsewhere in this brief, that revised document should be an Environmental Impact Statement (EIS).

["LRR"] infestation where it occurs within the Developed Recreation Management Area around Walton Lake, to develop a healthy stand of vegetation, and provide for public safety." AR 7573. The fourth states: "[t]here is a need to amend the Ochoco Land and Resource Management Plan." AR 7574. While an agency has discretion to define a project's purpose and need, "this discretion is not unlimited." *Westlands Water Dist. v. U.S. DOI*, 376 F.3d 853, 866 (9th Cir. 2004). A purpose and need statement fails if it unreasonably narrows the agency's consideration of alternatives so the outcome is preordained. *Nat'l Parks Conservation Ass'n*, 606 F.3d at 1070.

Overall, the reasonableness of the purpose and need statement must be assessed by considering the legal context of the action. In this case the legal context is the ONF Plan, which provides management direction for areas based on their classification. *See Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1067 (9th Cir. 1998) (upholding purpose and need based on applicable management plan). The Walton Lake recreation area is designated by the Plan as a "Developed Recreation Management Area." AR 7570; AR 1486. The Plan provides that the goal for Developed Recreation Management areas is to "provide safe, healthful, and aesthetic facilities for people to utilize while they are pursuing a variety of recreational experiences within a relatively natural outdoor setting." AR 7573. Developed Recreation Areas consist of two separate sub-areas – a "Developed Site" and a "Visual Influence Area" – for which the Plan provides separate management standards. AR 1629 (in the developed site, "[h]arvest only for the purpose of maintaining safe and attractive recreational sites[,]" and in the visual influence area, "[p]recommercial thinning and commercial thinning may be done to meet the visual quality objectives and maintain healthy stands"). Consistent with these Plan provisions, a more appropriate initial purpose and need statement would be: "There is a need to determine how best to address public safety in light of the existing LRR in the undeveloped visual influence portion

of the recreation management area." There are numerous potential ways to address public safety

other than completely eliminating the hundreds of large LRR-susceptible firs that currently

contribute to the Walton Lake recreation area's scenic beauty and natural outdoor setting.

Despite this, the Service has impermissibly construed its already overly-narrow initial purpose

and need statement to require exactly that.

The first "need," quoted above, is both overly specific and not consistent with the ONF

Plan. The need requires that LRR be "curbed" wherever it occurs within the Developed

Recreation Area, but this fails to account for the distinct management requirements of the *two*

sub-areas within the Developed Recreation Area. The Service acknowledged these different

timber standards in the 2020 EA. AR 7575 (acknowledging that the management area "includes

the *developed site* and a *visual influence area*") (emphasis in original); *id*. ("standards and

guidelines apply at three different scales in this MA: 1) entire Developed Recreation MA; 2)

*within developed site only*; and 3) *within the visual influence area only*.") (emphasis added). By

framing the "need" in a way that required the same treatment of LRR on all portions of the

Developed Recreation Area, the Service made it impossible to then select any reasonable

alternative that completely "curbs" LRR only in the developed site (where public safety is most

crucial due to extended exposure to potential hazards), but not within the visual influence area

(where potential exposure to hazards is transitory, or non-existent where closure orders exist).[13]

This "need" framing ignores the Plan's intention to manage timber in each sub-area based on its

respective unique prescription. AR 1629.

_____

[13] "*Developed sites* are places where people often congregate and are exposed for longer than normal time periods to damaged or defective trees. The longer the time frame of exposure to hazard trees, the greater the potential for property damage or personal injury." AR 3656 (1992 Long-Range Planning for Developed Sites in the Pacific Northwest: The Context of Hazard Tree Management) (emphasis added).

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY     18
JUDGMENT

Moreover, contrary to what the Service claimed in its preliminary injunction briefing, there is no "direction to 'remove' laminated root rot" in the Plan. ECF No. 49 at 20. The Service quoted the Plan's Pest Management Strategies to support its argument, but the quoted language was provided in a column titled "Management Strategies[,]" *not* "management directives." AR 1566. The text introducing this table indicates that the strategies are not mandatory (rather, the Service has discretion to "[s]elect strategy through the environmental analysis process") and that "[e]xceptions for individual management areas" exist. AR 1564. By framing the issue as a "need" to "curb" LRR in *all areas* of the Recreation Management Area, the Service preordained the chosen alternative; it was the only alternative that supposedly would "curb" LRR everywhere. This was both arbitrary and capricious, and in violation of the APA and NEPA.

The fourth purpose and need statement also fails because there was no legitimate reason to include a "need to amend the forest plan" in the purpose and need statement. Including such a "need" allowed the Service to eliminate any alternatives that did not require such amendments. The Service has asserted that "[i]f a proposed action includes amendments, then it is appropriate to address that need in an [Environmental Assessment ("EA")]." ECF No. 49 at 20. While it may be appropriate to discuss potentially using Plan amendments as part of an alternative to *meet* a legitimate need in an EA, it is not appropriate to *transform the amendment*, an element of the proposed action/preferred alternative, *into a need*. This is the opposite of what NEPA requires. The purpose and need informs the selection of alternatives; the preferred alternative should *not* inform the formulation of the purpose and need. "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives." *City of Carmel-by-the-Sea v. U.S. DOT*, 123 F.3d 1142, 1155 (9th Cir. 1997). By using elements of the preferred alternative to define the "need" of the

action, the Service put the cart before the horse, violating NEPA's requirement that the purpose and need be used to identify alternatives. *See* 40 C.F.R. § 1502.13 (2019). [14]

The Service's decision to unreasonably define the purpose and need of the project and then propose to amend the Forest Plan in response was arbitrary and capricious in violation of the APA and NEPA. 5 U.S.C. § 706; 40 C.F.R. §§ 1502.13, 1502.14 (2019). As discussed below, the Service used its unduly narrow purpose and need statements to arbitrarily reject or decline to consider several reasonable alternatives.

