Tom Buchele, OSB # 081560
Earthrise Law Center
10101 S. Terwilliger Blvd.
Portland, OR 97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

Jesse A. Buss, OSB # 122919
Willamette Law Group
411 Fifth Street
Oregon City, OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

*Attorneys for Plaintiff Blue Mountains Biodiversity Project*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| **BLUE MOUNTAINS BIODIVERSITY PROJECT**, an Oregon nonprofit corporation, | Case No. 2:20-cv-2158-MO |
| Plaintiff, | **REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 66) AND RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 67)** |
| v. | |
| **SHANE JEFFRIES**, in his official capacity as Ochoco National Forest Supervisor; and **UNITED STATES FOREST SERVICE,** an agency of the United States Department of Agriculture, | |
| Defendants. | |

## TABLE OF CONTENTS

**Page Nos.**

TABLE OF CONTENTS .................................................................................... i

TABLE OF AUTHORITIES ............................................................................. iii

TABLE OF ACRONYMS ................................................................................ vi

INTRODUCTION ............................................................................................1

ARGUMENT ..................................................................................................2

I.      The Flawed Public Involvement Process Violates NEPA (Claim 1, Count 1). .......3

II.    The Service's Continued Reliance on the 2016 Logging Contract Violates NEPA (Claim 1, Count 4). ........................................................................7

        a.    The Uncontradicted Record Evidence Shows the Feasibility of the Walton Lake Project was Dependent on Keeping the 2016 T2 Logging Contract. ........................................................................7

        b.    The Legal Standard Proposed by the Forest Service Does Not Apply Here. ..............................................................................9

        c.    It is Irrelevant that the Service May Unilaterally Cancel the T2 Contract. ...........................................................................12

III.   The Forest Service Violated NEPA by Having an Unreasonably Narrow Purpose and Need Statement (Claim 1, Count 2). ..................................................12

IV.  The Forest Service Violated NEPA by Failing to Meaningfully Consider an Adequate Range of Alternatives (Claim 1, Count 3). ......................................17

V.   The Forest Service Claims to Meet a Soil Compaction Standard That Does Not Exist and its Analysis Violates NEPA (Claim 1, Count 7; Claim 2, Count 4)...................................................................20

VI.  The Service Did Not Fully Analyze Cumulative Impacts (Claim 1, Count 6). .....21

VII. An EIS is Required Because the FONSI is Invalid and the Walton Lake Project's Impacts Raise Substantial Questions about Whether there will be Significant Localized Effects on the Walton Lake Recreation Area (Claim 1, Count 5). ...............................................................................23

        a.    The Forest Service Illegally Never Made a Determination Regarding

the Local Significance of the Walton Lake Project's Impacts...................24

    b.     The Intensity of the Project's Impacts, in the Context of a 218-Acre Recreation Area, Indicates that the Project's Impacts May be Significant. ....................................................................................27

VIII.   Under NFMA, the Site-Specific Amendments Result in a "Significant Change" to the Forest Plan, Requiring Additional Procedures (Claim 2, Count 2). ............30

    a.     The Exception Does Not Apply to Multiple Proposed Plan Amendments. ....................................................................................31

    b.     The Exception Does Not Apply Because An Amendment Outlives the Project. ................................................................................................32

    c.     Even if the Service Were Not Required to Provide a 90-day Public Comment Period, it Was Required to Provide a 45-day Comment Period. ....................................................................................33

CONCLUSION...............................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                                                            **Page(s)**

*Anderson v. Evans,* 371 F.3d 475 (9th Cir. 2004)................................................................23, 26, 29

*Asarco, Inc. v. EPA, 616 F.2d 1153 (9th Cir.1980)* .......................................................................3

*Benton Cty. v. U.S. Dep't of Energy*, 256 F. Supp. 2d 1195 (E.D. Wash. Feb. 28, 2003)............19

*Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208 (9th Cir. 1998) ...................23

*Cascadia Wildlands v. Bureau of Land Mgmt.,* 410 F. Supp. 3d 1146 (D. Or. 2019)..................26

*Connor v. Burford*, 848 F.2d 1441 (9th Cir. 1998)........................................................................10

*Ctr. For Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172
    (9th Cir. 2008)........................................................................................................................17

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985)..................................................................3

*LOWD/BMBP v. Connaughton,* 752 F.3d 755 (9th Cir. 2014)......................................................21

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000)..........................................................................10

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) ..................22

*Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001)............................23, 26

*Nat'l Parks Conservation Ass'n v. BLM*, 606 F.3d 1058 (9th Cir. 2010)......................................12

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 2017 WL 1829588
    (D. Or. Apr. 3, 2017)..............................................................................................................11

*Native Ecosystems Council v. Dombeck,* 304 F.3d 886 (9th Cir. 2002) .......................................19

*Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290 (D. Or. 2011)...............3

*ONDA v. BLM,*  625 F.3d 1092 (9th Cir. 2010)............................................................................27

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028
    (9th Cir. 2001)........................................................................................................................25

**Regulations**                                                                                          **Page(s)**

36 C.F.R. part 218, subpart A ...................................................................................34

36 C.F.R. part 218, subpart B ...................................................................................35

36 C.F.R. § 218.1(a) ..................................................................................................34

36 C.F.R. § 218.22(a) ................................................................................................34

36 C.F.R. § 218.25(a)(1) ...........................................................................................34

36 C.F.R. § 219.13(b)(3) .................................................................................... *passim*

36 C.F.R. § 219.16(a)(2) ............................................................................................34

36 C.F.R. § 219.16(b) .........................................................................................34, 35

36 C.F.R. § 220.7(b)(2) ..............................................................................................17

40 C.F.R. § 1500.1(b) (2019) ....................................................................................30

40 C.F.R. § 1500.2(d) (2019) ......................................................................................3

40 C.F.R. § 1501.4(b) (2019) ......................................................................................3

40 C.F.R. § 1502.2(f) (2019) ..................................................................9, 10, 11, 12

40 C.F.R. § 1502.13 (2019) ...................................................................12, 13, 17

40 C.F.R. § 1502.14 (2019) .......................................................................................17

40 C.F.R. § 1506.1(a)(2) (2019) .............................................................9, 10, 11, 12

40 C.F.R. § 1506.6(a) (2019) .......................................................................................3

40 C.F.R. § 1506.6(b) (2019) ...................................................................................3, 4

40 C.F.R. § 1506.6(b)(1) (2019) ..............................................................................3, 5

40 C.F.R. § 1508.7 (2019) .........................................................................................21

40 C.F.R. § 1508.9(a)(1) (2019) ...............................................................................25

40 C.F.R. § 1508.13 (2019) .......................................................................................25

40 C.F.R. § 1508.27(a) (2019) ................................................................................23, 24, 27, 29

40 C.F.R. § 1508.27(b) (2019) ................................................................................27, 29

40 C.F.R. § 1508.27(b)(3) (2019) ..........................................................................29

40 C.F.R. § 1508.27(b)(4) (2019) ..........................................................................30

40 C.F.R. § 1508.27(b)(6) (2019) ..........................................................................30

40 C.F.R. § 1508.27(b)(7) (2019) ..........................................................................30

40 C.F.R. § 1508.27(b)(10) (2019) ........................................................................30

**Code**                                                                                                          **Page(s)**

16 U.S.C. §1604(i) ....................................................................................................21

41 U.S.C. § 7101(6) ..................................................................................................8

42 U.S.C. § 4332(C)(v) ............................................................................................10, 11

**Other**                                                                                                         **Page(s)**

Forest Service Handbook (FSH) 2409.15 (Timber Sale Admin. Handbook) .................................8

Local Rule 56(b) ......................................................................................................3

**TABLE OF ACRONYMS**

APA                          Administrative Procedure Act

BMBP                         Blue Mountains Biodiversity Project

DBH                          Diameter at Breast Height

DN                           Decision Notice

EA                           Environmental Assessment

EIS                          Environmental Impact Statement

FONSI                        Finding of No Significant Impact

LOS                          Late and Old Structure

LRR                          Laminated Root Rot

NEPA                         National Environmental Policy Act

NFMA                         National Forest Management Act

ONF                          Ochoco National Forest

## INTRODUCTION

As the Forest Service's decision and analysis regarding the Walton Lake Project repeatedly and correctly notes, the Walton Lake Recreation Area is a relatively small place: the recreation area (including the Developed Site and its surrounding, densely-forested Visual Influence Area) is only 218 acres in size. But the Service's analysis also notes Walton Lake is a "unique" place – it is the Ochoco National Forest's ("ONF") only lake-side recreation area surrounded by both a moist and dry mixed conifer forest – and is also the ONF's most popular recreation area. Unfortunately, the Service's decision at issue has chosen to target this small but popular recreation area with a combination of unusually intense and concentrated management actions that would impact 178 acres, about 82% of the entire Walton Lake area, and specifically targets 35 acres for especially severe commercial logging that will remove hundreds of large and old growth firs. This intense logging will virtually eliminate the area's entire moist mixed-conifer forest, a key part of what makes the area "unique," and requires four ONF Plan amendments that remove requirements that would otherwise protect Walton Lake's resources. The targeted 35 acres of old growth forest are 25% of its entire Visual Influence Area and one amendment, that will be in place for 10–15 years *after* the Project is completed, lowers the visual quality standard for that area from "high" to "low."

