IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**BLUE MOUNTAINS BIODIVERSITY PROJECT,**

No. 2:20-cv-02158-MO

           Plaintiff,

   v.

OPINION AND ORDER

**SHANE JEFFRIES, et al.,**

           Defendants.

**MOSMAN, J.,**

This matter comes before me on Plaintiff's Motion for Summary Judgment [ECF 66] and Defendants' Cross Motion for Summary Judgment [ECF 67]. Oral Argument was held on July 25, 2022, at which I GRANTED IN PART and DENIED IN PART both parties' Motions, for the reasons stated on the record. Minutes of Proceedings [ECF 80]. I also TOOK UNDER ADVISEMENT various claims and asked Plaintiff for a supplemental statement of authorities. *See* Statement of Supplemental Authority [ECF 81]. For the reasons below, I GRANT Defendants' motion and DENY Plaintiff's motion on all claims taken under advisement.

## BACKGROUND

Plaintiff Blue Mountains Biodiversity Project ("BMBP") seeks vacatur of a United States Forest Service ("Defendant" or the "Forest Service" or the "Service") decision, as well as declaratory and injunctive relief under the Administrative Procedure Act ("APA"). BMBP challenges the Decision Notice ("DN"), including the Finding of No Significant Impact ("FONSI"), and underlying Environmental Assessment ("EA") issued by Defendant approving the Walton Lake Restoration Project ("the project"), which is a logging proposal in the Ochoco

1 – OPINION AND ORDER

National Forest ("ONF"). Am. Compl. [ECF 12] ¶ 1. The Amended Complaint alleges seven

violations of the National Environmental Policy Act ("NEPA") and four violations of the National

Forest Management Act ("NFMA"). Am. Compl. [ECF 12] ¶¶ 60–90. After various proceedings,

Plaintiff moved for summary judgment; Defendants did likewise shortly thereafter. Pl.'s Mot. for

Summ. J. [ECF 66]; Defs.' Cross Mot. for Summ. J. [ECF 67]. For those claims which I took

under advisement after Oral Argument on July 25, 2022, I provide my decision and reasons below.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The initial burden for a motion for summary judgment is on the moving party to identify the

absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once that burden is satisfied, the burden shifts to the non-moving party to demonstrate, through

the production of evidence listed in Fed. R. Civ. P. 56(c)(1), that there remains a "genuine issue

for trial." *Celotex*, 477 U.S. at 324. The non-moving party may not rely upon the pleading

allegations, *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995) (citing Fed.

R. Civ. P 56(e)), or "unsupported conjecture or conclusory statements," *Hernandez v. Spacelabs

Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). All reasonable doubts and inferences to be drawn

from the facts are to be viewed in the light most favorable to the nonmoving party. *Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Because BMBP's claims allege the Service violated NEPA and NFMA, they are governed

by the APA. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). "When

reviewing an agency's final decision, the court's duty on summary judgment is to determine

whether the evidence in the administrative record permitted the agency to make that decision as a

matter of law." *Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, 855 F. Supp. 2d 1199, 1204 (D. Or. 2012). "This review is governed by the [APA's] arbitrary and capricious standard." *Id.* (citing 5 U.S.C. § 706(2)(A)).

"To determine whether an agency decision is arbitrary and capricious, the court should 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* at 1204 (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). "After considering the relevant factors, the agency must articulate a satisfactory explanation for its action, including a rational connection between the facts found and the agency's conclusions." *Id.* (citing *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1193 (9th Cir. 2008)).