### IV.    The Service Violated NEPA When it Failed to Meaningfully Consider an Adequate Range of Alternatives (Claim 1, Count 3).

NEPA requires federal agencies to give full and meaningful consideration to all reasonable alternatives in an EA. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008) (agencies must in an EA "[r]igorously explore and objectively evaluate all reasonable alternatives to a proposed project."). This requirement includes an analysis of reasonable alternatives that "will avoid or minimize" a proposal's adverse effects. 40 C.F.R. § 1500.2(e) (2019); *see also* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981). In determining reasonableness, the Ninth Circuit "first determine[s] whether the statement of purpose and need was reasonable, and then whether the range of alternatives considered was reasonable in light of that purpose and need." *League of Wilderness Def. v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012). As discussed above, the purpose and need statement was not reasonable, thus, the range of alternatives considered was also not reasonable. Despite being

---

[14] Even the Service Handbook acknowledges this order of operations. *See* FSH 1909.15 zero-code § 5 ("Definitions") ("Proposed Action [Alternative]. A proposal made by the Service to authorize or implement an action *to meet* a specific purpose and need[.]" (emphasis added)). Supplemental Buss Declaration ("Supp. Buss Decl.") Ex. 3 at 14 (ECF No. 56-3).

presented with multiple reasonable alternatives for the Walton Lake Project—including the use

of warning signage *without* closing units to public use, and limiting the area needing to be

sanitized by shrinking the developed recreation boundary—the Service failed to fully and

meaningfully consider said alternatives, arbitrarily and capriciously violating NEPA. 40

C.F.R. § 1500.2(e) (2019); *see W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir.

2013) ("The existence of a viable but unexamined alternative renders an [EA] inadequate.").

As a result of the unduly narrow purpose and need statement, discussed above, the

Service considered a constrained range of possible alternatives, consisting of the following:

- **Alternative 1** (No Action)
- **Alternative 2** (Proposed Action), including 35 acres of "sanitation harvest" (essentially a clear cut) removing *all* grand and Douglas-fir of all ages and sizes in units 2–4, commercial and non-commercial thinning in units 1 & 5, non-commercial thinning in units 6–8, with .41 miles of temporary road construction.
- **Alternative 3:** mirrors most elements of the Proposed Action but limits the sanitation logging in units 2–4 to within 150 feet of the loop road, closes the untreated portion of those units to public use, and relocates the hiking trial.
- **Alternative 4:** mirrors most elements of Alternative 3, but eliminates *all* treatments in units 2–4 and instead implements a public closure for those units.

AR 7582–88. Alternatives 2 and 3 would require Plan amendments to avoid violation of the ONF

Plan, AR 7582–85, while Alternatives 1 and 4 would not require amendments.

By framing the Plan amendments and LRR elimination as basic project "needs," AR

7574, the Service demonstrated that it did not intend to give meaningful consideration to any

alternatives which did *not* include a Plan amendment, or which would not entirely "curb" LRR in

all areas. AR 7582; AR 7587. Indeed, the No-Action Alternative was rejected because it did not

address the narrowly stated needs in any units. AR 8728. Alternative 3, which only eliminated fir

trees in a portion of units 2–4, was rejected because it did not totally "curb" firs from the visual

influence portion of the recreation area. *Id.* (noting Alternative 3 did not "tackle the whole

area."). But Alternative 3 actually presents a true middle ground between "no action" and

Alternative 2's "cut down all firs" approach to public safety. Alternative 3 would have left hundreds of large firs in place while removing firs only from the areas near roads and trails where they arguably present an actual threat to public safety. AR 7585–6. And, importantly, the Service's own 2019 Forest Health Biological Evaluation, authored by six Service experts, specifically endorsed Alternative 3. AR 6300. The DN does not explain why their advice was not accepted. Alternative 4 also was rejected because eliminating treatment in units 2–4 conflicted with the Service's perceived need to address public safety by "curbing" all trees susceptible to LRR. AR 8728. Advancing alternatives for supposed consideration in an EA that do not meet the project's unreasonably narrowly-defined "need" is an exercise in futility. Instead of populating the EA with throw-away alternatives that it never intended to choose, the Service should have advanced an appropriately framed purpose and need statement, and dedicated its analysis to fully considering these and other serious alternatives proposed by BMBP and by Service staff.

For example, BMBP suggested that the Service consider alternatives that reduce the unnecessary logging of large and old growth trees yet still meet the Service's stated public safety goal, such as posting adequate signage around units of concern while leaving them open to recreationists. AR 6199. This alternative still allows logging in the "developed site" area, thus promoting public safety, while also reducing unnecessary logging of large trees in the "visual influence area," consistent with the management prescription for each respective area. AR 1486. Posting such signage is a recognized and acceptable way to address safety issues. *See, e.g., Valdez v. U.S.,* 56 F.3d 1177, 1180 (9th Cir. 1995) (dismissing tort claim for injury in national park where plaintiff was adequately warned). Installing such signage would save hundreds of large and old growth firs while allowing the public to decide for themselves whether to accept any safety risk posed by recreating in undeveloped areas of the forest.