Fortunately, the National Environmental Policy Act ("NEPA") recognizes that even relatively small areas like the Walton Lake Recreation Area can suffer significant impacts from federal agency proposals. NEPA's regulations required the Service to evaluate the significance of the localized impacts of its proposed actions on the Walton Lake area itself and to do that without improperly diluting those local impacts by comparing them to much larger areas like the entire ONF. Unfortunately, in its summary judgment response brief, the Service does not cite to

any instance in the record where it ever properly evaluated the significance under NEPA of all the combined localized impacts of its proposed, intense management actions on the Walton Lake area itself. Instead, the Service offers only examples where, in the record and in its brief, it improperly dilutes those local impacts by comparing them to much larger areas.

Based on this record the Service has not offered a convincing statement of reasons for its Finding of No Significant Impact ("FONSI") and plaintiff Blue Mountains Biodiversity Project ("BMBP") has met its burden of raising substantial questions about whether the Walton Lake Project may have a significant local effect, and thus requires a complete analysis of those impacts in an environmental impact statement ("EIS"). In an EIS the Service could correct other legal errors in its analysis such as properly evaluating the reasonable alternatives to its preferred but scientifically disputed intense management; it could evaluate those alternatives without a purpose and need statement that improperly makes Plan amendments a required "need" for the Project; and it could remove the thumb currently on the scale in the form of the 2016 logging contract that calls for the intense logging. Perhaps most importantly, the Service could also correct its flawed public process wherein the Service intentionally removed BMBP and its attorney from the list of interested parties given notice of the first NEPA-related public meeting regarding the current version of this Project. Such an intentional violation of NEPA's public participation requirements cannot be treated as "harmless error" and is sufficient by itself to overturn the Service's legally flawed decision.

## ARGUMENT

In its Response brief, the Service repeatedly cites to the Jeffries Declaration, ECF No. 50-1, which was filed along with the Service's response to BMBP's preliminary injunction motion. ECF No. 67 at 9–11. While courts "may consider extra-record evidence in determining whether a

party will suffer irreparable harm," *Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1300 (D. Or. 2011), the Court may not consider the Jeffries Declaration in support of the Service's merits arguments at the summary judgment stage. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) (courts reviewing an agency decision limited to the administrative record); *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1160 (9th Cir.1980) (extra-record evidence "to determine the correctness or wisdom of the agency's decision is not permitted"). And the use of extra-record evidence should be even more limited where, as here, that evidence is unreliable or misleading. As explained in BMBP's preliminary injunction reply, the Jeffries Declaration repeatedly makes assertions of fact that mischaracterize the record or lack adequate foundation. ECF No. 54 at 9, 36–38. The Court should strike the Jeffries Declaration or decline to consider the Jeffries Declaration as evidence at the summary judgment stage.[1]

## I.    The Flawed Public Involvement Process Violates NEPA (Claim 1, Count 1).

NEPA dictates that federal agencies "shall to the fullest extent possible … [e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment[,]" which includes making "diligent efforts" and seeking public input "to the extent practicable" when producing environmental assessments ("EAs"). 40 C.F.R. §§ 1500.2(d), 1501.4(b), & 1506.6(a) (2019). Agencies shall "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected." 40 C.F.R. § 1506.6(b) (2019). And, as cited and quoted in BMBP's opening brief, "*[i]n all cases*" the agency is to mail notice directly to those who have requested information on an individual action. 40 C.F.R. § 1506.6(b)(1) (2019) (emphasis added).

---

[1] The parties conferred by phone on April 13, 2022 regarding this issue, as required by Local Rule 56(b), but were unable to resolve their differences.

Here, the Service correctly quotes 40 C.F.R. § 1506.6(b) (2019), requiring agencies to provide notice of "NEPA-related" hearings and public information meetings, ECF No. 67 at 45, yet completely ignores its plain meaning. The Service contends that the "formal" NEPA process began on August 7, 2019 with a scoping letter, thus the agency had no duty to inform BMBP of any public meetings relating to the NEPA process for the Project prior to that date. *Id*. But again, the regulations require the Service to provide notice of "NEPA-*related*" hearings and public information meetings, 40 C.F.R. § 1506.6(b) (2019), and both the Service's response and the record indicate the June 25, 2019 meeting, about which BMBP was not individually notified, was, if nothing else, "NEPA-related." The Service states in its response that the purpose of the meeting was to "inform the public about the conditions at Walton Lake *and to provide information on how to engage in the NEPA process*." ECF No. 67 at 46 (emphasis added). Multiple Forest Service documents in the record make clear that the meeting's goals were to "engage the local public in this discussion to get their input about what is important" and to "inform the public and increase engagement in the NEPA process [to] get more input from local people." AR 5997; ECF No. 66 at 18; *see also* AR 6012 (press release stating that "[t]hose who attend the meeting will have an opportunity to … [d]iscuss the management options and trade-offs currently being considered [and] ... [a]sk questions and share their perspectives with Forest Service specialists"). So, while the Service asserts that the purpose of the meeting was not to solicit comments from the public, ECF No. 67 at 45, this is a blatant falsehood. Comments *were* solicited, and received, at the meeting. AR 6033–36; AR 6012. There is simply no way to describe the June 25, 2019 meeting as anything other than a "NEPA-related" public information meeting, triggering the Service's duty to individually notify interested parties such as BMBP.

The Service further asserts that BMBP "points to no provision" that required it to provide BMBP with individual notice of the public information meeting, ECF No. 67 at 46, ignoring 40 C.F.R. § 1506.6(b)(1) (2019), which BMBP cited and quoted. ECF No. 66 at 17–18. That regulation requires that "[*i*]*n all cases* the agency *shall* mail notice to those who have requested it on an individual action." 40 C.F.R. § 1506.6(b)(1) (2019) (emphasis added). The Service does not dispute that this regulation required BMBP and its attorney to receive individual notice of NEPA-related public information meetings due to their involvement in previous iterations of the Project and, importantly, their email subscriptions to project updates. AR 6065 (subscription list for Project showing BMBP's attorney and Co-Director Paula Hood subscribed to Project updates since 2017). Notably, while the Service has had many opportunities to refute BMBP's suggestion that its exclusion from the email list for the June 2019 meeting was intentional, the Service has not even attempted to do so. *See* AR 6037; AR 7802; AR 7557; ECF No. 67 at 45–47. The Service's continued silence on that issue is a *de facto* admission that it deliberately removed BMBP from the list of those who received individual notices for the June 25, 2019 meeting.

The Service's assertion that BMBP was not prejudiced by being effectively excluded from the June 2019 meeting is conclusory because the Service ignores all of BMBP's arguments as to how it was prejudiced. For example, had BMBP been present at the meeting, it would have had the opportunity to engage with the Service regarding the laminated root rot ("LRR") science – a point of controversy in this case – that was apparently presented. AR 6017–30.[2] BMBP also may

---

[2] Insisting that "BMBP's views [regarding] Walton Lake were already well documented through its participation in two prior NEPA processes," the Service makes much of the fact that BMBP heavily engaged in the Walton Lake decision-making process between 2015 and 2018. ECF No. 67 at 46; *id.* at 45 n.14. But the Service has taken pains throughout the present litigation to insist the prior iterations of the Walton Lake Project are completely separate from the 2020 Walton Lake Project. *See, e.g.,* ECF No. 57 at 13 ("the 2020 Project is new"); *id.* ("the environmental analysis for the 2020 Project is *different* from the environmental analysis for the 2015 project") (emphasis in original). The Service should not be allowed to treat the prior iterations of the Walton

have had the opportunity to address the newly proposed Plan amendments that may have been

discussed. Two of the four proposed Plan amendments were new, and the Service had no

knowledge as to BMBP's views on these proposals. Critically, BMBP would have had the

opportunity to provide comments earlier in the process, as other meeting attendees did, AR

6035–36, potentially impacting the alternatives the Service ultimately considered. It is also likely

that BMBP would have responded to information disseminated at this meeting in its scoping

comments, but was unable to do so without knowing what was discussed.

It is unclear why the Service would deliberately exclude BMBP in this manner if doing so

would have no benefit to the agency. Here, to uphold the Service's deliberate omission of BMBP

from the June 2019 meeting email notification list would be to allow an agency to hold private

meetings from which it can exclude known opponents of its proposed action simply by labeling

them "informal" or "unrelated" to the NEPA process, forcing the public to take the government's

word that it was not prejudiced by the exclusion. This kind of mischief, if enabled, would have

deleterious effects on environmental plaintiffs generally.