"An arbitrary and capricious finding is necessary if the agency 'relied on factors Congress did not intent it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (citing *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010)). "Review under this standard is narrow, and the court may not substitute its judgment for the judgment of the agency." *Id.* "The court must be 'at its most deferential' when reviewing an agency's scientific determinations." *Id.* (citing *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

## DISCUSSION

### I. Claim 1, Count 2

BMBP argues that the Service violated NEPA by having an unreasonably narrow purpose and need statements in its EA. Pl.'s Mot. for Summ. J. [ECF 66] at 16. According to BMBP, the first and fourth statements unreasonably defined the purpose and need for the project too narrowly

such that they ignore the Walton Lake area's ONF Plan management objectives and exclude reasonable alternatives that should be considered. *Id.*

NEPA requires agencies to "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. An agency "may not define the objectives of its actions in terms so unreasonably narrow that only one alternative . . . would accomplish the goals of the agency's action." *Nat'l Parks Conservation Ass'n v. BLM*, 606 F.3d 1058, 1070 (9th Cir. 2010). An agency enjoys "considerable discretion" to define the purpose and need statement. *Id.* Further, the statement of purpose and need is evaluated under a "reasonableness" standard on appeal. *Id.*

### A. First Purpose and Need Statement

The ONF Plan (the "Plan") designates the Walton Lake recreation area as a "Developed Recreation Management Area" with two sub-areas—a "Developed Site" and a "Visual Influence Area." Mot. for Summ. J. [ECF 66] at 18. The Plan provides for different restrictions on the two sub-areas. *Id.* For the Developed Site, the plan says, "[h]arvest only for the purpose of maintaining safe and attractive recreational sites." AR 1629. For the Visual Influence Area, the plan says, "[e]mphasize maintenance of large, ponderosa pine and western larch." *Id.* It goes on to state, "[p]recommercial thinning and commercial thinning may be done to meet the visual quality objectives and maintain healthy stands." *Id.*

BMBP contends that the first purpose and need statement—"[t]here is a need to curb the laminated root rot infestation where it occurs within the Developed Recreation Management Area around Walton Lake, to develop a healthy stand of vegetation, and provide for public safety," AR 7573—impermissibly lumps together these two areas and "preordain[s]" the chosen alternative. Mot. for Summ. J. [ECF 66] at 18–19. By describing the issue as a "need" to curb laminated root

rot ("LRR") in all areas of the Recreation Management Area, the statement makes it seem as if the Service's outcome would be the only one that would "curb" LRR everywhere, according to BMBP. *Id.* Instead, each sub-area should have been considered on its own. *Id.*

The Service responds that the first purpose and need statement is consistent with the Plan's mandatory direction to prevent and suppress insect and disease outbreaks. Defs. Mot. for Summ. J. [ECF 67] at 31. The Plan contains forest health standards and guidelines that direct the Service to "[u]tilize all methods to prevent or suppress insect and disease outbreaks" and to "[e]mphasize detection and treatment of bark beetle and root disease occurrences, as these relate to providing a safe environment . . . ." AR 1569. The Service argues that this standard applies to the entire Developed Recreation Area (that contains the two sub-areas) as a whole. Defs. Reply in Supp. of Mot. for Summ. J. [ECF 72] at 19. The EA confirms that these standards from the Plan apply to the entire Developed Recreation Area. *Id.* (citing AR 7575).

I find the Service's argument persuasive on this point. The purpose and need statement in the EA says that the LRR needs to be curbed in the larger Developed Recreation Management Area. When one reads the Plan and what it says should be done for the two sub-areas within the broader Developed Recreation Management Area, the EA and the Plan are not inconsistent. Generally speaking, to curb something means to restrain, or keep in check; alternatively, to check or control. *See Curb*, Merriam-Webster's Collegiate Dictionary (11th ed. 2005). I do not think that "curbing" LRR in some way violates the plan's requirement to "harvest only for the purpose of maintaining safe and attractive recreational sites" or thinning "done to . . . maintain healthy stands." In sum, I find neither the language nor the Service's reading and use of the purpose and need statement to be too narrow; nor are they arbitrary or capricious.