The Service points to the need for public safety within the Developed Recreation Management Area as a reason it must so aggressively "sanitize" the relevant units, AR 7573, but only advances solutions that involve logging the Visual Influence Area to the same level of "safety" as the Developed Site itself. AR 7573; AR 7582–83. What the Service fails to acknowledge, however, is that there is more than one way to achieve its stated safety goals. One such solution was provided by BMBP, above, and another was directly presented to the Service by one of its own staff; Kent Koeller, a Forest Service recreational planner, who advanced a simple and viable alternative which would have addressed the issue of safety within developed areas *and* helped to reduce the number of large and old growth fir trees being cut. [15] "I have from day one of this project two plus years ago recommended at least shrinking the developed recreation boundary in places to within (two tree lengths) 150 feet of loop road and promoting a sanitation treatment for LRR within that boundary."[16] AR 7901 (parenthetical in original). This reasonable alternative would reduce the burden on the Service to maintain an adequately "safe" developed recreation environment for recreationists by reducing the area it must administer and would spare many acres of the visually desirable LOS areas in units 2–4 from unnecessary and untimely "sanitation." Mr. Koeller indicates that trails (and perhaps roads) would not need to undergo this sanitation process if they did not fall within the developed recreation designation,

---

[15] The objection comment period was the first opportunity that BMBP had to raise this issue, because it did not receive the document containing Mr. Koeller's suggested approach, provided to BMBP by the Service in response to a February 2020 Freedom of Information Act request, until after the prior comment period had closed. *See* AR 7844, n.9. Moreover, Service employee Mr. Koeller raised this issue during the NEPA process. *Great Old Broads for Wilderness v. Kimbell,* 709 F.3d 836, 846 (9th Cir. 2013); s*ee also, Benton Cty. v. U.S. DOE*, 256 F. Supp. 2d 1195, 1198–99 (E.D. Wash. Feb. 28, 2003) ("a plaintiff, *or another,* must bring sufficient attention to an issue to stimulate the agency's attention and consideration of the issue during the environmental analysis comment process") (emphasis added).

[16] This alternative differs significantly from Alternative 3 because it modifies the boundary of the Developed Recreation Area, thereby saving hundreds of trees without the need to close the excluded area to public access.

"as it is only within [the] developed recreation boundary that we address safety. We wouldn't

safe proof a trail otherwise." *Id.* As the Service admits, moving the boundary would make

"general warnings about entering the Forest… more appropriate." ECF No. 49 at 23.[17]  There is

no evidence in the EA that the Service evaluated Mr. Koeller's proposed alternative.

Here, the existence of multiple "viable but unexamined alternative[s]" renders the Walton

Lake EA inadequate. *Abbey*, 719 F.3d at 1050. The Service's decision to not evaluate all

reasonable alternatives and reject other viable solutions was arbitrary and capricious in violation

of the APA and NEPA. 5 U.S.C. § 706; 40 C.F.R. § 1502.14 (2019).

## V.    The Forest Service's Soils Analysis Violates NEPA (Claim 1, Count 7) and NFMA (Claim 2, Count 4).

In support of its motion for summary judgment on BMBP's Claim 1, Count 7, and Claim

2, Count 4, BMBP adopts and incorporates herein the evidence cited and arguments from pp. 21–

25 and Appendix of its Motion for a Preliminary Injunction and Supporting Memorandum, ECF

No. 41 at 31–35 and 46–47, and from pages 20–22 of its Reply Memorandum in Support of its

Motion for a Preliminary Injunction, ECF No. 54 at 27–29.

## VI.    The Forest Service's Inadequate Cumulative Impacts Analysis Violates NEPA (Claim 1, Count 6).

"Cumulative impacts" includes consideration of actions "past, present, and reasonably

foreseeable." 40 C.F.R. § 1508.7 (2019). Although the FONSI claims the EA's analysis

considered the cumulative effects of the Project and any ongoing or reasonably foreseeable

future actions, AR 8732–33, this is not accurate. The DN acknowledged that the EA did not

address the cumulative impacts of the then-proposed amendment to the Eastside Screens, which

---

[17] "[I]t is not reasonable to eliminate all hazards (i.e. all trees) from a recreation site, line officers must decide what constitutes an acceptable level of risk, then treat or mitigate as necessary to achieve that level while minimizing disturbances and impacts on aesthetics and recreation enjoyment." AR 3670.

would eliminate the 21" mandatory standard across the entire ONF. AR 8733. The proposed

amendment to the Eastside Screens was reasonably foreseeable long before the EA for this

project was finalized in July 2020, and thus the date the EA was publicly released is irrelevant.

"[P]rojects need not be finalized before they are reasonably foreseeable… '[R]easonably

foreseeable future actions need to be considered even if they are not specific proposals.'" *N.

Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078–79 (9th Cir. 2011). The

Service does not dispute it was conducting public meetings regarding the proposal in May of

2020, months before the Walton Lake EA was released in July, or that defendant Jefferies, who

was also the decision-maker for that proposal, knew about it before it was publicly announced.

*See* ECF No. 41, at 41, n.20, citing AR 8066 and 8378.