Finally, the Service does not dispute that it had the discretion to extend the comment period

or open a second comment period to comply with NEPA as the COVID-19 pandemic escalated

in March 2020, and does not explain why it chose not to, despite other national forests

responding to the pandemic by adjusting public participation deadlines. ECF No. 67 at 47. The

Service contends that because BMBP was able to submit comments it could not have been

prejudiced, but BMBP requested the extension on behalf of all of its members, and neither the

Service nor BMBP can know how many individual members were unable to submit comments

by the deadline. As BMBP pointed out to the Service, AR 7280–83; ECF No. 66 at 19, BMBP

---

Lake Project as completely separate for purposes of the parties' administrative record dispute (a
position with which the Court agreed), and yet attempt to use BMBP's involvement in those prior
iterations in an attempt to satisfy its NEPA requirements for the 2020 iteration of the Project.

was *not* the only member of the public to request such an extension for this reason. AR 7262

(extension request from Margaret Chapple, not a BMBP member, due to COVID-19). The

Service also arbitrarily denied BMBP's request for additional time for public comment due to the

electronic comment link not working, AR 6724–26; AR 7280; ECF No. 66 at 19, which the

Service does not address in its response. The Service's refusal to provide the public additional

time for comment in light of the comment link not working and the declaration of local and state-

wide emergencies that led to the closure of public libraries and universities hindered BMBP and

the public's ability to participate fully in the public engagement process, a violation of NEPA.

    In summary, the Service committed flagrant violations of NEPA's public engagement

provisions, prejudicing BMBP and the public's ability to participate fully in the NEPA process.

To deter this behavior in the future, and to comply with the spirit and letter of NEPA – to which

public participation is central – the Court should rule the Service's actions arbitrary and

capricious in violation of NEPA.

## II.    The Service's Continued Reliance on the 2016 Logging Contract Violates NEPA (Claim 1, Count 4).

### a.    The Uncontradicted Record Evidence Shows the Feasibility of the Walton Lake Project was Dependent on Keeping the 2016 T2 Logging Contract.

The Service claims that "[o]ther than BMBP's conjecture, there is no evidence that the [2016

T2 logging] contract prejudiced or limited the Forest Service's choice of alternatives during the

NEPA process." ECF No. 67 at 36. That is a clear and important misrepresentation of the record.

In fact, the record contains plain *and uncontradicted* evidence (cited in BMBP's motion) that the

parameters of the Walton Lake Project have been constrained by the 2016 T2 contract since well

before the Service reinitiated its latest NEPA process in 2019.The uncontradicted record

evidence cited in BMBP's motion includes the following statement by the Forest Service's

Contracting Officer for the Walton Lake Project, in which he acknowledges the use-it-or-lose-it nature of the 2016 T2 contract: "[i]f the treatment prescription changes drastically or wood product value continues to decline that contract awarded years ago will be terminated without performance and *we will lose those appropriated dollars and likely not have the funds to compete and complete a new project*." ECF No. 66 at 24–25 (citing AR 7897) (emphasis added). The Service, in its response, dismisses this statement as "one person's speculation." ECF No. 67 at 36 n.13. Far from it. That response is a flippant way to characterize a statement made by its designated Contracting Officer, the official with the expertise and duty to oversee the financial and contracting portion of the Walton Lake Project. *See* 41 U.S.C. § 7101(6) (defining "Contracting Officer" as the person who "has the authority to make and administer contracts *and to make determinations and findings* with respect to contracts") (emphasis added); *see also*, *generally*, Forest Service Handbook (FSH) 2409.15 (Timber Sale Admin. Handbook) (detailing extensive powers and responsibilities of Contracting Officers). Because the Contracting Officer is the critical authority in charge of financial and contracting matters for timber sales like the Walton Lake Project, the Contracting Officer's statements about such matters cannot be easily dismissed. And the fact remains that the Service can point to no record evidence contradicting the Contracting Officer's statements about the T2 contract.

In summary, according to the uncontradicted statement of the singular authority on the matter (i.e. the Contracting Officer), the feasibility of the Walton Lake Project was contingent on the selection of a logging plan that was similar to the logging plan approved in the 2015 decision (including clearcutting of commercially valuable timber) and authorized by the T2 contract. If the Service changed the Project too much from that contemplated by the 2015 decision and 2016 contract, such as by removing the commercial timber harvest, the Service would "likely" not be

able to pay for (and therefore implement) *any* version of the Walton Lake Project. AR 7897. The

Service has not offered, and cannot offer, any contrary record evidence.

### b.  The Legal Standard Proposed by the Forest Service Does Not Apply Here.

The parties apparently disagree about the appropriate legal standard applicable to this claim.

While the Service argues that the T2 contract was not an "irreversible and irretrievable

commitment of resources" under NEPA, ECF No. 67 at 34, BMBP's motion for summary

judgment does not press its contract claim under that standard. Rather, the appropriate legal

standards (and those applied in BMBP's motion) are whether, by entering into and failing to

withdraw the 2016 T2 contract, the Service "*prejudic[ed]* the selection of alternatives before

making a final decision," or took pre-NEPA action "*limit[ing]* the choice of reasonable

alternatives." ECF No. 66 at 21; 40 C.F.R. § 1502.2(f) (2019); 40 C.F.R. § 1506.1(a)(2) (2019)

(emphasis added). While the Service understandably desires to apply a legal standard that is

more difficult for BMBP to satisfy, that choice does not belong to the Service; BMBP filed its

motion for summary judgment under NEPA regulations that contain a lower standard. That was,

and is, BMBP's choice. The Court should therefore review the contract claim under the

regulations cited by BMBP, while declining to apply the standard offered by the Service.

Regarding the contract claim, the regulations cited and relied upon by BMBP in its motion

are 40 C.F.R. §§ 1502.2(f) and 1506.1(a)(2) (2019). ECF No. 66 at 21. The former says that

"[a]gencies shall not commit resources *prejudicing* selection of alternatives before making a final

decision," and the latter says that "until an agency issues a [finding of no significant impact]…no

action concerning the proposal may be taken which would … *[l]imit* the choice of reasonable

alternatives." 40 C.F.R. § 1506.1(a)(2) (2019) (emphasis added). While closely related, these are

separate and independent standards contained in different sections of the NEPA regulations. As

noted, it is these regulations that BMBP relies upon in its motion for summary judgment.[3]

What BMBP does *not* rely upon in its motion for summary judgment is yet another standard,

contained in 42 U.S.C. § 4332(C)(v), which requires an EIS to discuss "any irreversible and

irretrievable commitments of resources which would be involved in the proposed action should it

be implemented." This is the standard the Service urges the Court to apply from *Metcalf v.*

*Daley*, 214 F.3d 1135 (9th Cir. 2000) and *Connor v. Burford*, 848 F.2d 1441 (9th Cir. 1998),

both of which deal with the pre-NEPA commitment of resources. ECF No. 67 at 34–36. As

*Connor* explained, "[o]ur circuit has held that an EIS must be prepared before any irreversible

and irretrievable commitment of resources" is made, noting that "[t]he 'irreversible and

irretrievable commitment of resources' criterion is derived from 42 U.S.C. § 4332(C)(v) which

requires an EIS to include a statement of 'any irreversible and irretrievable commitments of

resources which would be involved in the proposed action should it be implemented.' Obviously

this requirement only makes sense if the EIS is prepared prior to the commitment of resources."

848 F.2d at 1446 & n.13. However, neither *Metcalf* nor *Connor* addressed 40 C.F.R. §§

1502.2(f) or 1506.1(a)(2) (2019), which contain less onerous standards than does 42 U.S.C. §

4332(C)(v).

The textual differences between 42 U.S.C § 4332(C)(v) and 40 C.F.R. §§ 1502.2(f) and

1506.1(a)(2) (2019) illustrate that the standards under those laws are markedly different. While

42 U.S.C. § 4332(C)(v) uses the words "irreversible and irretrievable commitment[] of

resources," 40 C.F.R. § 1502.2(f) uses the much milder "[a]gencies shall not commit resources

---

[3] While BMBP *did* also rely on the "irreversible and irretrievable commitment of resources" standard in its motion for a preliminary injunction, *see* ECF No. 54 at 23–27, BMBP's motion for summary judgment contains no such reliance.

prejudicing selection of alternatives before making a final decision," with the words "irreversible

and irretrievable" noticeably absent. The same is true of 40 C.F.R. § 1506.1(a)(2) (2019), which

states only that "no action concerning the proposal may be taken that would … [l]imit the choice

of reasonable alternatives." The word "commit" is not even used in that regulation; rather, the

prohibition is on any "action" that would "limit" the choice of reasonable alternatives.

Indeed, the textual differences between 40 C.F.R. §§ 1502.2(f) and 1506.1(a)(2) (2019)

themselves show that not only do those regulations significantly differ from the "irreversible and

irretrievable commitment of resources" standard under 42 U.S.C. § 4332(C)(v), but also each

regulation itself contains a different standard from the other. Judge Simon made this point in

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 2017 WL 1829588 (D. Or. Apr. 3, 2017),

when comparing and contrasting the regulations:

> The Court must give meaning to the fact that the agency used the term 'prejudicing' in §
> 1502.2(f) and 'limiting' in § 1506.1(a)….If 'prejudicing' alternatives is construed
> identically as 'limiting' alternatives in § 1506.1(a), then § 1502.2(f) would be
> superfluous. This is contrary to 'the canon of construction that courts interpret statutes so
> as not to render any section meaningless.'