**B. Fourth Purpose and Need Statement**

The fourth purpose and need statement states: "There is a need to amend the Ochoco Land and Resource Management Plan." AR 7574. BMBP argues that "[b]y using elements of the preferred alternative to define the 'need' of the action, the Service put the cart before the horse, violating NEPA's requirement that the purpose and need be used to identify the alternatives." Pl.'s Mot. for Summ. J. [ECF 66] at 20. By including a need to amend the plan, any alternative that does not include a plan amendment is eliminated. *Id.* at 19. The Service counters that its regulations require the Service to "base a plan amendment on a preliminary identification of the need to change the plan." Defs.' Reply ISO Mot. for Summ. J. [ECF 72] at 18 (citing 36 C.F.R. § 219.13) ("When a plan amendment is made together with, and only applies to, a project or activity decision, the analysis prepared for the project or activity may serve as the documentation for the preliminary identification of the need to change the plan.")

The Service has the winning argument here. As noted, the Forest Service's regulations state that the Service must preliminarily identify the need to change the plan—and that is precisely what it did here. The Service's actions were therefore not arbitrary and capricious.

In light of the discussion and reasons given above, I GRANT the Service's motion and DENY BMBP's motion as to both the first and the fourth purpose and need statements under Claim 1, Count 2.

## II. Claim 1, Count 3

In determining whether a purpose and need statement is reasonable, the Ninth Circuit "first determine[s] whether the statement of purpose and need was reasonable, and then whether the range of alternatives considered was reasonable in light of that purpose and need." *League of Wilderness Def. v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012). As noted above

regarding Claim 1, Count 2, I find the purpose and need statements reasonable, so I must next consider BMBP's contentions about the range of alternatives considered. Under NEPA and applicable case law, the Forest Service has to include a brief discussion of "appropriate" and "reasonable" alternatives, but there is no correct number of alternatives required or proscribed. 36 C.F.R. § 220.7(b)(2) (Forest Service regulations implementing NEPA); 40 C.F.R. § 1508.9; *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1232, 1246 (9th Cir. 2005). The Forest Service's obligations under an EA are less than under an Environmental Impact Study ("EIS"). *Native Ecosystems*, 428 F.3d at 1246.

BMBP argues that the Service violated NEPA by failing to meaningfully consider an adequate range of alternatives in its EA. To BMBP, this failure is shown by the fact that the Service framed the Plan amendments and LRR elimination as project "needs," thereby spurning other choices that did not involve a Plan amendment or which would not entirely curb LRR in all areas. Pl.'s Mot. for Summ. J. [ECF 66] at 21. Additionally, BMBP argues that the Forest Service should have considered an alternative that limited the logging to within 150 feet of the road. *Id.* at 23.

However, the Service did consider four alternatives, including the proposed action, and discussed them in detail. Defs.' Mot. for Summ. J. [ECF 67] at 33. It also considered six others but did not discuss them in detail. *Id.* No alternative was rejected based on whether or not the alternative required plan amendments. *Id.* One alternative, alternative three, did in fact limit logging to within 150' of the road; the Forest Service considered, but did not ultimately adopt, this alternative. *Id.*

In short, the Service did what it was required to do in its analysis of the alternatives. Its briefing thoroughly explains why, among the options, the Service made the choice it did. *See, e.g.,*

Defs.' Mot. for Summ. J. [ECF 67] at 34. That the Service chose the alternative BMBP disliked is not actionable. I find the Walton Lake EA adequate and the Service's consideration of alternatives reasonable. I therefore GRANT the Service's motion and DENY BMBP's motion on Claim 1, Count 3.

## III. Claim 1, Count 4

BMBP next alleges that the Forest Service's ongoing contract with T2 violates NEPA as an irretrievable commitment. The parties dispute both the applicable standard and its application to the facts of this case.

### A. Applicable Standard

The Parties dispute what the applicable standard is for considering this claim. BMBP argues that an agency's action violates NEPA when it takes any pre-NEPA action that commits resources in a way that "prejudice[s] [the] selection of alternatives before making a final decision," 40 C.F.R. § 1502.2(f), or may "limit the choice of reasonable alternatives." *Id.* § 1506.1(a)(2). On the other hand, the Service contends that the question to ask is whether there was an "irreversible and irretrievable commitment of resources." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000). After discussion at Oral Argument, Counsel for Plaintiff submitted a Supplemental Statement of Authority regarding this issue. Pl.'s Statement of Suppl. Authority [ECF 81].