   The Service maintains that there will be no cumulative effects from the Project when

combined with impacts of Eastside Screens amendments because the latter "will not authorize

on-the-ground actions[.]" AR 8733.  But even if the Eastside Screens amendments would not

authorize specific projects, the Service *did* estimate that its preferred alternative ("Old Tree

Standard and Large Tree Guideline") would "increase the available volume for treatment"

(timber that may be cut) across the management area by up to 13%, AR 8126–7, and admitted

"[i]t is reasonable to assume that additional volume could be treated under the forest

management of projects of each Forest." AR 8127. These admissions undercut the Service's

position that it did not need to include the estimated impacts from the forest-wide Eastside

Screens amendments in its cumulative impacts analysis here. NEPA requires agencies to "engage

in reasonable forecasting. Because speculation is . . . implicit in NEPA, [ ] we must reject any

attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion

of future environmental effects as crystal ball inquiry." *N. Plains*, 668 F.3d at 1079.

### VII.    The Project is Significant Under NEPA and Requires an EIS (Claim 1, Count 5).

NEPA requires that agencies prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment[.]" 42 U.S.C. § 4332(C). The potential "significance" of a proposed action is determined by evaluating the context of those actions and the intensity of the effects within that proper context. 40 C.F.R. § 1508.27 (2019). The agency advancing or approving an action has the responsibility to demonstrate why an impact is not significant. *See Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001) (Service failed to articulate a "convincing statement of reasons to explain why a project's impacts are insignificant"). "[T]o prevail on a claim that the Service violated its statutory duty to prepare an EIS, a 'plaintiff need not show that significant effects will in fact occur.' It is enough for the plaintiff to raise 'substantial questions whether a project may have a significant effect' on the environment." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). The FONSI in the DN, AR 8731–8734, does not present a "convincing statement of reasons" to explain why the project's impacts are insignificant. Most fundamentally, the FONSI fails to consider the project's impacts within the local context of the Walton Lake Recreation Area itself.

#### a.  Context

Significance "*must* be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests*, and the locality*[,]" and it "varies with the setting of the proposed action." 40 C.F.R. § 1508.27(a) (2019) (emphasis added). For "a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole." *Id.* The failure to properly address the significance of the local impacts is a fatal and "major analytical lapse." *See Anderson v. Evans,* 371 F.3d 475, 492 (9th Cir. 2004)

(agency violated NEPA by failing to evaluate significance of impacts of authorized whaling on local whale population).

Here, the Service not only refers to the proposed logging plan as "the site-specific Walton Lake Restoration Project," Final EA (AR 7598), but it has also proposed to adopt "site-specific forest plan amendment[s][,]" AR 7729, in order to allow such logging to occur. AR 8682. This characterization of both the project and forest plan amendments as "site-specific," as well as the localized nature of the project's direct and indirect impacts, indicate the most appropriate and relevant context for evaluating the significance of this project is the locality – the Walton Lake project area – and not the ONF as a whole.

Despite this clear mandate from Section 1508.27(a) and the Service's acknowledgement of the site-specific nature of the proposed project, the agency instead attempts to minimize the local impacts by comparing them to all Developed Recreation Areas (1810 acres) within the Ochoco National Forest and to the ONF as a whole (845,498 acres), AR 8731, and does not evaluate the significance of those impacts on the 218-acre Walton Lake area itself. The FONSI then asserts that because those impacts occur only within 218 acres they are not significant and "have a negligible effect *at the Forest scale*." *Id.* (emphasis added). This failure to properly address the significance of the local impacts is a fatal and "major analytical lapse."

The FONSI's ultimate conclusion regarding significance is solely based on the project's impacts being "narrowly focused on a very small piece of the Forest with no effects extending outside the project area." AR 8731. In discussing its "significance" determination, the FONSI begins the "Context" discussion by noting that while the project is limited to the 218-acre Walton Lake area, "the [ONF] includes about 845,498 acres; of those, about 1,810 acres were allocated in the Forest Plan to Developed Recreation Areas (MA-13)." *Id.* It then attempts to

further minimize the perceived importance of impacts to the Walton Lake area by stating "the project area represents about .03% of the [ONF] and 12% of MA-13." *Id.* It then concludes that "[g]iven the area affected by the project *at the Management Area and Forest scale*, [the Service] find[s] that the effects of the project are not significant" and "will have a negligible effect at the *Forest scale*." *Id.* (emphasis added). The Service follows through with using an overly-broad scale in the body of the Final EA and DN/FONSI. In defending its proposed 35-acre sanitation harvest, the Service states that the "effects as disclosed in the EA for the 35 acres of sanitation harvest are minor on the *landscape*[,]" but provides no observations about the scope of the impact on the local area. AR 7781; AR 8762 (emphasis added).[18] The Service thus improperly attempts to obfuscate the localized impacts by reducing the entire Walton Lake Recreation Area, a whole unto itself, into a small fraction of a much larger whole.