> The term "limiting" connotes a more definitive restriction than does 'prejudicing.' *See*
> BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "limit" as: "1. A restriction or
> restraint. 2. A boundary or defining line. 3. The extent of power, right, or authority," and
> defining "prejudice" as "1. Damage or detriment to one's legal rights or claims . . . . 2. A
> preconceived judgment or opinion formed with little or no factual basis; a strong and
> unreasonable dislike or distrust. — Also termed *preconception*." (emphasis in
> original)).Thus, the level of commitment required to "limit" an agency's alternatives is
> higher than the level [of] commitment required to "prejudice" an agency's alternatives.

*Id.* at *14 (internal citations omitted).

In summary, the legal standards under 40 C.F.R. §§ 1502.2(f) and 1506.1(a)(2) (2019) do not

require an "irreversible and irretrievable commitment of resources" before NEPA is violated.

Rather, that standard is derived from 42 U.S.C. § 4332(C)(v), upon which BMBP does not rely.

All that BMBP must show is that the Service's reliance on the 2016 T2 contract either

"prejudiced" or "limited" the available reasonable alternatives under NEPA. 40 C.F.R. §§ 1502.2(f), 1506.1(a)(2) (2019). BMBP has made that showing.

### c.  It is Irrelevant that the Service May Unilaterally Cancel the T2 Contract.

The Service argues that "the [T2 logging] contract does not bind or commit the Forest Service in any way" because in the contract the Service "reserves the right to terminate the contract for its 'sole convenience.'" ECF No. 67 at 35. While the Service may very well be entitled to terminate the contract, and in that sense the T2 contract is not irrevocable, that is irrelevant to the inquiry here (i.e. whether the Service "prejudiced" or "limited" the choice of alternatives by entering into the T2 contract). The issue is not whether the Service can get out of the contract; the issue is whether the Service *needs* the contract in order to complete the Walton Lake Project. And need the contract it does. Without the T2 contract, as explained by the Contracting Officer, "we will lose [the] appropriated dollars and likely not have the funds to compete and complete a new project." AR 7897. So while the Service could cancel the T2 contract without incurring liability to T2, doing so would be tantamount to cancelling the Project itself. In other words, implementation of the Walton Lake Project is intertwined with and dependent upon the 2016 T2 contract. That "prejudices" and "limits" the available reasonable alternatives under NEPA, in violation of 40 C.F.R. §§ 1502.2(f) and 1506.1(a)(2) (2019).

### III.  The Forest Service Violated NEPA by Having an Unreasonably Narrow Purpose and Need Statement (Claim 1, Count 2).

The Ninth Circuit instructs that when defining the purpose and need of an action pursuant to 40 C.F.R. § 1502.13 (2019) an agency "may not define the objectives of its action in terms so unreasonably narrow that only one alternative… would accomplish the goals of the agency's action, and the EIS would become a foreordained formality." *Nat'l Parks Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070 (9th Cir. 2010). Here, the Service has defined and interpreted its

purpose and need so that only its preferred alternative would accomplish its stated "needs." That makes the purpose and need statement "unreasonably narrow" – contrary to NEPA.

As explained in BMBP's opening brief,  ECF No. 66 at 26–27, the Service offered four "needs" in its EA. AR 7573–74. The fourth "need" advanced by the Service, the "need to amend the [ONF Plan,]" AR 7574, is not one of the project's underlying needs at all, but is instead merely an element of the Service's preferred alternative. The Service notes that it has "considerable discretion" in defining the purpose and need of a project, ECF No. 67 at 36–37, but this discretion does not extend so far as to allow the Service to ignore the language of NEPA and its implementing regulations, which require that the agency identify the "*underlying* purpose and need" of a project. 40 C.F.R. § 1502.13 (2019) (emphasis added). In essence, this provision requires the agency to use the purpose and need statement to explain *why* the project needs to be undertaken in the first place. In contrast, the alternatives analysis must offer options of *how* those needs might be met.

When viewed through this lens, it becomes clear that the fourth "need" advanced by the Service – the "need to amend the [ONF Plan,]" AR 7574 – is not a *why* at all, but a *how*. Amending the ONF Plan is *how* the Service intended to meet its first stated purpose and need "to curb the laminated root rot infestation where it occurs[,]" AR 7573, because the Service's preferred plan to curb LRR involves logging practices which would have otherwise been in violation of the ONF Plan. *See generally* AR 7597–99 (proposed ONF Plan amendments necessary to allow selection of the Service's preferred alternative); AR 7727 ("Without these amendments the project cannot fully meet the purpose and need[.]").

The Service defends this fourth "need" by claiming that "[i]f a proposed action includes amendments, then it is appropriate to address that need in an EA." ECF No. 67 at 39. The

Service has it exactly backwards; the need drives the proposed action, not *vice versa*. In other words, the Service conflates the purpose of the *project* with an element of how to achieve a *proposed action alterative*. The Walton Lake Project itself is ostensibly made necessary by underlying forest conditions the Service wishes to change. These are the other "needs" described by the Service. The "need" for an ONF Plan amendment does not spring from underlying forest conditions. Rather, a Plan amendment is made "necessary" only because the Service needs such an amendment to undertake it's preferred action alternative. This is a "need" of the action alternative, not the underlying "need" to take action in the first place. As BMBP outlined in its prior briefing, while it may be appropriate to discuss potentially using Plan amendments as part of an alternative to *meet* a legitimate project need, it is not appropriate to transform Plan amendments into a "need" of the project itself. ECF No. 66 at 29–30. By doing so the Service unreasonably narrowed the range of alternatives that could meet these "needs." For example, one of the amendments that the Service identifies as essential to meet the "need" of the project is the amendment to allow logging of trees ≥ 21" DBH ("the 21" amendment").[4] AR 7727; AR 7598; AR 8722. This is the same as saying that the purpose and need can only be met by logging trees ≥ 21" DBH. Because the Service includes the 21" amendment as a "need," it rejected any alternatives that did *not* include the logging of trees ≥ 21" DBH. *See also* Section IV below.

The Service's first stated "need" to "curb the [LRR] infestation where it occurs within the Developed Recreation Management Area around Walton Lake" similarly inappropriately narrows the potential range of alternatives. AR 7573. The Service interpreted this need as requiring that LRR be "curbed" or eliminated throughout the entire Walton Lake Project area.

---

[4] Trees ≥ 21" DBH are considered "large trees." AR 7580.

AR 7578, AR 7608, AR 7676.[5] As described in BMBP's motion, this "need" is both overly-specific and inconsistent with the ONF Plan because (1) it frames the "need" in a way that requires the same treatment of LRR on all portions of the Developed Recreation Area despite the fact that the ONF Plan contemplates two sets of management standards for the two sub-areas contained within this broader management designation, and (2) by framing the "need" in this way, it allowed the Service to avoid selecting any reasonable alternative that did *not* include a plan to completely "curb" LRR in all areas of the Developed Recreation Area. ECF No. 66 at 28–29. The Service insists both sub-areas are subject to the same management standards, including the public safety emphasis, ECF No. 67 at 37–38, but this is not reflected in the Plan.

The ONF Plan designated Walton Lake as "MA-F13 Developed Recreation[,]" an overarching management designation which "includes the developed site and a visual influence area that surrounds each site." AR 1590; AR 1486. The Service argues "BMBP seeks to create a distinction between the 'developed site' and the 'visual influence area' parts of the project area." ECF No. 67 at 38. BMBP, however, does not need to *create* this distinction because *it already exists*, created by the ONF Plan itself. AR 1486; AR 1629. The Service explicitly acknowledges this distinction in its EA: the "developed site portion of the [management area] … includes campground, day use area, [and] loop road," and encompasses about 66 acres. AR 7575.[6] The Developed Site is separate from the Visual Influence Area, which "surrounds each [developed] site[,]" AR 1486, and encompasses 134 acres. AR 7575.

---

[5] The "Project area" is coextensive with the 218 acre Walton Lake Recreation Area. AR 7573.
[6] This is consistent with other Forest Service guidance with describes "developed sites" to include "sites such as campgrounds, picnic areas, ski areas, boat launches, parking lots, trailhead parking areas, buildings, and administrative complexes." AR 4640 (*Field Guide for Hazard-Tree Identification and Mitigation on Developed Sites in Oregon and Washington Forests* (2014)).

As the Service has pointed out, "the emphasis within [D]eveloped [R]ecreation [A]reas is to 'provide safe, healthful, and aesthetic facilities for people to utilize while they are pursuing a variety of recreational experiences within a relatively natural outdoor setting.'" ECF No. 67 at 37. What the Service has not acknowledged is that the focus on "safe, healthful, and aesthetic *facilities*" limits the applicability of this emphasis to the Developed Site portion of the Developed Recreation Area, because this is where all facilities are located – not within the Visual Influence Area. The Developed Recreation Area's emphasis on safety must be targeted at the "facilities" which are only located within the Developed Site portion of the recreation area and does not extend to the Visual Influence Area. This is supported by the ONF Plan's Standards and Guidelines which provide separate standards for the Developed Site and Visual Influence Area: standards for the Developed Site include the instruction to "[h]arvest only for the purpose of maintaining safe and attractive recreational sites. No scheduled timber harvest." AR 1629. In contrast, the standards for the Visual Influence Area do not mention safety, but instead address visual quality objectives and maintaining healthy stands. *Id.*[7]

Public safety has been addressed at Walton Lake for many years by the removal of actual hazard trees in the Developed Site and immediately adjacent to roads and designated trails, and BMBP has not objected to removal of legitimate hazards within the Developed Site. ECF No. 41 at 2, 11–12, 44. The Service is now attempting to extend the "need" for public safety, which had been targeted at the Developed Site, to encompass the Visual Influence Area, bringing with it the clear-cut logging the Service intends to use to achieve that "safety." There are other, legitimate

---

[7] As discussed prior briefing, LRR is a naturally-occurring and common disease across the ONF, and the purported forest health benefits of the Service's proposed action alternative do not justify a "need" to completely curb trees that are susceptible to LRR. ECF No. 41 at 11–12, 40–41; ECF No. 66 at 43–44.

ways to address LRR, especially outside the Developed Site. For the reasons outlined above and in prior briefing, ECF No. 66 at 28–29, by including a "need" to completely curb LRR within the Visual Influence Area the Service improperly and unreasonably narrowed the purpose and need statement. In so doing, it guaranteed that otherwise reasonable alternative approaches would not be fairly considered or chosen.