*Metcalf*'s "irreversible and irretrievable commitment of resources" standard originates from NEPA. *See* 42 U.S.C. § 4332. This statute requires all government agencies to include in "every report or recommendation on proposals for . . . major Federal actions significantly affecting the quality of the human environment" various assessments of the environmental impact of that action, including a statement of "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.* § 4332(C)(v).

Implicit in this requirement is the idea that resources for a project should not be irreversibly and irretrievably committed prior to taking the proposed action—or even assessing the proposed action. *Conner v. Burford*, 848 F.2d 1441, 1446 n.13 (9th Cir. 1988).

NEPA also created the Council on Environmental Quality ("CEQ"), which later was tasked with creating regulations to implement NEPA. *Id.* §§ 4342–4347; *Andrus v. Sierra Club*, 442 U.S. 347, 357 (1979). These regulations are found at 40 C.F.R. §§ 1500.1–1508.2. The regulations' standards for the commitment of resources prior to an EA or an EIS are lower than what the statutory text requires, as the regulations preclude any "prejudicing selection of alternatives before making a final decision" (EISs) and "limit[ing] the choice of reasonable alternatives" (EAs and EISs). *Id.* §§ 1502.2(f), 1506.1(a)(2).

Given this area of contradiction between the statute and the regulations—it is much easier for a commitment to prejudice or limit alternatives than for it to be considered irreversible and irretrievable—the Ninth Circuit appears to have focused on the statutory language. Usually, it is the regulations that provide specificity, but here, the statutory text is a bit clearer and more workable than the broader, more uncertain regulations. As such, the Ninth Circuit has applied the "irreversible and irretrievable" standard to both pre-EIS and pre-EA resource commitments. "This court has interpreted [the NEPA] regulations as requiring agencies to prepare NEPA documents, such as an EA or an EIS, 'before any irreversible and irretrievable commitment of resources.'" *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000). Similarly, *WildWest Inst. v. Bull*, 547 F.3d 1162 (9th Cir. 2008), notes that this standard comes not directly from the regulations, but from the court's "[c]onstruing" of them. *Id.* at 1168. In any event, the "irreversible and irretrievable" standard is precedent in the Ninth Circuit, and I will apply it.

*Metcalf* goes on to talk about the "point of commitment" to a particular proposal and states that if a contract amounts to a "surrender of the Government's right to prevent activity in the area" then there was an irretrievable and irreversible commitment of resources. *Metcalf*, 214 F.3d at 1144. Alternatively, if the agency was free to follow a schedule or alter it as conditions warranted, there was no problematic commitment. *Id*.

## B. Application

Here, the Forest Service entered into a contract with a company called T2 in 2016 for a logging contract it had tried and failed to implement at that time. Pl.'s Mot. for Summ. J. [ECF 66] at 11. BMBP argues that this act by the Service committed both natural resources (the old growth trees it has contracted with T2 for T2 to log) as well as financial resources (appropriated dollars) before the NEPA process was complete. *Id*. at 12–16. In support of its argument, BMBP cites an email from a Forest Service Contracting officer. The officer wrote, "[i]f the treatment prescription changes drastically or wood product value continues to decline[,] that contract awarded years ago will be terminated without performance[,] and we will lose those appropriated dollars and likely not have the funds to compete and complete a new project." *Id*. at 14– 15 (citing AR 7897).