Establishing the proper setting and scale ("context") within which to evaluate the impact of an action is critical. The Service is not allowed to sweep the significant impacts to the Walton Lake Area under the rug by pointing to the vastness of the surrounding forest. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035–37 (9th Cir. 2001) (agency cannot minimize the impact of an activity by adopting a scale of analysis so broad that it trivializes the site-level impact); *Cascadia Wildlands v. Bureau of Land Mgmt.,* 410 F. Supp. 3d 1146, 1157–58 (D. Or. 2019) (agency cannot marginalize effects to project area by comparing them to much larger surrounding watershed). While a single housefire may be inconsequential on the scale of the city, the impacts on the effected home are devasting. So too, here, when evaluated in the proper local context, the Project will devastate about 25% of the

---

[18] Not only does the Service's "Context" discussion fail to provide adequate analysis under 40 C.F.R. § 1508.27(a) (2019), it also contradicts the agency's admission that the proper scale to evaluate direct effects is "at the *project level*[.]" AR 7782, AR 8763 (emphasis added).

visual influence portion of the 218-acre Walton Lake Area, including almost all of the area's moist mixed-conifer forest in units 2–4. AR 7575, AR 7583. This will likely have a significant impact on that relatively small, but very popular, recreation area and weighs toward requiring an EIS. *See Anderson*, 371 F.3d at 490–92 ("In short, the record establishes that there are 'substantial questions' as to the significance of the effect on the *local* area").

Here, the FONSI never addresses impacts of the Project in the local context, instead focusing on the *Management Area* and *forest scale. Even if* these broader scales were a proper context in which to evaluate these impacts, Section 1508.27(a) unambiguously required the Service to *also* look at the significance of the localized impacts of the Project. This includes analyzing the significance of visual impacts. *See* AR 7608 (describing how over 3,000 trees will be removed from units 2–4, including over 500 large or old growth trees, leaving on average only three large trees per acres); AR 7610, Figure 16 (illustration of how units will look after prescribed logging).[19] Because of this extensive logging, soil productivity in Units 2–4 likely will be significantly harmed by violating the Plan's mandatory soil disturbance limitation – another impact the Service must analyze at the local scale. AR 7696–7. Additionally, the fact that the Service approved four site-specific plan amendments for this relatively small area,

---

[19] BMBP's successful 2016 motion for a preliminary injunction cited to and quoted documents from the 2016 administrative record that underscored the intensive localized impacts of the Service's approved management activities: "the Recreation Resource Report in particular indicated: '[t]he immediate impacts to visual resources would be extremely noticeable as a majority of fir species would be removed from the site'…AR 6342 [2016 record]. Meeting notes also contrasted sharply from the minimalizing language in the public notices. *See, e.g.*, AR 6119 [2016 record] ('These areas will resemble a regeneration harvest with retention trees[,]'); AR 6277 [2016 record] (describing it as a "[c]learcut with reserve trees[.]')" *League of Wilderness Def. v. Turner*, 16-cv-1648-MO, ECF No. 9 at 15. All of these 2016 record documents cited and quoted by BMBP's 2016 motion were not included in the Service's administrative record that it submitted for this case. BMBP's Motion to Complete the Record, ECF No. 10, sought to have these and other 2016 record documents added to the record for this case, but that motion was denied. *See* ECF No. 40.

amendments that completely reverse key environmental protection mandates, underscores the significance of project impacts at the local scale.

Considering a project's impacts at the local scale does not mean that all projects will be deemed significant. Most projects do not call for commercial and non-commercial logging to be implemented within a very limited time frame and within almost the entire forested area of a small, very popular recreation area. Doing so was a choice the Service made. Its choice was likely motivated by the need to fund the Project through the 2016 contract that is still in place. That contract depends upon revenues from the most intensive commercial logging. Nevertheless, this choice also required the Service to conduct a complete EIS to thoroughly evaluate the impacts of such concentrated and intense actions on Walton Lake. While the Service's failure to evaluate significance in the local context is itself sufficient to invalidate the FONSI, the record further evidences the infirmities of the FONSI by demonstrating how the intensity of local impacts also raises "substantial questions" about the significance of those impacts.

### b. Intensity

The second element of the significance analysis, intensity, refers to the severity of impact within the appropriately selected context, and offers a non-exhaustive list of ten factors to consider. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869–70 (9th Cir. 2020). Several of these factors are implicated by the Walton Lake Project. *See* 40 C.F.R. § 1508.27(b) (2019). The presence of even just "one of these factors may be sufficient to require an EIS in appropriate circumstances." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005). Impacts of the Walton Lake Project, including but not limited to those implicated by these factors, indicate that those impacts are significant, especially at the local level, and merit an EIS.

In this case, consideration of the concentrated nature of the proposed activities in such a relatively small area is essential to assessing the intensity of their impacts. The Service has authorized logging on 178 acres of the 218-acre Walton Lake recreation area (about 82%), removing more than 4,000 commercially valuable trees (trees between 8 and 20.9 inches DBH) and 571 large trees over 21 inches DBH from this small local area. AR 7608.[20] The proposed sanitation logging would remove almost all trees from 35 acres within the visual influence area (over 25% of the total visual influence area), and would destroy the ability of those 35 acres to achieve a primary purpose – to provide scenic views for the recreation area – for at least a decade. AR 1608; AR 7575–6; AR 7583–4; AR 7808. The Service admits that the forested areas, especially the "very large" pine and firs, are "a major part of the aesthetics surrounding the lake." AR 6290. The sanitation logging will completely destroy some of that aesthetic: the moist mixed conifer LOS/old growth forest is part of what makes the Walton Lake Recreation area "unique."