### IV.    The Forest Service Violated NEPA by Failing to Meaningfully Consider an Adequate Range of Alternatives (Claim 1, Count 3).

NEPA requires federal agencies to give full and meaningful consideration to all reasonable alternatives in an EA. *Ctr. For Biological Diversity v. Nat'l Highway Traffic Safety Admin.,* 538 F.3d 1172, 1217 (9th Cir. 2008). As discussed above and in BMBP's prior briefing, ECF No. 66 at 30–34, the Service's statement of purpose and need was unreasonably narrow, and because alternatives are meant to respond to that purpose and need, 40 C.F.R. § 1502.13 (2019), by extension the range of alternatives was unreasonable. However, *even if* the Court finds the purpose and need statement to be reasonable, the range of alternatives the Service actually considered was still unreasonable in light of the Service's stated purpose and need, because with the exception of the Preferred Alternative (Alternative 2), none of the alternatives advanced by the Service met the stated "needs." The Service's own NEPA regulations "require that an EA 'briefly describe the proposed action and alternative(s) that *meet the need for action*.'" ECF No. 67 at 39–40, citing 36 C.F.R. § 220.7(b)(2) (emphasis added). Here, the Service violated not only its own regulations, but the CEQs NEPA-implementing regulations, 40 C.F.R. § 1502.14 (2019), by advancing alternatives that *did not* meet the alleged need for action, and rejecting them for that same reason. For example, the Service advanced two action alternatives that clearly did not meet the "needs" of the project because they either did not include a Plan amendment, did not "curb" LRR in *all* areas of the Developed Recreation Area, or both. In other words, while the EA

included an alternatives analysis that appears to include two other action alternatives, in reality

those two alternatives never stood a chance – the narrow purpose and need statement ensured

they would be rejected – and from the very beginning the Service positioned its preferred

alternative as the only available "reasonable" action alternative that could be chosen.

The Service nevertheless argues that "none [of the four alternatives] were rejected based on

whether the proposed action required plan amendments[,]" ECF No. 67 at 39, and that "none

were rejected because they would not curb laminated root rot in all areas." *Id.* at 40. This is not

accurate. For example, Alternative 3 would "limit the sanitation harvest [in Units 2, 3, and 4] to a

150-foot buffer" along the road, while the untreated portions of those units would be closed to

the public. AR 7585. This "sanitation harvest" is part of the strategy to "curb" LRR within the

Developed Recreation Area. *Id.* Alternative 3 "was not selected… because [the Forest

Supervisor] believe[s] the appropriate course of action is to tackle *the whole area infested with

[LRR]* within the Developed Recreation Management Area… rather than just partially treat it."

AR 8728 (Decision Notice ["DN"]/FONSI). This is just another way of saying that Alternative 3

was rejected because it does not completely curb LRR in all parts of the Project area.

Alternative 4 was similarly rejected for failing to meet one of the Service's overly-narrow

"needs." AR 8728. The Service alleges the 21" amendment is necessary in order to meet the

purpose and need of the project. AR 7727. Without the 21" amendment, the Service would not

be allowed to log the large trees in Units 2, 3, and 4. Alternative 4 was rejected in part because

"there is no remediation of the forest health issues in Units 2, 3, and 4 that create a public safety

issue" and because "large fir [trees]… would not be thinned out." AR 8728. The "forest health

issue" referenced is the existence of LRR in Units 2, 3, and 4. Rejecting Alternative 4 because it

does not "remediate" the "forest health issues in Units 2, 3, and 4" is the same as rejecting it for

not "curbing" LRR in all areas. Similarly, rejecting it because it does not allow logging of large

fir trees is the same as rejecting it because it does not include the 21" amendment.

Several other reasonable alternatives were advanced by members of the public and agency

personnel that the Service should have considered. *See* ECF No. 66 at 32–34. For example,

Forest Service personnel repeatedly suggested an alternative which would shrink the designated

Developed Recreation Area boundary. AR 7901. Instead of addressing this alternative, the

Service accuses BMBP of failing to exhaust this issue because it was not "BMBP or other

members of the public" who proposed this alternative during the scoping or comment periods.

ECF No. 67 at 42; AR 7901. BMBP has already addressed this objection, ECF No. 66 at 33 n.15,

and the Service has not attempted to rebut BMBP's argument that it is sufficient where "a

plaintiff, *or another*" brings "sufficient attention to an issue to stimulate the agency's attention

and consideration of the issue during the environmental analysis comment process[.]" *Benton*

*Cty. v. U.S. Dep't of Energy*, 256 F. Supp. 2d 1195, 1198–99 (E.D. Wash. Feb. 28, 2003)

(emphasis added); ECF No. 66 at 33 n.15. The point of exhaustion is to ensure an agency had

*notice* of an issue and the opportunity to address the matter. *Native Ecosystems Council v.*

*Dombeck,* 304 F.3d 886, 899–900 (9th Cir. 2002). It is irrelevant that it was not BMBP or a

member of the public who raised this alternative during the NEPA process; what matters is that it

was raised in a manner that put the agency on notice. It would be disingenuous of the Service to

claim that it was not on notice of this proposed alternative when it was their own employee who

raised it, multiple times. AR 7901. Further, BMBP *did* raise this alternative in its September

2020 objection comments.[8] AR 7843–44.

---

[8] The Forest Service provided the document that suggested this alternative to BMBP in response
to a Freedom of Information Act request submitted in February of 2020. AR 6688; AR 6698.
However, BMBP did not actually receive the document until July of 2020. AR 8238–39.

The Service also maintains that it had no obligation to analyze BMBP's proposed alternative to post signage around Units 2–3 while leaving them open to recreationists because it "would not meet the Forest Service's public safety goals[.]" ECF No. 67 at 41. As discussed *supra* at 15–16, Units 2–4 constitute the Visual Influence Area, which does not share the same public safety emphasis as the Developed Site. As the name suggests, the Visual Influence Area is instead intended to serve a visual quality objective, AR 1629, therefore the fact that BMBP's proposed alternative does not meet the Service's overly-expansive interpretation of the public safety objective should not disqualify it from serious consideration.

## V.    The Forest Service Claims to Meet a Soil Compaction Standard That Does Not Exist and its Analysis Violates NEPA (Claim 1, Count 7; Claim 2, Count 4).

As it did during preliminary injunction briefing, the Service's response claims to be complying with a soil compaction standard that is not found in the ONF Plan. According to the Service, the ONF Plan "instructs the Forest Service to strive to achieve at least 80 percent in a non-compacted, non-displaced condition 'one year after any land management activity.' AR 7476." ECF No. 67 at 44 (emphasis omitted). But as BMBP explained in its Preliminary Injunction Reply, ECF No. 54 at 27–28, this claimed mandatory standard of 20% compaction after rehabilitation or restoration does not exist in the actual Plan. The Service creates its standard by piecing together pieces of different sentences from the Plan's language. *Id.* The Plan's actual mandatory standard simply says that "[t]he minimum [uncompacted and un-displaced soil area] will be 80% of the total activity area." AR 1612. Interpreting this mandatory standard to allow for greater soil disturbance so long as there is subsequent rehabilitation or restoration would allow *unlimited* initial soil compaction from Project activities so long as it is subsequently restored. That is an unreasonable interpretation because it would be inconsistent with the Plans' admonition to plan "all activities to reduce soil compaction and displacement[,]"

AR 1612, and with Regional Guidance that instructs the Service to "emphasize protection over restoration." AR 7476. The EA's soils analysis in fact shows a likely violation of the mandatory 80% standard, and therefore a violation of 16 U.S.C. § 1604(i), because soil compaction could exceed 20% in three units. AR 7696. Indeed, the EA's disclosures regarding soil compaction in the Project area may show an even greater violation because its soil compaction numbers in its chart, AR 7696, do not include admitted existing soil compaction in units 1, 2 and 3. AR 7695.[9]

Even if the EA does not disclose a Plan violation in the EA's soil compaction analysis, that analysis is not presented "in a clear and concise format readily discernable by the public" as the Service claims. ECF No. 67 at 44. To the contrary, the analysis is obscure. To understand the actual total soil disturbance at the project site, the public must review an incomplete chart, AR 7696, add in additional soil displacement described several pages later, AR 7699, and then add in existing soil displacement in three units that is disclosed one page before the chart, but not included in it. *See* AR 7695; *see also* ECF No. 54 at 29. This convolution violates NEPA. *LOWD/BMBP v. Connaughton,* 752 F.3d 755, 761 (9th Cir. 2014) (public should not be required to "parse" agency analysis to understand all impacts).