The Service responds by saying that the contract did not in any way bind or commit the Forest Service. Defs.' Mot. for Summ. J. [ECF 67] at 27, 29. As such, the Service argues the contract did not prejudice or limit the Forest Service's alternatives during the NEPA process; any other contentions are "conjecture." *Id*. at 29. To support its argument that no resources were irreversibly or irretrievably committed, the Service points to the fact that the Service could sign a new contract and terminate the existing contract, and the amount paid to T2 was a relatively modest sum. *Id*. at 28–29. Furthermore, according to the Service, unappropriated funds are not a natural

resource and therefore not subject to the "irreversible and irretrievable" standard. *Id.* at 29 n.13. At bottom, BMBP's claim rests on single, speculative email about annual appropriations, and it is uncertain if the email was ever seen by the Forest Supervisor or informed any decision-making whatsoever. Defs.' Reply in Supp. [ECF 72] at 16; Defs.' Resp. to Sur-Reply [ECF 79] at 2.

One email describing one contract does not transform that contract into an irreversible and irretrievable commitment. The Government did not surrender its rights; as the Service points out, it was free to sign a new contract or terminate the existing one as conditions warranted. The government maintained control over activity in the area at issue. I therefore GRANT the Service's motion and DENY BMBP's motion as to Claim 1, Count 4.

## IV. Claim 1, Count 5 & Claim 2, Count 2

Under NEPA, agencies are required to prepare an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The burden is on the agency to demonstrate why an action is not significant and no EIS is required. *Metcalf*, 214 F.3d at 1142. Plaintiff's next argument is that the Service did not carry this burden of showing the project to be insignificant; according to Plaintiff, the FONSI in the DN inadequately describes why the project should be considered insignificant. Mot. for Summ. J. [ECF 66] at 26. Therefore, Plaintiff contends, the project is significant under NEPA, and an EIS is required. *Id.*

The significance of an action is determined by looking at its (i) context and (ii) intensity. *Natl' Parks & Conserv. Ass'n v. Babbit*, 241 F.3d 722, 730 (9th Cir. 2001). I address these two factors in turn.

### A. Context

Determining the relevant context boils down to two dispositive issues. First, I must consider the proper roles of the EA and the FONSI. Second, I must ensure the Service looked at the project's environmental impacts at the level required by regulation.

BMBP's argument as to the first issue is that the text of the FONSI does not consider the project's impacts within the local context of the Walton Lake Recreation Area. Pl.'s Mot. for Summ. J. [ECF 66] at 26. The Service's response is that the EA, which the FONSI explicitly relies upon, considers the impact in several contexts—including the locality, as required by the regulation—and provides a convincing statement of reasons. Defs.' Reply in Supp. [ECF 72] at 7. The Service points out that since the FONSI explicitly relies on the EA, looking *only* at the FONSI and not the EA would be myopic. *Id.* at 3; *see* AR 8731 (noting in the FONSI that "the information in the EA is more than adequate for me to determine that the effects are not significant").

The Ninth Circuit has made clear that courts may look to the EA to assess if an agency's statement of reasons for why a proposal is not significant are adequate. For example, in a recent case, the panel explained that the "EA fail[ed] to articulate a science-based criteria for significance in support of its finding of no significant impact . . . ." *350 Mont. v. Haaland*, 29 F.4th 1158, 1163 (9th Cir. 2022). This proposition shows that it is permissible for courts to refer to an EA to assess whether there are adequate statements of reasons made by the agency. As such, Defendants are correct in their assertions; Plaintiff's first challenge regarding context fails.

As to the second issue, BMBP contends that the Service did not look at the project's environmental impacts at the level required by regulation. By only looking at the project in a larger context, the Service purportedly dilutes the impact to the local Walton Lake area. Pl.'s

Reply [ECF 71] at 24, 26.  The Service responds that the only way to make the argument that the impact has been diluted is if one ignores the EA.  Defs.' Reply [ECF 72] at 5.  The Service then goes on to point out places in the record in which it considers a variety of contexts, including the local impact.

The relevant NEPA regulation at issue tells the agency to analyze actions "in several contexts such as society as a whole . . . the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a) (2019).  The Supreme Court has stated that the "particular identification of the geographic area within which [environmental impacts] may occur . . . is a task assigned to the special competency of the appropriate agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 413–14 (1976).  Upon review of the EA, it is apparent that the Service looked at the impact of the project on a variety of levels, including the locality level.  Defs.' Reply in Supp. [ECF 72] at 4. Therefore, Plaintiff's second argument as to context also fails.