In order to authorize this logging, the Service needed to approve four different site-specific amendments to the Forest Plan. These amendments created exceptions to existing Plan provisions that were in place to prevent logging within LOS, logging of trees over 21 inches DBH, logging patches over five acres, and modifying the "retention" visual quality standard that typically protects the Walton Lake area from these precise types of impacts. AR 7598–9.[21] Collectively, eliminating four different protective Plan provisions for such a relatively small recreation area will have significant impacts on that area.

---

[20] This comparison actually understates the percentage of the impacted forested land because about 18 acres of the area is the water body of Walton Lake itself.

[21] See above at 2 for a more complete description of the four site-specific amendments.

Under any rational definition of the term "significant," the concentrated, intense impacts authorized by this Project in the context of a small 218-acre recreation area are significant. Several of § 1508.27(b)'s more specific intensity factors add to and underscore this conclusion.

The unique characteristics of a site is a necessary consideration of intensity, 40 C.F.R. § 1508.27(b)(3) (2019), and the Walton Lake area has numerous unique characteristics. It is the most visited recreation site in the ONF, AR 7625, containing beautiful old growth and large trees that the Service has targeted for almost complete removal in units 2–4 (about 25% of the visual influence area). AR 7583. These scenic, heavily forested areas are part of the draw of the area, as the Service learned during its initial scoping. AR 4930. The NEPA regulations instruct agencies to look at the "[u]nique characteristics of the geographic area *such as* proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3) (2019) (emphasis added). In its DN, the Service incorrectly concluded that because none of the specifically listed examples of unique characteristics are present at the site, this factor did not weigh in favor of undertaking an EIS. AR 8732; ECF No. 49 at 32. But the uniqueness factors listed in § 1508.27(b)(3) are non-exclusive examples. *Native Ecosystems Council v. U.S. Forest Serv. ex rel. Davey*, 866 F. Supp. 2d 1209, 1228 (D. Id. June 6, 2012).[22] The Service's dismissal of the uniqueness factor is also contradicted by the agency's own documents describing Walton Lake as "unique" because "it is the only Developed Recreation Management Area that has a lake with the combination of moist mixed conifer and dry mixed conifer forest surrounding it." AR 7729; *see also* AR 8771.

---

[22] This reading is the most consistent with the plain-language of the regulation; the presence of the words "such as" preceding a list is a strong indication that the drafters intended for what followed to be a non-exhaustive set of examples. *Google LLC v. Oracle America, Inc*., 141 S. Ct. 1183, 1197 (2021).

Because the unique characteristics of the site are directly jeopardized by the Service's plan to destroy the moist mixed conifer forest, the uniqueness factor weighs in favor of requiring an EIS.

Another relevant intensity factor is the controversial impacts of the project. 40 C.F.R. § 1508.27(b)(4) (2019). Such controversy exists where "a substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use." *Found. For N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1182 (9th Cir. 1982). "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI … casts serious doubt upon the reasonableness of an agency's conclusions." *Nat'l Parks Conservation Ass'n.,* 241 F.3d at 736. Here, a substantial dispute exists regarding the effects of this major federal action, specifically, impacts of proposed logging activities on the incidence of laminated root rot in the project area. While the Service claims that the proposed logging will curb the LRR problem, BMBP pointed out that logging may not only *not* resolve the issue, but may actually *spread* LRR. *See* AR 11118. Logging to control LRR would not significantly reduce LRR unless entire root systems of affected trees are removed (though, even then, wood fragments with the disease would likely persist in the soil). The Project's effects were also contested by a giant in the field of forest health and ecology, Chad Hanson, Ph.D., who commented during the 2015 scoping period. AR 11002 ("the project would not reduce LRR occurrence, as claimed, and would likely increase LRR occurrence through logging… due to the presence of infected stumps and root systems"). This would still be the case under the proposed action, which anticipates leaving stumps of harvested trees, as well as any infected root systems, in the ground. AR 7595. Hanson pointed out that the Service is acting inconsistently with regard to a scientific report that *the Service itself* cites as an authoritative source in the EA, *see* AR 11002 (Hanson citing Hansen and Goheen 2000, AR 11006–11030); AR 7605 (EA citing to

Hansen and Goheen 2000 in its discussion of LRR), and that "stumps spread or increase LRR and 'pine trees may be infected when growing mixed with more susceptible conifers'" indicating that the remaining pine themselves could become infected. AR 11002 (citing Hanson and Goheen 2000, AR11006–11030). The Service responded that it reviewed the information provided by Mr. Hanson, but that for this project "[t]here is no evidence that the proposed treatments would exacerbate [LRR][.]" AR 8760. This response improperly chooses to ignore rather than address the scientific controversy regarding the effects of using commercial logging to "curb LRR."[23] Importantly, the Ninth Circuit has explained that even if the evidence regarding one of the intensity factors is insufficient by itself to require an EIS, that evidence can combine with other evidence of intensity to establish that there are substantial questions overall regarding whether a project's impacts may have a significant effect on the environment. *Anderson,* 371 F.3d at 493. That is the case here. The EA only devotes a few paragraphs to addressing the fundamental issues Dr. Hanson raises about whether the Service's unprecedented attempt to address LRR using commercial logging will work. AR 7775–7. This controversy deserves a much more thorough discussion in an EIS.