**VI.    The Service Did Not Fully Analyze Cumulative Impacts (Claim 1, Count 6).**

As described in BMBP's prior briefing, the proposed amendment of the Eastside Screens was a reasonably foreseeable future action for which cumulative impacts should have been analyzed pursuant to 40 C.F.R. § 1508.7 (2019). ECF No. 41 at 41–42; ECF No. 54 at 34–36; ECF No. 66 at 34–35. In its response, the Service has dropped any argument that the Eastside Screens amendment itself was not reasonably foreseeable before it finalized its EA, and thus that argument should be deemed waived. *See* ECF No. 49 at 35 (arguing proposed amendment not

---

[9] Regional Guidance indicates that limits on soil displacement include any existing displacement. *See* AR 7476.

released until after final EA issued); *but see* ECF No. 54 at 35 (BMBP refuting that argument

with record evidence). Instead, the Service now seems to focus on the argument that projects

*authorized by* the amended Screens were not reasonably foreseeable. ECF No. 67 at 24–25.

However, as BMBP has previously pointed out, the Service itself had estimated an approximate

increase in timber extraction resulting from the Eastside Screens amendment. ECF No. 66 at 35,

quoting AR 8127 (Eastside Screens Amendment Preliminary EA estimating a 13% increase in

timber available for harvest under the "old tree standard" alternative that was ultimately

adopted). It is difficult to reconcile the over 10% increase in timber made available for harvest

with the Service's assertion that this has *no potential* to result in cumulative impacts.

The Service also alleges that "[a]ny potential increase in large tree removal based on the

Eastside Screens amendments would be speculative and could not be meaningfully analyzed."

ECF No. 67 at 25. NEPA requires agencies to "engage in reasonable forecasting. Because

speculation is . . . implicit in NEPA, [ ] we must reject any attempt by agencies to shirk their

responsibilities under NEPA by labeling any and all discussion of future environmental effects as

crystal ball inquiry." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1079

(9th Cir. 2011). The Service had more than enough information to engage in "reasonable

forecasting" regarding the additional impacts of the additional logging that could occur under

this proposed amendment to the Screens.[10]

---

[10] The Service incorrectly characterizes the Eastside Screens cumulative effects argument as a
newly raised issue. ECF No. 67 at 24. BMBP's initial summary judgement brief, ECF No. 66,
was not the first time BMBP raised this argument. BMBP first raised the issue of the need to
analyze cumulative impacts of the Project in conjunction with the Eastside Screens amendments
in its September 2020 Objection comments. AR 7851. Additionally, BMBP's Amended
Complaint, ECF No. 12, clearly alleged that the Service's "cumulative impacts analysis … fails
to consider all reasonably foreseeable actions that could combine with the impacts of the Project
to produce a greater cumulative impact," *id.* at 22, and BMBP pursued this issue without

VII.    **An EIS is Required Because the FONSI is Invalid and the Walton Lake Project's Impacts Raise Substantial Questions about Whether there will be Significant Localized Effects on the Walton Lake Recreation Area (Claim 1, Count 5).**

BMBP has shown it should prevail on its challenge to the Service's FONSI in two different ways. First, the FONSI completely fails to consider or make a determination regarding the significance of the Project's impacts in the local context of the Walton Lake Recreation Area itself. In every instance where the Service expressly addresses NEPA "significance," both the FONSI and the underlying EA improperly dilute the significance of the impacts to the local, site-specific Project area by comparing them to much larger areas such as watersheds, the sum of all developed recreation areas within the ONF, or the entire ONF. This violates binding Ninth Circuit case law and the express language of 40 C.F.R. § 1508.27(a) (2019). Such a failure to properly address the significance of local impacts is a "major analytical lapse." *Anderson v. Evans,* 371 F.3d 475, 492 (9th Cir. 2004). Second, the impacts disclosed by the EA and elsewhere in the record demonstrate that the Service has also failed to meet its burden of providing a convincing statement of reasons explaining why project impacts are insignificant. *See Nat'l Parks Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001). Instead, BMBP has pointed to record evidence that raises substantial questions about whether the Project may have a significant effect, which satisfies its burden of proof on this issue. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir. 1998). When a Project (1) approves logging on 178 acres of a 218-acre recreation area, (2) removes 35 of the area's 78 acres of Late Old Successional forest (45%) that is a critical part of what makes the area "unique" in the ONF, (3) effectively eliminates 25% of the recreation area's Visual Influence

procedural objection in its preliminary injunction briefing. *See* ECF No. 41 at 41–42 (BMBP PI motion); ECF No. 49 at 35. (USFS PI Response); ECF No. 54 at 34–36 (BMBP PI Reply).

Area, and (4) includes four different Plan amendments reducing environmental protections for

the area – including an amendment reducing part of the Visual Influence Area's visual quality

standard from "High" to "Low" – then there is really little question that those impacts may be

significant on that recreation area. This explains why the FONSI goes out of its way to avoid

making a significance determination about the Project's impacts to the Walton Lake Recreation

Area itself.

<p style="margin-left:2em;"><strong>a.   The Forest Service Illegally Never Made a Determination Regarding the Local Significance of the Walton Lake Project's Impacts.</strong></p>

The Service makes its defense of its FONSI in two different sections of its Response Brief.

*See* ECF No. 67 at 17–23, 25–32. The first section, pages 17–23, focuses almost exclusively on

the EA's analysis and discussion of impacts. The second section, 25–32, cites to both the EA and

the actual FONSI in the DN. Both defenses fail for the same fundamental reason: neither

document contains a determination that the Project will not have significant impacts in the

context of "the locality," the Walton Lake Recreation Area, as 40 C.F.R. § 1508.27(a) (2019)

expressly requires. The Service disputes BMBP's assertion in its opening brief that the "most

appropriate and relevant context for evaluating the significance of th[e] project is the locality –

the Walton Lake project area" – and not the ONF as a whole. ECF No. 67 at 30, quoting ECF

No. 66 at 37. But that is what Section 1508.27(a) (2019) says: "in the case of a site-specific

action, significance would usually depend upon the effects in the locale[.]" Rather than make an

actual significance determination regarding the impacts of the Project to the Walton Lake area

itself, in every instance where NEPA significance is addressed in both the EA and the

DN/FONSI, the Service improperly dilutes the significance of the impacts to the local Walton

Lake area by comparing them to a much larger area, such as the entire ONF. *See*, e.g., AR 7677

(loss of woodpecker habitat "insignificant at the scale of the Forest"), AR 7781 (loss of 35 acres

of late and old structure stands ["LOS"] "minor on the landscape"), AR 8731 (project properly

documented in an EA/FONSI "because the project is narrowly focused on very small piece of the

Forest").

The Service insists BMBP improperly ignores the EA's discussion of the Project's localized

impacts. ECF No. 67 at 30–31. But the Service's argument confuses the EA's discussion and

disclosure of impacts with the ultimate significance determination that the Service needed to

make in its DN/FONSI. The CEQ regulations explain that an EA's function is to provide

evidence and analysis for determining whether an EIS is necessary, 40 C.F.R. § 1508.9(a)(1)

(2019), while a FONSI is a separate document providing the reasons for why an action's impacts

are not significant and no EIS is necessary. 40 C.F.R. § 1508.13 (2019). The EA itself explains

that the Service's determination regarding NEPA significance will occur in the DN. AR 7602–3.

Nevertheless, the Service's response uses multiple pages to imply, and occasionally even

explicitly assert, that the EA determined that there would be no localized significant impacts on

the Walton Lake area. *See* ECF No. 67 at 17–23. Those suggestions are fiction. None of the EA

pages cited by the Service actually offer a determination regarding localized NEPA significance.

Instead the Service, through its lawyers, offers tardy characterizations regarding localized

impacts that are not found in the EA itself. For example, the Service argues the elimination of 35

of the Project area's 78 acres of LOS (45% of that LOS) is somehow a "modest reduction." It

then improperly defends that characterization by comparing it to the watershed and the entire

ONF. ECF No. 67 at 20. That is exactly the kind of improper dilution of localized impacts that

NEPA does not allow. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries

Serv.*, 265 F.3d 1028, 1035–37 (9th Cir. 2001) (cannot minimize impact of activity by adopting a

scale of analysis so broad it trivializes the site-level impact); *Cascadia Wildlands v. Bureau of Land Mgmt.,* 410 F. Supp. 3d 1146, 1157–58 (D. Or. 2019) (cannot marginalize effects to project area by comparing them to much larger surrounding watershed); *Anderson,* 371 F.3d at 492.[11]

In its discussion of scenic impacts the Service pieces together some disclosures from the EA to argue those impacts will be minimized, ECF No. 67 at 21–22, but leaves out the most important fact: the DN amends the ONF Plan to lower the visual quality standard for the area where it will remove all firs from "Retention/High" to "Modification/Low," and this lowered standard will remain in place for up to 15 years after the Project is completed. AR 7634; AR 7641; AR 7578. Objectively, a 15-year reduction in the visual quality standard from "high" to "low" is difficult to characterize as insignificant, yet the FONSI ignores that impact rather than trying to claim it is an insignificant localized impact.[12]

When the Service's response finally addresses what the FONSI actually says, the Service focuses on the FONSI's initial conclusion that "[t]he information in the EA is more than adequate for [the Forest Supervisor] to determine that the effects are not significant." *See* ECF No. 67 at 26, quoting AR 8731. Ninth Circuit case law, however, requires a "convincing statement of reasons," not just a conclusion, *see Babbitt*, 241 F.3d at 730, and the "reasons" the Service offers for its "no significant effects" conclusion make it quite clear that it is not a determination based on the significance of the localized impacts to Walton Lake. Instead, the FONSI is entirely based on improperly diluting those localized impacts by noting the project is

---

[11] In its motions for a preliminary injunction and for summary judgment BMBP cited to this binding Ninth Circuit case law prohibiting such a dilution of localized impacts. *See* ECF No. 41 at 38; ECF No. 66 at 36, 38. The Service has ignored this case law in both of its responses.