### B. Intensity

When examining intensity, the severity of the environmental impact should be analyzed. There are ten factors that can be considered, but not all are relevant in every case.  *See Bark v. Forest Serv.*, 958 F.3d 865, 869–70 (9th Cir. 2020).  Here, the relevant factors are: (i) "the unique characteristics of the geographic area"; (ii) the "degree to which effects on the quality of the human environment are likely to be highly controversial"; and (iii) the "degree to which the action may establish a precedent for future actions with significant effects . . . ."  40 C.F.R. § 1508.27(b)(3), (4), (6) (2019).

For the first factor, BMBP argues that the area is unique because it is the only recreation area with a lake and certain types of mixed conifer stands.  Pl.'s Reply [ECF 72] at 29. Unfortunately for BMBP, these are not the types of unique features NEPA seeks to protect (such

as historical or cultural resources, parklands, prime farmlands, wild and scenic rivers, or ecologically critical areas). 40 C.F.R. § 1508.27(b)(3). For example, the Ninth Circuit found Glacier Bay in Alaska to be an area with unique features. *National Parks & Conservation Ass'n v. Babbit*, 241 F.3d 722, 731 (9th Cir. 2001). While they are beautiful in their own ways, the Ochoco National Forest and the Walton Lake Recreation Area do not contain the unique features of Glacier Bay.

The second factor, "controversial," refers to "disputes over the size or effect of the action itself, not whether or how passionately people oppose it." *Wild Wilderness v. Allen*, 871 F.3d 719, 728 (9th Cir. 2017). Here, BMBP vehemently opposes the proposed action. There is also a dispute over the size and effect of the action itself—BMBP argues that the action can be smaller (a different plan amendment could have been chosen) and that the impact on the Walton Lake Recreation Area is large for such a small area. Pl.'s Reply [ECF 71] at 28.

The final factor is whether the current project will establish a precedent for future agency actions. The Service argues that this project will not set a precedent because the plan amendments serve specific functions tied to specific characteristics of the present project, they have never been used before in the Ochoco National Forest, and there are no other Forest areas where similar amendments are planned or anticipated. Defs.' Reply [ECF 75] at 9. And in fact, while BMBP does claim that this project is unprecedented, it does not contend that the project will be used to establish new precedent after it. Pl.'s Mot. for Summ. J. [ECF 66] at 35.

In sum, for the three relevant sub-factors used to assess intensity, only one cuts in favor of Plaintiff; the other two strongly support Defendants' position. Referring back to the discussion of context, Plaintiff's arguments fail as to both of the issues analyzed. With only one sub-factor of the analysis supporting Plaintiff's contentions, I cannot find the project to be significant: the

Service appropriately addressed the different contexts in the EA and adopted those findings in the FONSI, and the intensity factors also do not require a significance finding under NEPA.   As such, no EIS was required.

Furthermore, the standard for a "significant change" under NFMA and "significance" under NEPA are the same.   77 Fed. Reg. 68, 21238 (Apr. 9, 2012) ("This addition to the final rule makes the NEPA and NFMA findings of 'significance' one finding.   If under NEPA a proposed amendment may have a significant effect on the environment and an EIS must be prepared, the amendment would automatically be considered a significant change to a plan.").   In Claim 2, Count 2, BMBP argues that under NFMA, the forest plan amendments are "significant change" and therefore, should have been subject to additional procedures.   Pls.' Mot. for Summ. J. [ECF 66] at 36.   Because the amendments are not significant under NEPA, they cannot be a significant change under NFMA.   As such, given the discussion above, I GRANT the Services' motion and DENY BMBP's motion as to both Claim 1, Count 5 and Claim 2, Count 2.