The proposed action also sets a novel precedent, implicating 40 C.F.R. § 1508.27(b)(6) (2019), by proposing to use forest plan amendments and commercial logging to treat LRR.[24] *See* AR 7729 (Service emphasizing that these amendments are unprecedented). To implicate this factor the Service need not establish a formal or binding precedent– unprecedented actions that

---

[23] Other studies the Service reviewed also call into doubt the supposedly beneficial effects of this project in terms of curbing LRR. *See* AR 8448–485 (Thies and Sturrock, *Laminated Root Rot in Western North America* (April 1995)); AR 8394–445 (Shaw, et al., *Managing Insects and Diseases of Oregon Conifers* (June 2009)). They identify western larch, which the Service intends to replant the area with, as moderately susceptible to LRR. AR 8452; AR 8417.

[24] The Service admits that it has never before used commercial logging to treat LRR in the ONF. AR 8389 (a response to BMBP's FOIA request on the topic).

could be used as a precedent for future environmentally harmful actions must also be considered.
*Anderson,* 371 F.3d at 493. Here, the Service's action is unprecedented in at least three respects.
This is the first time the Service has used commercial logging to treat LRR. ECF No. 41 at 41,
n.19; AR 8389. It is also the first time the Service has amended the Forest Plan's scenic quality
standard in a developed recreation area in order to allow for commercial logging.[25] *See* AR 7729.
Finally, the Service points to no prior instance where it has used four site-specific amendments to
eliminate plan provisions – designed to protect the ONF from harmful environmental impacts –
in order to allow a single commercial logging project to go forward. The FONSI concludes that
its actions are "not likely" to set a precedent and asserts that any future action seeking to take
similar unprecedented actions would have to undergo NEPA review. AR 8732. Such conclusory
assertions are no substitute for the Service actually analyzing the precedential impact of these
unprecedented actions in its NEPA analysis. Accordingly, this factor also supports the need for
an EIS. *Anderson,* 371 F.3d at 493.

Cumulative impacts, discussed *supra* at 24–25, also demonstrate the intensity, and
subsequent significance, of the project. 40 C.F.R. § 1508.27(b)(7) (2019).

Finally, the Project implicates 40 C.F.R. § 1508.27(b)(10) (2019), the intensity factor
weighing whether the action "threatens a violation of Federal, State, or local law or requirements
imposed for the protection of the environment." Here, the Project violates both NEPA and
NFMA, including a violation of the Plan's soil disturbance limitation, and weighs in favor of
significance. The Project only arguably avoids other legal violations by including four different
Plan amendments that exempt the Project from Plan provisions that would otherwise protect

---

[25] Here, downgrading the applicable standard from "retention," which "means that human
activities should not be evident to the casual forest visitor[,]" AR 7599, to "modification," which
does not provide this same protection. AR 1607; AR 1610.

large trees, old growth, forested areas, and visual quality in the project area. The illegality of the process used to approve these Plan amendments is discussed below. Even if the Court finds the process used for the amendments to be legal, the very need to create numerous exceptions to the Plan's environmental protection mandates evidences the significant nature of the impacts of the Project on the Walton Lake area.

The Service has not here met its burden to articulate a "convincing statement of reasons to explain why a project's impacts are insignificant" and, in direct violation of 40 C.F.R. § 1508.27(a)'s mandatory terms, has totally failed to evaluate the significance of the Project's impacts in the most relevant, local context, making the FONSI arbitrary and capricious. Moreover, BMBP has itself raised substantial questions about whether this project will have a significant effect on the environment, indicating that the Service should prepare an EIS instead of this EA. Its decision not to do so is arbitrary and capricious.

## VIII. Under NFMA, the Site-Specific Forest Plan Amendments Result in a "Significant Change" to the Forest Plan, so Additional Procedures are Required (Claim 2, Count 2).

Under NFMA, forest plan amendments that are "significant" are subject to additional procedures. The statute says that forest plans may "be amended in any manner whatsoever after final adoption after public notice, and, if such amendment would result in a significant change in such plan, in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section[.]"[26] 16 U.S.C. §

---

[26] 16 U.S.C. § 1604(e) and (f) relate to the required contents of forest plans, while subsection (d)(1) specifies the required public participation procedures, as follows: "The Secretary shall provide for public participation in the development, review, and revision of land management plans including, but not limited to, making the plans or revisions available to the public at convenient locations in the vicinity of the affected unit for a period of at least three months before final adoption, during which period the Secretary shall publicize and hold public meetings or comparable processes at locations that foster public participation in the review of such plans

1604(f)(4). Despite the Walton Lake Project plan amendments being "significant" under NFMA, the Service did not undertake the required additional procedures. That violates NFMA.

The statute does not define the term "significant change." *Id.* Under the 1982 Forest Service planning regulations, significance was determined "[b]ased on an analysis of the objectives, guidelines, and other contents of the forest plan[.]" 36 C.F.R. § 219.10(f) (1996); *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 898 (9th Cir. 2002). However, that standard no-longer applies because it has been superseded by the 2012 planning regulations:

> *Amendment requirements.* For every plan amendment, the responsible official shall … [a]mend the plan consistent with Forest Service NEPA procedures. The appropriate NEPA documentation for an amendment may be an environmental impact statement, an environmental assessment, or a categorical exclusion, depending upon the scope and scale of the amendment and its likely effects. Except for an amendment that applies only to one project or activity, a proposed amendment that may create a significant environmental effect and thus requires preparation of an environmental impact statement is considered a significant change in the plan for the purposes of the NFMA and therefore requires a 90-day comment period for the proposed plan and draft environmental impact statement (§ 219.16(a)(2)), in addition to meeting the requirements of this section.