[12] Elsewhere in the DN, the Forest Service does argue that the "short term visual impacts are an acceptable tradeoff and are necessary for [long term forest health and public safety]." AR 8726. But saying a trade-off between adverse and beneficial impacts is acceptable is far different from saying the adverse impact is not "significant."

focused on only "a very small piece of the forest[,]" and comparing some localized impacts to the entire Management Area and the "Forest scale." AR 8731. The Service's response repeats this key error, arguing that the Project area is "just 218 acres" while the ONF itself is 845,498 acres and has 1,810 acres of developed recreation areas. ECF No. 67 at 31.[13]

The FONSI never asserts, argues, or concludes that the Project's impacts are insignificant at the localized scale of the Walton Lake Recreation Area itself. In fact, the FONSI never summarizes and considers together all of those localized impacts on the Walton Lake area, and the Service cites to no analysis of combined localized impacts in the EA that could support a conclusion of no significant localized impacts on the Walton Lake Recreation Area. Thus, while the Service argues its FONSI is entitled to deference, ECF No. 67 at 18, in terms of the significance of the Project's localized impacts to the Walton Lake Recreation Area, the Court cannot defer to a void. *See ONDA v. BLM,* 625 F.3d 1092, 1121 (9th Cir. 2010).

### b. The Intensity of the Project's Impacts, in the Context of a 218-Acre Recreation Area, Indicates that the Project's Impacts May be Significant.

The Service appears to agree that the list of intensity factors in 40 C.F.R. § 1508.27(b) (2019) is a non-exhaustive list and also includes the intensity of impacts on resources such as LOS forest, large trees, and visual quality. *See* ECF No. 67 at 26. However, the Service insists in a footnote, ECF No. 67 at 26 n.9, that "the size of a project boundary [cannot] make[] an environmental impact more or less severe." However, 40 C.F.R. § 1508.27(a) (2019) specifically instructs that "[s]ignificance varies with the setting of the proposed action." Thus while a project's impacts – for example, 35 acres of lost LOS – may be dismissed as "minor on the

---

[13] In its Response, the Service further attempts to minimize the Project's impacts by pointing out that "just 143 acres" of the 218-acre area will be subject to commercial and non-commercial thinning. ECF No. 67 at 31. What the Service does not point out is that this number *excludes* the additional 35 acres of the *much* more intensive "sanitization" logging (clear-cutting of all firs) that will take place in the Visual Influence Area. AR 8716.

landscape[,]" AR 7781, or "negligible" at the "Forest scale," AR 8731, those same impacts could

be significant for a small 218-acre recreation area when 45% of the recreation area's LOS is

eliminated. The Service's brief improperly dismisses the intensity of those impacts by pointing to

the amount of surviving LOS "across the watershed analysis area." ECF No. 67 at 25.

In fact, all of the management actions the Service has authorized as part of this Project within

a 218-acre recreation area indicate intense, severe, and significant impacts on that small but very

popular recreation area. The DN authorizes logging, both commercial and non-commercial, on

178 of the recreation area's 200 forested acres, resulting in the removal of hundreds of large trees

and thousands of trees overall. AR 8716–17, AR 7608.[14] Thirty-five acres of that logging will

remove all firs in what is now the area's moist, mixed conifer LOS forest, which is 45% of the

recreation area's LOS forest. AR 7583, AR 7613. That destroyed LOS forest also currently

constitutes 25% of the area's Visual Influence Area, *id.,* AR 7575, AR 7579–80, and this logging

requires a ONF Plan amendment to reduce that area's required scenic integrity level from

"high/retention" to "low/modification." AR 7599, AR 7634. AR 7582. Indeed, the "sanitation

logging" in Units 2–4 required three other Plan amendments that remove other restrictions – no

logging of large trees, no logging LOS, and no logging "patches" greater than five acres – also

intended to protect the area's current scenic beauty and the qualities that make it such a popular

recreation area. Overall, approving four separate Plan amendments that allow a reduction in the

scenic integrity rating from "high" to "low" for 25% of the recreation area's Visual Influence

Area, and for 10–15 years, where maintaining such scenic integrity is that area's primary

purpose, can only be accurately described as an intense, severe, and significant impact on the

Walton Lake Recreation Area. As noted above, *see* note 12, characterizing such adverse impacts

---

[14] Eighteen acres of the Walton Lake Recreation Area's 218 acres consist of the lake itself. AR 7701.

as acceptable "trade-offs" because of other supposedly beneficial impacts, *see* ECF 67 at 26

(citing AR 8726), does not change the severity or significance of those adverse impacts.[15]

The Service's brief also misconstrues BMBP's arguments regarding Section 1508.27(b)'s

listed intensity factors. For example, in terms of "unique characteristics," 40 C.F.R. §

1508.27(b)(3) (2019), the Service appears to admit that "uniqueness" includes more than the

expressly listed characteristics, ECF No. 67 at 26–27, but then completely ignores BMBP's

citation to the EA where the Service itself described the Walton Lake Recreation Area as

"unique" because "it is the only Developed Recreation Management Area that has a lake with the

combination of moist mixed conifer and dry mixed conifer forest surrounding it." AR 7729; *see*

*also* AR 8771. Although the DN acknowledges that the lake itself is a unique feature, it argues

the Project will not affect the lake itself. AR 8732. But according to the Service it is the

combination of the lake and its surrounding, differing forest types that makes Walton Lake

"unique," and the Project is designed to destroy the moist mixed conifer forest (the target of the

"sanitation" logging) that is a key part of that uniqueness. The Service's own EA thus establishes

that the Project could have a significant impact on "unique characteristics of the project area."

In terms of the other listed intensity factors, the Service dismisses those cited by BMBP by

attacking them in isolation. *See* ECF No. 67 at 27–29. This ignores BMBP's argument, supported

by the decision in *Anderson*, 371 F. 3d at 493, that while an individual intensity factor might not

by itself support a finding of significance, the combination of several intensity factors can do so,

and that is certainly the case here. *See* ECF No. 66 at 43–45. Most importantly, as established

above in Section VI, the Service's cumulative impacts analysis, also an intensity factor, 40

---

[15] Labeling visual quality impacts that could last more than 10 years as "short-term[,]" ECF No.
67 at 26, also does not avoid a significance finding since 40 C.F.R. § 1508.27(a) (2019) instructs
that both short-term and long-term impacts are relevant when determining NEPA "significance."

C.F.R. § 1508.27(b)(7) (2019), is incomplete. In terms of scientific controversy and establishing

a precedent, 40 C.F.R. §§ 1508.27(b)(4) and (6) (2019), the Project is the first time the Service

has used commercial logging to treat LRR. AR 8389; ECF No. 41 at 41 n.19. The Project

therefore sets a precedent for such future use, and both the Service and BMBP's cited expert, Dr.

Chad Hanson, construe the same scientific literature addressing the use of commercial logging to

treat LRR much differently. The Service currently only addresses these important, potentially

significant issues in a few paragraphs in its response to comments document. *See* AR 7775–76.

In terms of compliance with federal law, in this case the ONF Plan and the National Forest

Management Act ("NFMA"), 40 C.F.R. § 1508.27(b)(10) (2019), BMBP has also identified

issues that should be addressed in an EIS. Even if the Service were complying with the ONF

Plan's soil compaction standard, the issue is a close call and the analysis in the EA is not a model

of clarity. The Service's approval of four different "site-specific" amendments also requires

much more public process and analysis in an EIS. NEPA's purposes of fully informing the public

regarding a project's impacts and ensuring the integrity of its scientific analysis, s*ee* 40 C.F.R. §

1500.1(b) (2019), would be directly served by addressing all these intensity factors in a more

detailed EIS.

**VIII.    Under NFMA, the Site-Specific Amendments Result in a "Significant Change" to the Forest Plan, Requiring Additional Procedures (Claim 2, Count 2).**

Based on the briefing to date, the parties appear to agree that a finding of NEPA

"significance" (Claim 1, Count 5) generally requires a finding of NFMA "significance" (Claim

2, Count 2), pursuant to 36 C.F.R. § 219.13(b)(3). ECF No. 66 at 47–48; ECF No. 67 at 33.