**V. Claim 1, Count 7 & Claim 2, Count 4**

BMBP's final arguments are that the soil analysis is improper under NEPA (Claim 1, Count 7) and also is inconsistent with the Forest Plan—therefore violating NFMA (Claim 2, Count 4). Pl.'s Mot. for Summ. J. [ECF 66] at 24 (referring to arguments made in Pl.'s Mot. for Prelim. Inj. [ECF 41] at 21).

**A. NEPA Arguments**

NEPA's "hard look" requirement necessitates that an agency's discussion must be complete and meaningful regarding the actual impact of the proposed project.   *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1172 (9th Cir. 2006); 40 C.F.R. §§ 1500.2, 1502.1 & 1502.8

(2019). It also must be written in plain language so that decisionmakers and the public can readily understand. *Id.*

BMBP seizes on both of these requirements, arguing that the Service failed to take a "hard look" when it did not provide meaningful statements regarding the impact of the proposed project on the soil. *Id.* at 23. In the alternative, BMBP contends that even if the Forest Service did take a "hard look" at the soil impact, it violated NEPA by failing to present the information in a way the public can readily understand and thereby impeded the public's participation. *Id.* at 24. In particular, BMBP takes issue with a chart that the Forest Service used to represent the total level of soil compaction and displacement. The chart must be read with the text around it for an individual to fully understand it, which BMBP claims impacts the participation of the public and decisionmakers.

The Service responds that the language in dispute—a table of figures—does not violate NEPA because the twelve-page Soil Specialist Report constitutes a "hard look" at the impact of the proposed project on the soil. Def.'s Resp. in Opp'n. [ECF 49] at 20. Next, Defendants state that the table, combined with language on the page directly after it, provides a narrative that details for the public the additional compaction and displacement that may occur. *Id.* at 21.

**B. NFMA Arguments**

BMBP's NFMA argument is that Forest Service violates the ONF plan because the plan allows for a maximum 20% soil disturbance and the Forest Service anticipates exceeding the threshold. Pl.'s Mot. for Prelim. Inj. [ECF 41] at 24–25. BMBP contends that Defendants parsed the language of the plan inappropriately to find that the 20% threshold can be exceeded. Pl.'s Reply [ECF 54] at 21. Defendants respond they did not violate the Forest Plan because the text of the plan does not require a hard 20% cap on soil compaction and displacement. *Id.* at 22. Instead,

the plan gives the Forest Service one year to get to the 20% maximum after any land management activity. *Id.*

After reviewing these disputed matters, I find that the Forest Service did not violate either NEPA or NFMA. The Service clearly took a hard look at the soil impacts: the impact of the four project alternatives was considered, and the separate Soil Specialist Report discusses each alternative in depth. As to Plaintiff's second NEPA argument, the language is readily understandable. Having to look at a table and the text immediately following it to determine the full meaning of the data in the table is not so difficult as to prevent the public or a decisionmaker's comprehension. It would require an unduly dim view of my fellow citizens' intelligence to find otherwise. Therefore, I do not think that the Forest Service violated NEPA in this manner.

As for NFMA, the plain language of the Forest Plan contemplates that at times, the soil disturbance will exceed 20%—but that through project implementation and restoration, soil compaction and displacement will return below the 20% threshold. I therefore do not agree with BMBP that the language provides for a rigid 20% threshold. As such, I find that the Forest Service did not violate NFMA.

In sum, I GRANT the Services' motion and DENY BMBP's motion as to both Claim 1, Count 7, and Claim 2, Count 4.

## CONCLUSION

For the reasons stated above, I GRANT Defendants' Cross Motion for Summary Judgment [ECF 67] and DENY Plaintiff's Motion for Summary Judgment [ECF 66] on Claim 1, Count 2; Claim 1, Count 3; Claim 1, Count 4; Claim 1, Count 5; Claim 2, Count 2; Claim 1, Count 7; and Claim 2, Count 4.

IT IS SO ORDERED.

DATED this 26 day of September, 2022.

MICHAEL W. MOSMAN
Senior United States District Judge

18 – OPINION AND ORDER