36 C.F.R. § 219.13(b)(3). Under the current regulation, then, plan amendments that "may create a significant environmental effect" are "significant" under NFMA unless the exception applies. *Id.* As discussed below, the four plan amendments advanced by the Service for the Walton Lake Project meet that standard, and the exception does not apply.

The Federal Register notice for the 2012 planning regulations explains that the new NFMA "significant change" standard is identical to the "significance" standard under NEPA:

> The Department added a sentence to the end of paragraph (b)(3) of [section 219.13] to make clear that a proposed amendment that may have a significant environmental effect and thus require preparation of an EIS is consider a "significant change in the plan" for purposes of the NFMA. The NFMA at 16 U.S.C. 1604(f)(4) states that plans shall be amended in any manner whatsoever after public notice, and, if such amendment would result in a significant change in a plan, the plan must be amended

---

or revisions." As part of NFMA, these requirements are different and separate from NEPA's public participation requirements.

in accordance to the requirements of 16 U.S.C. 1604(e) and (f) and public involvement required by 16 U.S.C 1604(d). Likewise, as part of the NEPA process, the responsible official must determine whether the significance of the proposed amendment's impact on the environment would require an environmental impact statement. **This addition to the final rule makes the NEPA and NFMA findings of "significance" one finding. If under NEPA a proposed amendment may have a significant effect on the environment and an EIS must be prepared, the amendment would automatically be considered a significant change to a plan**.

77 Fed. Reg. 68, 21238 (Apr. 9, 2012) (bolding added). This addition to the final rule equates a

"significant change" under NFMA with a finding of "significance" under NEPA, such that there

is no separate analysis for the two. That simplifies matters for the Court in this case. As

discussed herein at Section VII, the Walton Lake Project and the multiple plan amendments it

requires are "significant" under NEPA. Therefore, under 36 C.F.R. § 219.13(b)(3), the plan

amendments are also *per se* significant under NFMA. This means that the Service was required

to undertake the additional public involvement procedures specified by 16 U.S.C. § 1604(d)(1)

and 36 C.F.R. § 219.13(b)(3), which it did not do.

Rather than "municiz[ing] and hold[ing] public meetings or comparable processes at

locations that foster public participation in the review of" the proposed amendment, as required

by 16 U.S.C. § 1604(f)(4) and (d)(1), as is discussed above, the Forest Service *failed* to foster

public participation when it declined to notify BMBP about the sole public meeting it hosted (on

June 25, 2019) regarding this iteration of the Walton Lake Project. *See* AR 7579 (EA describing

public involvement). In any event, even if the proposed Plan amendments were discussed at that

June 2019 meeting (something BMBP cannot know), that meeting took place before the formal

NEPA process began and before the proposed forest plan amendments had been officially,

publicly revealed, so that June 25th meeting, by itself, cannot satisfy NFMA's requirement that

the Forest Service hold "public *meetings*" to "*review*" proposed significant plan amendments. 16

U.S.C. § 1604(d)(1). Indeed, the only project-related public event, held after the four

amendments were disclosed in the August 2019 scoping notice, was hosted by the Ochoco Forest Restoration Collaborative, not the Forest Service. AR 7579. Further, although 36 C.F.R. § 219.13(b)(3) requires a 90-day comment period for significant plan amendments, the Service only provided a 30-day public comment period. AR 6601. The Court should therefore remand this matter to the Service for completion of those additional, required procedures.

As noted above, the regulation contains an exception such that "*an* amendment that applies only to one project or activity" is not considered "significant" under NFMA just because it is "significant" under NEPA. 36 C.F.R. 219.13(b)(3) (emphasis added). That exception does not apply here for two reasons. First, by its plain terms the exception only applies when "an" amendment is being proposed. *Id.* Here, the Service proposed and adopted not one but *four* plan amendments covering multiple activities. This takes it outside the reach of the exception. Second, even if the regulation did apply to multiple plan amendment situations like the Walton Lake Project, the statute does not permit the Service to exclude entire classes of plan amendments as not significant under NFMA. Rather, the statute says that plan amendments that result in a "significant change" to a plan must undertake additional procedures, 16 U.S.C. § 1604(f)(4), and there is no statutory exception for project-specific plan amendments.

In summary, the Walton Lake Project and its four plan amendments are "significant" under NEPA, and are therefore "significant" under NFMA. This triggers the additional procedural requirements of 16 U.S.C § 1604(f)(4) and 36 C.F.R. § 219.13(b)(3). The Court should therefore remand to the Forest Service for compliance with those requirements.

### CONCLUSION

For the above reasons, BMBP respectfully requests that the Court grant summary judgment in its favor on Claim 1 (Violations of NEPA and the APA), Counts 1–7, and Claim 2

(Violations of NFMA and the APA), Counts 2 and 4, from its Amended Complaint, ECF No. 12, and vacate the Forest Service's DN/FONSI and EA.

Respectfully submitted this 17th day of February, 2021.

s/Tom Buchele
Tom Buchele, OSB # 081560
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland OR 97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

s/Jesse Buss
Jesse A. Buss, OSB # 122919
Willamette Law Group
411 Fifth Street
Oregon City OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

*Attorneys for Plaintiff Blue Mountains Biodiversity Project*