Normally, a finding of NFMA "significance" would trigger the need for additional procedures

(which the Service admits it did not do for the Walton Lake Project). The Parties' dispute on this

NFMA issue, therefore, centers on whether a regulatory exception applies that excuses the

Service from undertaking those additional procedures. As explained below, the regulatory

exception does not apply, so the Service was required to undertake additional NFMA procedures.

The regulatory exception to the requirement to perform additional procedures under NFMA

is for "an amendment that applies only to one project or activity." 36 C.F.R. § 219.13(b)(3). The

Service argues that each of its four Plan amendments is *individually* subject to that exception,

such that the Service was not required to perform any additional NFMA procedures, including

increased public outreach and a longer comment period. ECF No. 67 at 32–33. As explained

below, the exception does not apply here, and the Service was required to conduct additional

public outreach and provide a longer public comment period (either 90 or 45 days).

### a.   The Exception Does Not Apply to Multiple Proposed Plan Amendments.

The regulatory exception to the requirement to conduct additional procedures under NFMA

applies only when *a single* Forest Plan amendment is proposed, not when *multiple* amendments

are proposed. This is apparent from the plain text of the regulation: "Except for *an* amendment

that applies only to one project or activity, *a* proposed amendment that may create a significant

environmental effect … requires a 90-day comment period." 36 C.F.R. § 219.13(b)(3) (emphasis

added). By its plain language, that regulation only applies where a single plan amendment "may

create a significant environmental effect." *Id.* Here, the Service has proposed and adopted not

one, but four plan amendments. And, as explained in BMBP's motion in relation to NEPA

significance, ECF No. 66 at 39–40, "the fact that the Service approved *four* site-specific plan

amendments … that completely reverse key environmental protection mandates [] underscores

the significance of project impacts[.]" (Emphasis added). In other words, even if the four Plan

amendments are not *individually* significant (under NEPA and, by extension, NFMA), they are

certainly *cumulatively* significant when their additive impacts are considered. The regulatory

exception therefore does not apply. It would be a bizarre result indeed to find four Plan amendments to be cumulatively significant, only to exempt the project as a whole from the more rigorous public involvement requirements because each *individual* Plan amendment is, viewed in isolation, exempt under 36 C.F.R. § 219.13(b)(3). The plain language of the regulation does not support such a result, and neither does reason. The Court should therefore find that the regulatory exemption applies only where a *single* Forest Plan amendment is proposed, not where, as here, multiple proposed amendments are collectively "significant."

      **b.  The Exception Does Not Apply Because An Amendment Outlives the Project.**

Even if multiple plan amendments can collectively be exempt under 36 C.F.R. § 219.13(b)(3), the Service may invoke that provision exclusively where an amendment "applies only to one project or activity." *Id.* Unfortunately for the Service, at least one of the four ONF Plan amendments outlives the Project itself, so the exception cannot apply. According to the EA, the Walton Lake Project will take no more than five years to complete. *See*, *e.g.,* AR 7589 (commercial harvest to begin immediately after DN signed; non-commercial thinning completed within three years after signing of DN; burning to occur within two years of thinning). However, at least one of the Plan amendments will remain in effect well *after* the Project is completed. That amendment is the modification of the ONF Plan's current "retention/high" visual quality standard to "modification/low," which the EA indicates will remain in place for "10–15 years *following* implementation" of the Project. AR 7578 (emphasis added); *see also* DN, AR 8723 ("amendment would change the visual quality objective in the units treated for laminated root rot to the Modification standard for approximately ten years."). Because at least one of the amendments, by its own definition, will last for "10–15 years following implementation" of the Project, it does not apply "only to one project or activity" under 36 C.F.R. § 219.13(b)(3)'s

exception. That is, if the Plan amendment modifying the visual quality objective survives for 10–15 years beyond the life of the Project, then the Service could implement *other* projects or activities under that amended standard. The regulatory exception was not designed for, and does not cover, such long-lived Plan amendments.

The Service has not identified any limited lifespans for two of the other three ONF Plan amendments. This ambiguity leaves open the possibility the Service could rely on those two Plan amendments for future projects, even after the Walton Lake Project is completed. Amendment #1 (amending the Eastside Screens to allow for the net loss of 28 acres of LOS) does not contain a time limit or sunset clause. Rather, it states  "[t]he amendment would waive this standard and allow for 28 acres of net loss of LOS." AR 7598 (EA); *see also* AR 8722 (DN)(same). Similarly, Amendment #2 (allowing logging of trees greater than 21" DBH) contains no sunset clause. It states  "[t]he amendment would waive this standard on a total of 68 acres in the project area." AR 7598 (EA); *see also* AR 8722 (DN)(same). This leaves open the possibility the Service could cut large trees in the Project area well *after* the Walton Lake Project is completed, as the Service does not propose to log *all* old and large trees in some of the applicable treatment units (Units 1 and 5) as part of this Project. AR 8734 (DN); AR 8671 (Objection Reviewing Officer's objection resolution letter). Only Amendment #4 (waiver of patch size standard) states that it applies only to "the Walton Lake project." AR 7599 (EA); AR 8723 (DN)(same). The failure of the Service to provide sunset clauses for Amendments #1 and #2 is further reason to reject the Service's attempt to invoke the regulatory exception under 36 C.F.R. § 219.13(b)(3).

### c.  Even if the Service Were Not Required to Provide a 90-day Public Comment Period, it Was Required to Provide a 45-day Comment Period.

Assuming for the sake of argument that the Service was *not* required to provide a 90-day public comment period for the draft EA, the Service was still required to provide a *45-day* public

comment period. Of course, the 30-day comment period offered by the Service did not satisfy

that requirement. 36 C.F.R. § 219.16(a)(2) states: "For an amendment that applies only to one

project or activity for which a draft EIS is prepared, the comment period is at least 45 days[.]"

So, even if the four proposed Plan amendments did not trigger the *90-day* public comment period

under 36 C.F.R. § 219.13(b)(3) (and 36 C.F.R. § 219.16(a)(2) itself, which also discusses the 90-

day requirement), the Service still needed to provide at least a *45-day* comment period.[16]

The Service's explanation of why it only provided a 30-day public comment period under

NFMA does not stand up to scrutiny. In its response brief the Service argues that its planning

regulations provide that "[w]hen a plan amendment is *approved in a decision document*

approving a project or activity and the amendment applies only to the project or activity, the

notification requirements of 36 CFR part 218, subpart A apply. 36 C.F.R. § 219.16(b). Those

provisions allow for a 30-day comment period. *See e.g.* 36 C.F.R. § 218.22(a), and

218.25(a)(1)." ECF No. 67 at 32 (emphasis added)(internal quotation marks omitted). There are

two problems with that argument. First, as emphasized in the quotation above, the provisions of

36 C.F.R. part 218, subpart A only apply "[w]hen a plan amendment is approved in a decision

document." 36 C.F.R. § 219.16(b). At the time public comments were taken on the draft EA,

however, there was no written approval or a decision document, so 36 C.F.R. § 219.16(b) could

not apply. Indeed, the provisions of 36 C.F.R. part 218, subpart A apply to the formal objection

process, not the initial public comment process. *See, e.g.,* 36 C.F.R. § 218.1(a) ("This subpart A

provides the general provisions of the objection process[.]"). The second problem with the

Service's argument is that the two Subpart A provisions it cites as authorizing a 30-day comment

period, 36 C.F.R. § 218.22(a) and 218.25(a)(1), are not from Subpart A at all; they are in Subpart

---

[16] Of course, the 45-day public comment period requirement applies only if the Project's impacts
are "significant" under NEPA (and, by extension, NFMA) and therefore requires an EIS.

B. 36 C.F.R. part 218, subpart B (§§ 218.20 – 218.26). For these two reasons, 36 C.F.R. §

219.16(b) did not authorize the Service to use a 30-day public comment period for the draft EA.

In summary, even if the Service were not required to offer a 90-day public comment period

for the draft EA, it was required to offer a 45-day public comment period. Its failure to do so

even though the Walton Lake Project is "significant" under NFMA violates that statute.

<div align="center">

**CONCLUSION**

</div>

For the above reasons, and the reasons set forth in its summary judgment motion, ECF No.

66, BMBP respectfully requests that the Court grant summary judgment in its favor on Claim 1

(Violations of NEPA and the APA), Counts 1–7, and Claim 2 (Violations of NFMA and the

APA), Counts 2 and 4, from its Amended Complaint, ECF No. 12, deny the Forest Service's

motion for summary judgment, ECF No. 67, and vacate the Forest Service's DN/FONSI and EA.

Respectfully submitted this 13th day of April 2022.

 s/Tom Buchele
Tom Buchele, OSB # 081560
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd.
Portland OR 97219-7799
Tel: 503-768-6736
Fax: 503-768-6642
Email: tbuchele@lclark.edu

s/Jesse A. Buss
Jesse A. Buss, OSB # 122919
Willamette Law Group
411 Fifth Street
Oregon City OR 97045-2224
Tel: 503-656-4884
Fax: 503-608-4100
Email: jesse@WLGpnw.com

*Attorneys for Plaintiff Blue Mountains Biodiversity Project*